J. Martin Wagner (DC Bar #435730)
Sarah H. Burt (admitted *pro hac vice*)
Abby L. Rubinson (admitted *pro hac vice*)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Tel.: (415) 217-2000
Fax: (415) 217-2040
mwagner@earthjustice.org
sburt@earthjustice.org
arubinson@earthjustice.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHESAPEAKE CLIMATE ACTION NETWORK, FRIENDS OF THE EARTH, SIERRA CLUB, WEST VIRGINIA HIGHLANDS CONSERVANCY, CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW, and PACIFIC ENVIRONMENT, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 13-1820 RC |
| v. | ) ) | |
| EXPORT-IMPORT BANK OF THE UNITED STATES and FRED P. HOCHBERG, in his official capacity as Chairman of the Export-Import Bank of the United States, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MOTION FOR SUMMARY JUDGMENT**

1.     Plaintiffs Chesapeake Climate Action Network, Friends of the Earth, Sierra Club,

West Virginia Highlands Conservancy, Center for International Environmental Law, and Pacific

Environment ("Plaintiffs") hereby move for summary judgment in the above-captioned case

pursuant to Fed. R. Civ. P. 56 and Local Rule 7(h).  The Plaintiffs request that the Court hold a

hearing on this Motion and ask that the hearing be scheduled for the Court's earliest convenience.

2.      Plaintiffs are entitled as a matter of law to summary judgment because Defendants the Export-Import Bank of the United States and Fred Hochberg, Chairman of the Export-Import Bank of the United States, (collectively "Defendants") violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), its implementing regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA"), when it approved a $90 million loan guarantee to Xcoal Energy Resources and Xcoal Energy & Resources, LLC ("Xcoal") without preparing an environmental impact statement ("EIS") or an environmental assessment ("EA").

3.      Accordingly, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment and issue an order (i) declaring that Ex-Im Bank's approval of the $90 million loan guarantee to Xcoal without preparing an EA or an EIS violated NEPA; and (ii) vacating the loan guarantee and remanding with instructions to Ex-Im Bank to provide the environmental analysis that NEPA requires.

4.      In support of this Motion, Plaintiffs submit the accompanying Memorandum of Points and Authorities and all exhibits thereto, and a Proposed Order.  Plaintiffs are also filing a Motion for Admission of Extra-Record Evidence, which requests that the Court consider extra-record evidence necessary for the Court's effective review of the claims presented in this Motion for Summary Judgment.

Respectfully submitted,

Dated March 21, 2014

*s/ Abby L. Rubinson*

J. MARTIN WANGER (DC Bar #435730)
SARAH H. BURT (admitted *pro hac vice*)
ABBY L. RUBINSON (admitted *pro hac vice*)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel.: (415) 217-2000
Fax: (415) 217-2040
mwagner@earthjustice.org
sburt@earthjustice.org
arubinson@earthjustice.org

*Counsel for Plaintiffs*

J. Martin Wagner (DC Bar #435730)
Sarah H. Burt (admitted *pro hac vice*)
Abby L. Rubinson (admitted *pro hac vice*)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Tel.: (415) 217-2000
Fax: (415) 217-2040
mwagner@earthjustice.org
sburt@earthjustice.org
arubinson@earthjustice.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHESAPEAKE CLIMATE ACTION NETWORK, FRIENDS OF THE EARTH, SIERRA CLUB, WEST VIRGINIA HIGHLANDS CONSERVANCY, CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW, and PACIFIC ENVIRONMENT, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 13-1820 RC |
| v. | ) ) | |
| EXPORT-IMPORT BANK OF THE UNITED STATES and FRED P. HOCHBERG, in his official capacity as Chairman of the Export-Import Bank of the United States, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    **INTRODUCTION**................................................................................................1

II.   **STATEMENT OF FACTS**................................................................................2

    A.   Ex-Im Bank's Financing of Xcoal's Coal Exports .................................. 2

    B.   Environmental Impacts of Xcoal's Coal Exports ..................................... 5

    C.   Ex-Im Bank's Financing Enables Xcoal to Increase the Amount of Coal it Exports... 9

III.  **ARGUMENT**...................................................................................................11

    A.   This Court Has Jurisdiction to Review Plaintiffs' Claims........................ 11

        1.   Subject Matter Jurisdiction ............................................... 11

        2.   Plaintiffs Have Standing ................................................... 12

    B.   Standard of Review................................................................... 24

    C.   Ex-Im Bank's Failure to Conduct Environmental Review Before Financing Xcoal's Coal Exports Violates NEPA.................................... 25

        1.   Ex-Im Bank's approval of a loan guarantee to finance coal exports is a major federal action subject to NEPA.................................... 26

           a.   Ex-Im Bank's financing is sufficient to bring Xcoal's coal export activities within the scope of a major federal action under NEPA. ........................... 27

           b.   Ex-Im Bank's financing allows it to influence and control Xcoal's coal export activities............................................ 28

               i.   Ex-Im Bank's approval was required for all specific transactions under the Loan Facility ................................................ 28

               ii.   Ex-Im Bank imposed conditions on its loan guarantee to Xcoal..... 30

        2.   Ex-Im Bank's approval of a loan guarantee to finance coal exports "significantly affects the quality of the human environment" within the meaning of § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C)........................... 33

        3.   Ex-Im Bank's loan guarantee to Xcoal does not properly fall within any categorical exclusion........................................................... 37

IV.  **CONCLUSION** ...............................................................................................39

# TABLE OF AUTHORITIES

### FEDERAL CASES

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
659 F.3d 13 (D.C. Cir. 2011) .......................................................................................13, 22, 23

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
462 U.S. 87 (1983).......................................................................................................................24

*Brady Campaign to Prevent Gun Violence v. Salazar*,
612 F. Supp. 2d 1 (D.D.C. 2009) ...........................................................................................38

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*,
267 F.3d 1144 (D.C. Cir. 2001) ...............................................................................................31

*Citizens Alert Regarding the Environment v. EPA*,
259 F. Supp. 2d. 9 (D.D.C. 2003) .....................................................................................27, 28

*City of Dania Beach, Fla. v. FAA*,
485 F.3d 1181 (D.C. Cir. 2007) ...............................................................................................26

*Comcast Corp. v. FCC*,
579 F.3d 1 (D.C. Cir. 2009) ......................................................................................................12

*Comm. to Save the Rio Hondo v. Lucero*,
102 F.3d 445 (10th Cir. 1996) .................................................................................................17

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
528 U.S. 167 (2000).....................................................................................................................12

*\*Friends of the Earth v. Mosbacher*,
488 F. Supp. 2d 889 (N.D. Cal. 2007) ...............................................................28, 30, 32, 33

*Fund for Animals v. Espy*,
814 F. Supp. 142 (D.D.C. 1993) ...............................................................................................12

*Fund for Animals v. Norton*,
281 F. Supp. 2d 209 (D.D.C. 2003) ........................................................................................37

*Grand Canyon Trust v. FAA*,
290 F.3d 339 (D.C. Cir. 2002) ...........................................................................................35, 36

*Grunewald v. Jarvis*,
930 F. Supp. 2d 73 (D.D.C. 2013) ...................................................................................11, 24

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)...........................................................................................................13, 22, 23

*Humane Soc'y of U.S. v. Johanns*,
    520 F. Supp. 2d 8 (D.D.C. 2007) ...................................................................38, 39

*Humane Soc'y of U.S. v. Johanns*,
    CIV A 06-265 CKK, 2007 WL 1120404 (D.D.C. Apr. 13, 2007) ...........................38

*Idaho Pub. Util. v. ICC*,
    35 F. 3d 585 (D.C. Cir. 1994) ..............................................................................13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................12

*Nat'l Org'n for the Reform of Marijuana Laws v. US Drug Enforcement Admin.*,
    545 F. Supp. 981 (D.D.C. 1982) ..........................................................................28

*Natural Res. Def. Council, Inc. v. Jamison*,
    815 F. Supp. 454 (D.D.C. 1992) ..........................................................................34

*Sierra Club v. USDA*,
    777 F. Supp. 2d 44 (D.D.C. 2011) ................................................................ passim

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) .........................................................................25, 34

**FEDERAL STATUTES**

5 U.S.C. §§ 701 *et seq.* ................................................................................... passim

12 U.S.C. § 635a-4 ........................................................................................... passim

12 U.S.C. § 635i-5(a) ...............................................................................................32

42 U.S.C. §§ 4321 *et seq.* ................................................................................. passim

**FEDERAL REGULATIONS**

7 C.F.R. Part 1794 ...................................................................................................27

12 C.F.R. § 408.1 ..................................................................................25, 32, 37, 39

23 C.F.R. § 771.117 .................................................................................................38

40 C.F.R. § 1508.18 .......................................................................................... passim

43 C.F.R. § 46.215 ...................................................................................................38

I.       **INTRODUCTION**

Coal production and use is one of the world's largest sources of toxic pollution.  The

United States produced just over a billion tons of coal in 2012, but as domestic coal use declines,

producers are increasingly looking to export US coal—and the pollution associated with burning

this coal—overseas.  Even though the coal will ultimately be burned elsewhere, the mining and

transportation of coal for export nonetheless have significant adverse effects on human health

and the environment in the United States.  For example, coal mining, transport by rail in open

cars, unloading from rail cars at port, storage in piles, and reloading onto ships, all emit large

quantities of coal dust.  Coal dust contains toxic heavy metals such as arsenic and lead, and

contributes to lung disease, asthma, and cardiopulmonary diseases.  Trains and ships used to

transport coal also emit diesel exhaust and other harmful air pollutants, which worsen respiratory

and pulmonary conditions and can cause premature death.  Coal mining—including the mining

itself and supporting infrastructure such as preparation plants, slurry impoundments, and

transportation infrastructure—causes discharges of pollutants to surface waters, including acid

mine drainage, selenium, and ionic pollution, which can kill fish and other aquatic life, and harm

human health.  Degradation of air quality related to coal mining has been linked to health

problems for people living in coal-mining areas of Appalachia.

Defendants, the Export-Import Bank of the United States and Fred Hochberg, Chairman

of the Export-Import Bank of the United States, (collectively "Ex-Im Bank") approved a $90

million loan guarantee to finance one billion dollars' worth of coal exports, yet did not conduct

any assessment of the significant environmental and human health harms related to the mining,

rail transport, and shipment of that coal.  The $90 million loan guarantee facilitates a commercial

loan for Xcoal Energy Resources and Xcoal Energy & Resources, LLC ("Xcoal").  Ex-Im

Bank's financing enables Xcoal to broker $1 billion in sales—approximately five million tons—

of coal for export from mines in Appalachia to clients in China, Japan, South Korea and

elsewhere.  Xcoal's export activities include loading of the coal onto open train cars at the mine;

transport of the coal by rail to port facilities in Baltimore, MD, and Hampton Roads (Norfolk),[1]

VA; unloading, storage and handling of that coal in port; and then transport of that coal by ship

to clients in China, Japan, South Korea and elsewhere.

Plaintiffs Chesapeake Climate Action Network, Friends of the Earth, Sierra Club, West

Virginia Highlands Conservancy, Center for International Environmental Law, and Pacific

Environment (collectively, "Plaintiffs") are entitled as a matter of law to summary judgment

because Ex-Im Bank, violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*

("NEPA"), its implementing regulations, and the Administrative Procedure Act, 5 U.S.C. §§ 701

*et seq.* ("APA"), when it approved the $90 million loan guarantee without conducting any

environmental review.  Plaintiffs seek declaratory and injunctive relief, including a declaration

that Ex-Im Bank's approval of the $90 million loan guarantee to Xcoal without preparing an

environmental impact statement ("EIS") or an environmental assessment ("EA") violated NEPA

and its implementing regulations, and an order vacating the loan guarantee and remanding with

instructions to Ex-Im Bank to provide the environmental analysis that NEPA requires.

## II.    STATEMENT OF FACTS

### A.    Ex-Im Bank's Financing of Xcoal's Coal Exports

On May 24, 2012, Ex-Im Bank approved a $90 million working capital guarantee to

Xcoal to finance coal exports.  AR000001.  This loan guarantee facilitates a $100 million

"Transaction Specific Revolving Working Capital Guarantee Loan" (the "Loan Facility")

between Xcoal and PNC Bank, N.A.  AR000030A.  PNC Bank is a commercial bank acting

---

[1] The Hampton Roads area includes Norfolk, Virginia.  Plaintiffs use both "Norfolk" and
"Hampton Roads" to refer to the area near the port facility at Lambert's Point from which Xcoal
ships coal.

under Ex-Im Bank's delegated authority.[2]  AR000036A.  Ex-Im Bank's loan guarantee supports

an estimated $1 billion in coal export sales.  AR000029A.  The term of the Loan Facility is 36

months.[3]  AR000273.

Through its working capital guarantees, Ex-Im Bank provides financial support to US

exporters to facilitate exports of goods or services from the United States.  *See* Sanzillo Decl. ¶ 8.

According to Ex-Im Bank, its working capital financing decreases lenders' risk and provides "the

liquidity and confidence to accept new international contracts, grow … export sales, and

compete more effectively in the international marketplace."  *Id.* ¶ 13.  The Ex-Im loan guarantee

provides a source of credit from a lender (in this case PNC Bank, acting under Ex-Im Bank's

delegated authority) to a borrower (in this case Xcoal).  AR000030A, 36A.  The purpose of this

credit is to "finance the manufacture, production or purchase and subsequent export sale of

[i]tems."  AR000070.  Under the Ex-Im Bank-guaranteed Loan Facility, the item for export is

coal.  AR000029A.

There are three types of working capital loan facilities: transaction specific (supporting

one transaction after repayment of which the funding cannot be reborrowed); revolving

(financing, not linked to specific transactions, that may be made and repaid on a continuous

basis); and transaction specific revolving (financing supporting one or more specific transactions

that may be made and repaid on an ongoing basis).  *See* AR000066, 69-70.  The loan guarantee

to Xcoal is for a transaction specific revolving loan facility, and thus is not used for general

funds, but rather to finance identified and approved transactions.  The loan documents

---

[2] Pursuant to the "Master Guarantee Agreement," PNC must "originate and manage each Loan
Facility, manage, perform and enforce the terms of the Loan Documents and exercise and
enforce all privileges and rights exercisable or enforceable by [PNC] thereunder, for the joint
benefit of [PNC] and Ex-Im Bank."  AR000076 (Section 4.04(a) of the Master Agreement).
[3] The Loan Facility replaces an existing $25.0 million Ex-Im Bank Guaranteed Loan Facility
approved in December 2008 and renewed in December 2011.  AR000273.

establishing a loan guarantee specify the purpose of the transaction specific revolving loan

facility and impose conditions on that financing.  AR000070.  With respect to the Ex-Im Bank

Loan Facility, Xcoal will use the proceeds "mainly for working capital advances to finance

Export-Related Inventory, and Export-Related Accounts Receivable," AR000033A, "to support

the sale of metallurgical and thermal coal to international steel producers and electric utilities

primarily located in South Korea, Japan and China."  AR000032A.  Because the Loan Facility is

transaction specific, "all transactions … require approval by Ex-Im Bank staff prior to being

included under the proposed Loan Facility."  AR000033A.  Ex-Im Bank imposed additional

conditions on Xcoal's activities under the loan authorization agreement.  *See* AR000070.

Xcoal's "core business is marketing low, mid, and high volatile hard coking coals[4] from

Appalachian mining operations located in Pennsylvania and West Virginia."  AR000034A.

Xcoal "sources 100% of [its] products" from the United States, AR000035A, and exports

through multiple terminals in Baltimore, Maryland and Hampton Roads, Virginia.  AR000034A.

Xcoal takes possession of the coal at the mine and then ships by rail to the port, then by ship to

the export destination.  AR000035A.

　　　Based on second quarter 2012 prices, *see* AR000271, Ex-Im Bank's financing supported

the export of between 4.76 and 6.45 million tons of coal.[5]  Based on the estimated 12 million

tons of coal Xcoal shipped in 2012, AR000268, Ex-Im Bank's financing backed 13.2 to 17.9

---

[4] Xcoal also supplies semi-soft coking coal, low and high volatile PCI coal, and anthracite coal or blends of these coals.  AR000034A.  Coking, PCI, and anthracite coals are metallurgical coals used in steelmaking.

[5] Second quarter 2012 prices for hard-coking, PCI, and semi-soft metallurgical coal were $210/ton, $165/ton, and $155/ton, respectively.  AR000271.  At these prices, $1 billion would purchase between 4.76 million tons (at $210/ton) and 6.45 million tons (at price $155/ton) of coal.  These prices listed in the administrative record are the final sales prices.  The price of coal when purchased at the mine is generally lower than the final sale price.  Because Xcoal purchases the coal at the mine, AR000035, the amount of coal that Xcoal is able to purchase under the Loan Facility is likely higher than the amount (4.76 to 6.45 million tons) calculated using the final sale price.

percent of the coal that Xcoal exported.[6]  In terms of sales, Xcoal's coal shipments were valued at over $2.3 billion in 2012.  AR000133.  Ex-Im Bank's support for a billion dollars' worth of Xcoal's exports amounts to roughly 14 percent of Xcoal's 2012 sales.  *See id.*; AR000029A.

Despite the large volumes of coal exports that Ex-Im Bank's financing facilitates, Ex-Im Bank did not prepare an EIS or an EA before approving the loan guarantee to Xcoal.

### B.   Environmental Impacts of Xcoal's Coal Exports

Coal export activities generate large amounts of coal dust.  Trains that carry coal in the United States are generally not covered.  Declaration of Ranajit Sahu, Mar. 21, 2014 ("Sahu Decl."), ¶ 6.  Coal dust blows off the tops of these cars, especially during changes in temperature, humidity, and wind speed.  *Id.* ¶ 7.  Coal dust may also escape through holes in the bottom of the cars.  *Id.*  Rail cars emit between 0.5% to 3.0% of coal transported as fugitive coal dust.  *Id.* ¶ 6. According to a 1993 Norfolk Southern Rail Emission study, each open car carrying metallurgical coal from mines in Appalachia to the port terminals in Hampton Roads and Baltimore releases roughly 300 pounds coal dust into the air, water, and soil in the communities through which it travels.  *Id.*  According to a 2010 Burlington Northern Santa Fe (BNSF) study, each rail car carrying Powder River Basin [thermal] coal loses between 250 and 700 pounds of coal and coal dust on each trip," or over 30 tons of coal for a typical 120-car coal train.  *Id.*  BNSF estimates that around 3,600 lbs. per car can be lost in the form of dust.  *Id.*

Ports are also a significant source of coal dust.  *Id.* ¶ 9.  When a train arrives at the Hampton Roads or Baltimore terminals, it may dump its coal into an open air storage pile or holding silo.  *Id.*  Alternatively, a train arriving at a port terminal may wait for days in a train

---

[6] In light of the three-year term of the Loan Facility, Ex-Im Bank's financial support for Xcoal's exports sales amounts to roughly from 1.59 to 2.15 million tons of coal per year.  Based on the estimated 12 million tons of coal Xcoal shipped in 2012, AR000268, 1.59 to 2.15 million tons of coal per year represents 13.2 to 17.9 percent of the coal that Xcoal exported.

yard at the port before its coal is unloaded.  *Id.*  These waiting train cars and open-air coal piles

are significant sources of coal dust particulate matter at export terminals because typical wind

speeds and wind gusts prevalent in near-coastal areas cause coal particles from the storage piles

and from the uncovered tops of waiting coal cars to be released into the air.  *Id.*  Unloading the

coal from rail cars into storage piles at the port facility and storing the coal in these piles emits

coal dust into the air, soil, and water nearby.  *Id.* ¶ 8.  In addition, coal dust is carried off the

storage piles as runoff when the piles are exposed to rain.  *Id.* ¶ 22.  This runoff can impact both

surface water and underlying groundwater.  *Id.*  When a ship is ready for loading, conveyor belts

transport the coal from the train car, silo, or coal pile, and dump the coal onto the ship, releasing

additional coal dust into the air and water.  *Id.* ¶ 9.

The Virginia Department of Environmental Quality (VDEQ) estimates that the coal

transported through the Norfolk Southern Lambert's Point coal terminal emits 0.02 tons of coal

dust per ton of coal.  *See* Sahu Decl. ¶ 13.  Based on that figure, the five million tons of coal Ex-

Im Bank is financing will emit approximately 100,000 pounds, or 50 tons, of coal dust.  *Id.*

VDEQ also estimates that only 80 percent of the coal dust generated at the port can be controlled

and contained within port boundaries, indicating that even using the best mitigation measures, 20

percent escapes into the air as fugitive coal dust.  *Id.*  At this rate, Ex-Im Bank's financing would

result in the release of at least 20,000 pounds, or 10 tons, of fugitive coal dust into areas

surrounding the ports.  *Id.*

Coal dust, once emitted, can have multiple impacts on humans and the environment.  *Id.*

¶ 15.  Fugitive coal dust that is 10 micrometers or less in diameter is classified as PM10, and

fugitive coal dust that is 2.5 micrometers or less in diameter is classified as PM2.5.  *Id.* ¶ 14.

PM10 can travel up to 30 miles, and PM2.5 can travel 500 miles.  *Id.*  VDEQ estimates that

roughly 18 percent of coal dust generated at the Lambert's Point coal facility is PM10 (particulate matter with diameters less than or equal to 10 micrometers). *Id.*

Both PM10 and PM2.5 are extremely harmful to human health. The particles can travel deep into the lungs and into the bloodstream, causing premature death in people with heart or lung disease, heart attacks, decreased lung function, and increased respiratory effects, including irritation of the airways, aggravated asthma, coughing, and breathing difficulties. *Id.* ¶ 17. Groups that are most at risk due to PM10 and PM2.5 exposure include children, older adults, low-income communities, and individuals with asthma or preexisting heart and lung disease. *Id.*

Although the precise impacts depend on the composition of the particles, it is well established that particulate air pollution has a detrimental effect on the environment. *Id.* ¶ 16. PM10 and PM2.5 emissions contribute to haze and reduce visibility. When PM10 or PM2.5 lands on water, it can alter the acidity of lakes and streams and can change the nutrient balance in coastal waters and large river basins, harming fish and other aquatic species. *Id.* When PM10 or PM2.5 lands on the ground, it can deplete nutrients in soil, damage sensitive forests and farm crops, and affect the diversity of ecosystems. *Id.*

In addition to the harms caused by particulate pollution, coal dust from Appalachian mines contains toxic substances with well-documented adverse effects on human health and the environment. Coal can contain metals, such as arsenic, selenium, mercury, cadmium, and lead, which are likely to impact areas affected by coal dust. *Id.* ¶ 19. In fact, coal from northern Appalachia contains the highest levels of elemental mercury of all US coals. *Id.* ¶ 20. Coal stockpiles exposed to rain can contribute heavy metals to local waterways, *id.*, and due to contamination from the toxic compounds found in coal, coal terminals have high concentrations of metals such as arsenic in their vicinity. *See* Declaration of Karen Johannesson, Mar. 21, 2014 ("Johannesson Decl."), ¶ 22. A 2007 study showed that soil one kilometer downwind from

Lambert's Point coal export terminal was 20 percent coal particles by weight.  *See Id.* ¶ 16.  The study concluded that the particulate coal originated from the adjacent coal shipping terminal at Lambert's Point.  *Id.*  The study further concluded that increased coal dust and arsenic in soils in Norfolk are caused at least in part from coal shipping through the Lambert's Point docks, and that the further the distance from the docks, the less coal dust and arsenic the soil contains.  *Id.* ¶¶ 16, 22.

Inorganic arsenic found in coal dust deposited in soil near coal export terminals is a human carcinogen.  Sahu Decl. ¶ 21.  Human exposure to inorganic arsenic by inhalation has been strongly associated with lung cancer, and ingestion has been linked to skin, bladder, liver, and lung cancers.  *Id.*  Chronic inhalation has been associated with irritation of the skin and mucous membranes, as well as effects in the brain and nervous system.  *Id.*  Gastrointestinal effects, anemia, peripheral neuropathy, skin lesions, hyperpigmentation, and liver or kidney damage have resulted from chronic oral exposure to elevated levels of inorganic arsenic.  *Id.*

In addition to coal dust, the trains and ships used to transport coal emit diesel exhaust. Diesel exhaust contains significant sources of harmful air pollutants including particulate matter (PM/PM2.5), volatile organic compounds (VOCs), toxic compounds known as air toxics, carbon monoxide (CO), nitrogen oxides (NOx) and, in the case of ships, sulfur oxides (SOx), and contributes to elevated ozone levels.  *Id.* ¶ 24.  This pollution causes poor air quality, reduced visibility, water and soil contamination, and ecosystem damage.  *Id.*  Health effects associated with exposure to this pollution include premature mortality, increased hospital admissions, heart and lung diseases, asthma, reduced lung function, and increased cancer risk.  *Id.*

Coal mining in Appalachia generates a number of environmental hazards, including extensive contamination of water and air.  *See* Declaration of Evan Hansen, Mar. 21, 2014 ("Hansen Decl.") ¶¶ 8, 16, 42.  Underground and surface coal mining—including the mining

itself and supporting infrastructure such as preparation plants, slurry impoundments, and transportation infrastructure—causes discharges of pollutants to surface water. *Id.* ¶ 8. Common types of water pollution caused by coal mines and associated infrastructure in West Virginia and Pennsylvania include acid mine drainage, selenium, and ionic pollution. *Id.* ¶ 16. Huge coal slurry ponds are scattered across the landscape, and spills from these ponds occur from time to time, releasing pollution directly into surface waters. *See id.* ¶¶ 39, 41. Slurry impoundments can be enormous—for instance, the Brushy Fork Coal Impoundment in West Virginia has a capacity of 8 billion gallons, or more than 12,000 Olympic swimming pools. *Id.* ¶ 39. Surface water pollution, including mine discharges, can cause fish mutations, kill fish and other aquatic life, and can result in the death of a streaming meaning that no life can survive. *Id.* ¶ 8. Slurry discharges also compromise groundwater quality. *Id.* ¶ 43. Coal mining can cause springs to dry up, reducing groundwater levels. *Id.* ¶ 33. Air quality impacts of coal mining have been linked with heart, lung, respiratory and kidney disease problems in people who live in coal-mining areas of Appalachia.

C. **Ex-Im Bank's Financing Enables Xcoal to Increase the Amount of Coal it Exports**

According to the Board of Directors of the Ex-Im Bank, Ex-Im Bank's $90 million loan guarantee facilitates an increase in Xcoal's coal export activities. *See* AR000032A, 37A, 273; *see also* Export-Import Bank of the United States Act, 12 U.S.C. § 635a-4. The Export-Import Bank Act authorizes Ex-Im Bank to approve loan guarantees based on its Board of Directors' determination that the private credit market is unavailable to finance the transaction and that the "guarantees would facilitate expansion of exports which would not otherwise occur." 12 U.S.C. § 635a-4. This requirement, known as "additionality," is a "statutory-based test used to determine whether an Ex-Im Bank Guarantee is necessary to facilitate the financing of an export

sale,"—*i.e.*, to ensure compliance with "Congress['s] instruct[ion] that Ex-Im Bank … provide

guarantee support to otherwise creditworthy Borrowers when support from the private sector is

not available and when the exports to be supported would not otherwise go forward."

Declaration of Tom Sanzillo, Mar. 21, 2014 ("Sanzillo Decl.") ¶ 15 (citing Export-Import Bank

of the United States, *Working Capital Guarantee Program Manual*, (2005) ("Ex-Im Bank WCG

Manual"), p. 12).

> Given the importance of the Additionality test, Ex-Im Bank developed a set of
> questions aimed at assisting both Ex-Im Bank staff and Ex-Im Bank Delegated
> Authority Lenders in the decision process.  The answers to each of these questions
> should be accompanied by relevant information supporting a conclusion that the
> transaction meets the Additionality test.

*Id*. (citing Ex-Im Bank WCG Manual, at 12).  The administrative record in this case contains

emails confirming the answers to questions under the heading "Additionality."  *See* AR000363-

70.  These emails demonstrate that Ex-Im Bank did in fact apply the additionality test, and its

subsequent approval of the loan guarantee to Xcoal indicates that it concluded that its financing

would facilitate "additional" exports.  *See* AR000001.

Furthermore, in Ex-Im Bank's Board memorandum regarding this Working Capital

Guarantee, the statement of need indicates that Xcoal would have to limit or end its business

without Ex-Im Bank's loan guarantee.  *See* AR000032A; *see also* Sanzillo Decl. ¶ 7.  The Board

memorandum describes four fundamental issues related to Xcoal's access to capital:

> The Company, a small business, is experiencing significant international
> opportunities as its export sales are increasing.  In addition, given the uncertainty
> of the European sovereign debt crisis the Company is concerned that its European
> banks may not be in a position to fund the Company in the future, and is seeking
> to replace those financing arrangements with an increase in the Ex-Im Bank Loan
> Facility. The Lender traditionally does not (without Ex-Im Bank support) provide
> financing against accounts receivable due from foreign buyers.

AR000032A.  These issues "indicate that Xcoal's business model and risk profile require strong, external, third party banking support to succeed.  Ex-Im Bank is providing that support at a time of increased instability in the credit market and underlying global coal trade."  Sanzillo Decl. ¶ 8.

Without Ex-Im Bank's financing, Xcoal could not achieve its projected growth in coal export sales.  AR000032A.  Ex-Im Bank's guarantee enabled Xcoal to complete at least 17 transactions despite unfavorable market conditions.  *See* AR000135, 137-38, 144, 151, 160, 162, 177, 180-81, 184-85, 192, 201, 205 (emails approving inclusion of new contracts in the Loan Facility).  Fulfillment of these transactions requires the movement of more coal:  more mining to fulfill Xcoal's orders, more coal transported by train from those mines to ports in Baltimore and Norfolk where Xcoal operates, and more coal shipped from these ports.  Sanzillo Decl. ¶ 12.  According to Xcoal's website, the company exported 16 million tons of coal in 2013.  *Id.* ¶ 14.  Based on actual and estimated production levels provided to Ex-Im Bank during the application process, this represents a 33 percent increase in business activity from the 2012 estimate of 12 million tons.  *See* AR000368.  The year 2013 was the first full year of business activity following the approval of the Ex-Im Bank loan guarantee.  *See* AR000001.

## III.   ARGUMENT

### A.   This Court Has Jurisdiction to Review Plaintiffs' Claims

#### 1.   Subject Matter Jurisdiction

Plaintiffs' claims that the Ex-Im Bank violated a federal statute—the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*—present questions of federal law that this Court has jurisdiction to review under 28 U.S.C. § 1331.  The APA waives the government's sovereign immunity and provides a private cause of action for challenges to final agency actions that violate NEPA.  5 U.S.C. §§ 702, 706; *Grunewald v. Jarvis*, 930 F. Supp. 2d 73, 81 (D.D.C. 2013).  Ex-Im Bank's approval of the Xcoal loan guarantee constitutes final agency action

subject to judicial review under the APA.  5 U.S.C. §§ 702, 704.

### 2.    Plaintiffs Have Standing

To establish standing under Article III of the US Constitution, at least one plaintiff[7] must

show: (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will

be redressed by a favorable decision.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528

U.S. 167, 180-81 (2000).  When plaintiffs assert a procedural injury, such as an agency's failure

to prepare an EA or EIS, the standards for redressability and immediacy are relaxed.  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992) (When asserting procedural injury, the

plaintiff has standing if there is some possibility that the requested relief will prompt the injury-

causing party to reconsider the decision that allegedly harmed the litigant.); *Fund for Animals v.*

*Espy*, 814 F. Supp. 142, 148-9 (D.D.C. 1993) (failure to prepare an EA or an EIS under NEPA

gives rise to a procedural injury).

Plaintiffs Chesapeake Climate Action Network ("CCAN"), Friends of the Earth, Sierra

Club, and West Virginia Highlands Conservancy ("WVHC") bring their claims on their

members' behalf.  *See Laidlaw*, 528 U.S. at 181 (An organizational plaintiff has standing to sue

on its members' behalf "when its members would otherwise have standing to sue in their own

right, the interests at stake are germane to the organization's purpose, and neither the claim

asserted nor the relief requested requires the participation of individual members in the

lawsuit.").  Plaintiffs Center for International Environmental Law ("CIEL") and Pacific

---

[7] To establish that Plaintiffs have standing, this Court need only find that one of the Plaintiffs has
met the Article III standard.  *See Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009) ("[I]f
one party has standing in an action, a court need not reach the issue of the standing of other
parties when it makes no difference to the merits of the case.").

Environment bring their claims on their own behalf.  *See Havens Realty Corp. v. Coleman*, 455

U.S. 363, 379 (1982) (An organization suing on its own behalf can establish standing if it can

show that defendant's actions cause "concrete and demonstrable injury to the organization's

activities" that is "more than simply a setback to the organization's abstract social interests.");

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 25 (D.C. Cir.

2011) (an organization suing on its own behalf must show a "direct conflict between the

defendant's conduct and the organization's mission").

Standing under the APA requires showing that claim is within the statute's "zone of

interests."  *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof."); *State of Idaho by & thru Idaho Pub. Util. v. ICC*, 35 F. 3d

585, 590 (D.C. Cir. 1994) (involving pollution from salvage activities at abandoned railroad

track).  It is well established that "NEPA's concern is with protection of the environment."  *State*

*of Idaho*, 35 F.3d at 591 (quoting *Gifford-Hill & Co., Inc. v. FTC*, 523 F.2d 730, 732 (D.C. Cir.

1975)).  As described below, Plaintiffs have satisfied this prudential standing requirement

because they have suffered concrete and particularized injuries related to the air pollution and

other environmental harms caused by coal export activities.  *See infra* pp. 13-23.  These injuries

are fairly traceable to Ex-Im Bank's approval of the Xcoal loan guarantee, can be redressed by

the relief Plaintiffs request, and fall squarely within NEPA's zone of interests.  *See State of*

*Idaho,* 35 F.3d at 591 ("Of course, the environmental injury asserted by the State falls squarely

within the zone of interests protected by the National Environmental Policy Act.").

### *Chesapeake Climate Action Network*

CCAN brings this action on behalf of itself and its members.  CCAN has over 90,000

members in Maryland, Virginia, and Washington, DC.  CCAN members live and recreate

adjacent to and near the rail lines and port facilities in Maryland and Virginia that will see increased activity due to Ex-Im Bank's financing of Xcoal's coal exports.  These members suffer concrete and ongoing harms to their health, property, and recreational and aesthetic interests due to increased coal transport and export activities.  For example, 73-year-old Margaret Fox is harmed by pollution from coal dust and soot in the air from the Curtis Bay coal export terminal half a block from her home which threatens her health, especially due to her increased vulnerability given her age.  Declaration of Margaret Fox, Mar. 21, 2014 ("Fox Decl.") ¶¶ 2, 7. From her house, she can see coal dust blow off trains when they stand idle at the facility and blow into the air when coal is unloaded from the trains and dumped into chutes, onto conveyor belts, and onto ships.  *Id.* ¶ 6.  She regularly sees black dust on her car, furniture, deck, window sills, and siding of my house, and on door frames and air conditioner vents inside her home.  *Id.* She finds it nearly impossible to keep her property clean because the facility operates every day, for hours on end.  *Id.*  From inside her home, Ms. Fox is disturbed by loud noise from trains and heavy machinery moving and dumping coal, sometimes all night long.  *Id.* ¶ 5.  She fears that more coal dust on her property and in the air she breathes and additional noise due to increased coal export activity could make it less safe and "unbearable" for her to stay in her home.  *Id.* ¶¶ 7, 9.

Jason Reed teaches about four blocks from the Curtis Bay coal export terminal at the Filbert Street Community Garden, and spends about 15-20 hours a week outside in the area. Declaration of Jason Reed, Mar. 21, 2014 ("Reed Decl."), ¶¶ 2, 3, 5.  From the garden he can see an uncovered coal pile "about the size a football field," and on windy days can see dust blowing off the coal pile.  *Id.* ¶ 3.  He is concerned that his exposure to this pollution is impacting his respiratory health, *id.* ¶ 6, as well as the health of his students, many of whom have asthma or other health problems that make them vulnerable to air pollution.  *Id.* ¶ 8.  This harm to his

students' health impairs his professional interest in improving health outcomes for his students. *Id.* ¶ 9.  In his work to provide a community food source, Mr. Reed notes, "[i]t doesn't make sense for me to spend all day sweating over one acre of soil to provide healthy food for the community but ignore the harmful effects of industrial pollution on acres and acres of adjacent land."  *Id.*  Mr. Reed fears that additional pollution from coal dust will further impair the health of his students and the garden as a community food source and frustrate his professional goals. *Id.* ¶¶ 6, 9.

Lorraine Ortega is concerned that increased pollution from coal exports will exacerbate her and her daughter's respiratory problems.  Declaration of Lorraine Ortega, Mar. 21, 2014 ("Ortega Decl."), Decl. ¶¶ 6-7.  Ms. Ortega lives one half mile from the Norfolk Southern rail line that carries coal to Lambert's Point in Norfolk, and works at Norfolk General Hospital, less than two miles from that facility.  Ortega Decl. ¶ 2.  She suffers from chronic congestion and reduced lung capacity due to her exposure to high levels of air pollution.  *Id.* ¶ 6.  Her daughter has reactive airway disease, which is caused by irritants entering the airway, and acute asthma, which required her to visit the emergency room several times when she used to row crew on the Lafayette River near Lambert's Point.  She now attends college about a mile from that export facility.  *Id.* ¶ 7.  Ms. Ortega worries that an increase in coal exports will further jeopardize her daughter's health, as well as her own, due to the increase in coal dust and soot in the air and Norfolk's visibly polluted waterfront near the nation's busiest coal export terminal.  *Id.*  ¶¶ 7-8. She also worries more open coal trains passing by her home will add to the "black grime" she already sees on her property and in nearby ponds and lakes, *id.* ¶ 5, and prevent her from hiking, biking, and walking her dog in the local parks in her neighborhood due to the noise, pollution from coal dust and soot, and increased traffic congestion around the train tracks near to these parks.  *Id.* ¶ 10.

Desiree Bullard lives within 75 feet of rail lines where open coal cars travel to the CSX terminal in Baltimore.  Declaration of Desiree Bullard, Mar. 21, 2014 ("Bullard Decl."), Decl. ¶ 2.  She is harmed by the increased risks of asthma and other health complications due to exposure to increased levels of coal dust and soot from open train cars.  *Id.* ¶¶ 4-5.  Ms. Bullard enjoys biking, playing fetch with her dog, and taking walks in her neighborhood, but the noisy coal trains make these activities less pleasant and would cause her to avoid these activities near her home if longer trains came through her neighborhood.  *Id.* ¶ 6.  She is also concerned that transporting more coal will make her time at home less enjoyable because "[t]he noise makes it impossible to enjoy sitting outside and talking with friends because you have to yell or stop talking every time a train goes by."  *Id.* ¶ 7.

The harms that CCAN members suffer due to Xcoal's increased coal export activities are "fairly traceable" to Ex-Im Bank's approval of the loan guarantee because Ex-Im Bank's actions enabled an additional one billion dollars' worth—approximately five million tons—of coal exports that would not have otherwise occurred.  *See* AR000029A; 12 U.S.C. § 635a-4; *supra* p. 4, n. 5; *see also supra* pp. 9-11; AR000363-70 (emails confirming additionality requirements). Ex-Im Bank's loan guarantee was essential to Xcoal's increased coal export activities because: Xcoal was unable to fulfill its own needs for capital; US lenders would not have been willing to lend to Xcoal without Ex-Im Bank's guarantee; European banks were not available because of the credit crisis; and Xcoal was experiencing growth, making the need for capital even more vital.  *See* AR0000032A; Sanzillo Decl. ¶¶ 8-12.  Despite unfavorable market conditions, Ex-Im Bank's guarantee enabled Xcoal to add at least 17 new contracts for the export of Appalachian coal to customers abroad.  *See* AR000185 (acknowledging inclusion of new contracts). Fulfillment of five million tons of additional coal exports results in an increase in transport of coal to port terminals in Baltimore and Hampton Roads and along rail lines leading to those

16

ports.  *See* AR000034A; *supra* p. 4, n. 5.  Because Ex-Im Bank's financing facilitates these

increased export activities, the harms from transporting more coal in the areas in which CCAN

members live, work, and recreate are "fairly traceable" to the increase in coal export activities

enabled by Ex-Im Bank's loan guarantee and its failure to consider the environmental

consequences of its decision and undertake any mitigation or other measures NEPA requires.

*See Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 451-52, 479 (10th Cir. 1996) ("The

increased risk of adverse environmental consequences is due to the agency's 'failure

substantively to consider the environmental ramifications of its actions in accordance with [the

National Environmental Policy Act].'" (citation omitted)).

 This Court has authority under the APA to redress CCAN's members' injuries because it

must "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful

and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law;" or "without observance of procedure required by law."  5 U.S.C. § 706.

A judgment declaring that Ex-Im Bank's failure to conduct environmental review in connection

with its approval of the $90 million loan guarantee violated NEPA, vacating the $90 million loan

guarantee and remanding to Ex-Im Bank with instructions to provide the environmental analysis

that NEPA requires before undertaking any action to further Xcoal's coal export activities,

including approval or provision of financing, would redress the harms caused to CCAN's

members by Ex-Im Bank's approval of the loan guarantee.  *See, e.g.*, Fox Decl. ¶ 10; Reed Decl.

¶ 11.  Ex-Im Bank's consideration of the harms caused by its financial support for increased coal

export activities could result in reduced financing or the imposition of mitigation measures to

ameliorate the adverse impacts of its financing decisions.

*Friends of the Earth*

Friends of the Earth brings this action on behalf of itself and its members. Friends of the Earth has more than 10,000 members and 150,000 activists in the United States. More than 100 Friends of the Earth members live, work, or recreate near the ports in Hampton Roads and Baltimore from which Xcoal ships its coal abroad, or near rail lines linking those ports to the Appalachian coal mines where the coal originates. Friends of the Earth's members suffer concrete and ongoing harms to their property, health, and recreational and aesthetic interests from coal dust near the Lambert's Point coal export facility. For instance, Carolyn Ware lives less than two miles from that facility and sees trains carrying open cars of coal to Lambert's Point when she drives to or from her house. Declaration of Carolyn Ware, Mar. 21, 2014 ("Ware Decl."), Decl. ¶ 3. Her enjoyment and use of her property is harmed by the black dust she sees on her porch. *Id.* ¶ 4; *see also* Johannesson Decl. ¶ 15 (soil samples taken within one mile of Carolyn Ware's home were 3.87 percent coal by weight). Ms. Ware also sees black dust all over the tennis courts where she plays tennis most days, about six blocks from Lambert's Point. Ware Decl. ¶ 5. She also bikes and walks her dog in Blue Bird Park, where coal trains travel to and from the export facility. Ware Decl. ¶ 6. Increased coal export activities in her neighborhood harms her enjoyment of biking, playing, tennis, and walking her dog due to the decrease in air quality and the aesthetic impairment of the area. *Id.* ¶ 5. Her health is particularly threatened by the increase in air pollution because she has bronchiectasis and asthma. *Id.* ¶ 7. The increased air pollution in these recreational areas is particularly harmful to her because the threats posed by air pollution are most acute when she breathes more deeply into her lungs during exercise. *Id.* ¶¶ 6-7.

Because Ex-Im Bank's loan guarantee has increased coal export activities in Ms. Ware's neighborhood, *see* AR000032A; 12 U.S.C. § 635a-4; *see also* AR000363-000370, her harms are

"fairly traceable" to Ex-Im Bank's approval of that financing and its failure to consider the environmental consequences of its decision and undertake any mitigation or other measures NEPA requires. *See supra* pp. 9-11 (section II.C), 16-17 (discussing causation). A judgment declaring that Ex-Im Bank's failure to conduct environmental review in connection with its approval of the $90 million loan guarantee violated NEPA, vacating the loan guarantee, and remanding to the agency with instructions to comply with NEPA by assessing the impacts of the guarantee before undertaking any action to further Xcoal's coal export activities, would redress Ms. Ware's harms. *See* Ware Decl. ¶ 9; *supra* pp. 17-18 (discussing redressability).

*Sierra Club*

Sierra Club brings this action on behalf of itself and its members.[8] Sierra Club has more than 600,000 members nationwide, including approximately 30,000 members in West Virginia, Virginia, and Maryland. Sierra Club members live, work, and recreate in communities near the mines, railroad tracks and export terminals that will see increased activity due to Ex-Im Bank's financing and suffer concrete and ongoing harms to their property, health, and recreational and aesthetic interests from that activity. For example, Joe Cook lives about two miles from Lambert's Point coal export facility and often sees coal cars dumping coal onto a conveyor belt and then onto ships there. Declaration of Joe Cook, Mar. 21, 2014 ("Cook Decl."), ¶ 5. The coal dust caused by these activities leaves coatings of black dust on the porch, walls, and roof of his home, and his car, which impairs his enjoyment of his property and requires him to spend time on cleaning and maintenance. *Id.* ¶ 6; *see also* Johannesson Decl. ¶ 15 (soil samples taken within one mile of Joe Cook's home were 4.73 percent coal by weight). Mr. Cook is also harmed by the increase in pollution that threatens his respiratory health because he lives and

---

[8] The harms to another Sierra Club member, Cindy Rank, related to mining, are described on pp. 20-21 in the discussion related to West Virginia Highlands Conservancy. Ms. Rank is a member of both organizations.

obtains health care services near the coal export facilities. Cook Decl. ¶ 7. In addition, Mr.

Cook frequents the Ghent area of Norfolk, about two miles from Lambert's Point, to shop, eat,

attend movies and otherwise pass the time. *Id.* ¶ 9. Increased rail traffic and coal dust will

hinder his recreational enjoyment of Ghent as more cars loaded with coal cross through Ghent to

get to Lambert's Point. *Id.* ¶¶ 9-10.

Because Ex-Im Bank's loan guarantee has increased coal export activities in Mr. Cook's

neighborhood, *see* AR000032A; 12 U.S.C. § 635a-4; *see also supra* pp. 9-11; AR000363-70, his

harms are "fairly traceable" to Ex-Im Bank's approval of that financing and its failure to

consider the environmental consequences of its decision and undertake any mitigation or other

measures NEPA requires. *See supra* pp. 9-11 (section II.C), 16-17 (discussing causation). A

judgment declaring that Ex-Im Bank's failure to conduct environmental review in connection

with its approval of the $90 million loan guarantee violated NEPA, vacating the loan guarantee,

and remanding to Ex-Im Bank with instructions to comply with NEPA by assessing the impacts

of the guarantee before undertaking any action to further Xcoal's coal export activities, would

redress Mr. Cook's harms. Cook Decl. ¶ 11; *see supra* p. 17 (discussing redressability).

> ### *West Virginia Highlands Conservancy*

WVHC brings this action on behalf of itself and its members. Most of its approximately

1,600 members reside in West Virginia or recreate in the Appalachian highlands. WVHC has

members who suffer concrete harms to their recreational and aesthetic interests from mining

activities that supply coal for Xcoal's exports. WVHC member Cindy Rank, who lives near the

Arch coal Sentinel mine in West Virginia and frequents places in nearby Tygart Valley, is

harmed by increased mining activities in West Virginia. Declaration of Cindy Rank, Mar. 21,

2014 ("Rank Decl."), ¶¶ 1, 7-9, 11. Ms. Rank attends meetings and recreates in local parks in

Philippi, West Virginia, near the Sentinel mine. *Id.* ¶¶ 7-9. She has seen red and orange-colored

water discharged into the Tygart Valley watershed, and believes that selenium, acid mine drainage or other pollutants from mining are to blame. *Id.* ¶ 10; *see also* Hansen Decl. ¶ 19. Increased mining will add to the noise, coal dust, and gravel from the heavy trucks used in mining operations, which impair her enjoyment of time spent in nearby parks hiking, watching birds and other wildlife, taking photos and "generally enjoy[ing] the beauty and serenity of streams and wildlife in the area." Rank Decl. ¶¶ 8, 11-12.

Because Ex-Im Bank's loan guarantee has increased coal mining in West Virginia, including near the parks Ms. Rank visits in Philippi, *see* AR000032A; 12 U.S.C. § 635a-4; *see also supra* pp. 10-12; AR000363-70, her harms are "fairly traceable" to Ex-Im Bank's approval of that financing and its failure to consider the environmental consequences of its decision and undertake any mitigation or other measures NEPA requires. *See supra* pp. 9-11 (section II.C), 16-17 (discussing causation). A judgment declaring that Ex-Im Bank's failure to conduct environmental review in connection with its approval of the $90 million loan guarantee violated NEPA, vacating the loan guarantee, and remanding to Ex-Im Bank with instructions to comply with NEPA by assessing the impacts of the guarantee before undertaking any action to further Xcoal's coal export activities, would redress Ms. Rank's harms. Rank Decl. ¶ 13; *see supra* pp. 17-18 (discussing redressability).

### Center for International Environmental Law

CIEL is a non-profit organization founded in 1989 and incorporated in Washington, DC. CIEL uses the power of law to protect the environment, promote human rights, and ensure a just and sustainable society. As part of this work, CIEL is active in efforts to reduce reliance on environmentally damaging energy sources, and to promote public access to information and transparent democratic processes with respect to decisions affecting the environment. The

21

United States' energy policies and the decision-making processes through which such policies are developed and implemented are highly relevant to CIEL's work.

Ex-Im Bank's approval of the $90 million loan guarantee without conducting environmental review concretely and demonstrably harms CIEL and its work to reduce reliance on environmentally damaging energy sources, and to promote public access to information and transparent democratic processes with respect to government decisions affecting the environment.  Declaration of Alyssa Johl, Mar. 21, 2014 ("Johl Decl."), ¶¶ 4-6; *see Havens Realty*, 455 U.S. at 379.  Ex-Im Bank's decision undermines CIEL's work to promote environmentally sustainable energy policies and has required CIEL to put extra time and resources into monitoring Ex-Im Bank's policies.  Johl Decl. ¶¶ 6, 9.  In addition, Ex-Im Bank's failure to comply with NEPA's environmental review requirements deprives CIEL of the right to information about the environmental impacts of Ex-Im Bank's decision to finance an environmentally damaging energy source, and its right to participate in that decision and has caused CIEL to expend additional effort to inform the public about coal financing and its potential effects on the environment and public health.  *Id.* ¶ 10; *Am. Soc'y for Prevention of Cruelty to Animals*, 659 F.3d at 25.

Because Ex-Im Bank's approval of a $90 million loan guarantee to increase coal exports without considering the environmental impacts of that decision frustrates CIEL's efforts to promote environmentally sustainable energy policies and ensure the public's right to participate in decisions affecting their health and environment, CIEL's harms are "fairly traceable" to Ex-Im Bank's approval and failure to consider the environmental consequences of its decision.  *See* Johl Decl. ¶¶ 9-10.  A judgment declaring that Ex-Im Bank's failure to conduct environmental review in connection with its approval of the $90 million loan guarantee violated NEPA, vacating the loan guarantee, and remanding to Ex-Im Bank with instructions to comply with NEPA by

assessing the impacts of the guarantee before undertaking any action to further Xcoal's coal

export activities, would redress CIEL's harms and allow CIEL to participate in the process

leading to Ex-Im Bank's decision whether to approve the loan guarantee. *See id.* ¶ 12; *supra* p.

17 (discussing redressability).

> *Pacific Environment*

Pacific Environment is a non-profit organization founded in 1987 in California with its

headquarters in San Francisco. Pacific Environment works to protect the environment and

peoples of the Pacific Rim by strengthening local communities and grassroots movements, and

with sophisticated policy advocacy at international finance and governance institutions. Pacific

Environment has fought to strengthen environmental policies in financial institutions including

the Export-Import Bank. Since 1997, Pacific Environment has sought to require financial

institutions to adequately assess the environmental, social, and human health impacts of the

fossil-fuel projects they support.

Ex-Im Bank's approval of the $90 million loan guarantee without conducting

environmental review concretely and demonstrably harms Pacific Environment and directly

conflicts with the organization's mission to promote accountability of public financial

institutions, especially regarding environmental impacts of their financing. Declaration of

Douglas Norlen, Mar. 21, 2014 ("Norlen Decl."), ¶ 5; *see Havens Realty*, 455 U.S. at 379; *Am.

Soc'y for Prevention of Cruelty to Animals*, 659 F.3d at 25. Pacific Environment Policy Director

Doug Norlen has advocated for the past 15 years to strengthen Ex-Im Bank's policies related to

the environment and accountability. Norlen Decl. ¶ 6. Ex-Im Bank's failure to consider the

environmental impacts of its decision to finance Xcoal's coal exports will require Pacific

Environment to devote additional resources to its work promoting environmentally responsible

financing, including increased monitoring of Ex-Im Bank's financing policies and practices. *Id.* ¶¶ 12-13.

Because Ex-Im Bank approved financing for fossil-fuel exports without assessing the environmental, social, and human health impacts of that financing, Pacific Environment's harms are "fairly traceable" to Ex-Im Bank's approval of the loan guarantee without consideration of the environmental consequences of its decision. *See id.* ¶¶ 5-6. A judgment declaring that Ex-Im Bank's failure to conduct environmental review violated NEPA, vacating the $90 million loan guarantee, and remanding to Ex-Im Bank with instructions to comply with NEPA by assessing the impacts of the guarantee before undertaking any action to further Xcoal's coal export activities, would redress Pacific Environment's harms and allow Pacific Environment to participate in the process leading to Ex-1m Bank's decision whether to approve the loan guarantee. *See id.* ¶ 14; *supra* p. 17 (discussing redressability).

### B.   Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Plaintiffs' NEPA claims are subject to judicial review under the APA, which requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Grunewald*, 930 F. Supp. 2d at 81.

NEPA requires that federal agencies "take a 'hard look' at the environmental consequences" of a major federal action before taking that action. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). To that end, NEPA requires every federal agency to:

> include in every recommendation … on … major Federal actions significantly
> affecting the quality of the human environment, a detailed statement by the
> responsible official on (i) the environmental impact of the proposed action, (ii)
> any adverse environmental effects which cannot be avoided should the proposal
> be implemented, (iii) alternatives to the proposed action, (iv) the relationship
> between local short-term uses of man's environment and the maintenance and
> enhancement of long-term productivity, and (v) any irreversible and irretrievable
> commitments of resources which would be involved in the proposed action should
> it be implemented.

42 U.S.C. § 4332(2)(C).  "[A] federal agency's determination that NEPA is wholly inapplicable

to its actions … is 'not entitled to the deference that courts must accord to an agency's

interpretation of its governing statute' and is instead 'a question of law, subject to de novo

review.'"  *Sierra Club v. USDA*, 777 F. Supp. 2d 44, 54 (D.D.C. 2011) (quoting *Mineral Policy*

*Ctr. v. Norton,* 292 F. Supp. 2d 30, 54–55 (D.D.C. 2003).

### C.   Ex-Im Bank's Failure to Conduct Environmental Review Before Financing Xcoal's Coal Exports Violates NEPA

NEPA requires federal agencies to prepare an EIS for any major federal action

significantly affecting the quality of the human environment.  42 U.S.C. § 4332(2)(C)(i); *Sierra*

*Club*, 777 F. Supp. 2d at 47.  This requirement furthers NEPA's "'twin aims'" of ensuring that

an agency "'consider every significant aspect of the environmental impact of a proposed

action,'" and "'inform the public that it has indeed considered environmental concerns in its

decisionmaking process.'"  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013)

(quoting *Baltimore Gas,* 462 U.S. at 97).  Ex-Im Bank's regulations implementing NEPA also

require the agency "to give appropriate consideration to the environmental effects of [its]

proposed actions in [its] decision-making and to prepare detailed environmental statements on

recommendations or reports on proposals for legislation and other major Federal Actions

significantly affecting the quality of the human environment."  12 C.F.R. § 408.1(a).

The Council on Environmental Quality ("CEQ") regulations implementing NEPA allow for preparation of an environmental assessment instead of an EIS to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact … [to] aid an agency's compliance with the Act when no environmental impact statement is necessary [and] … [to] facilitate preparation of a statement when one is necessary."  40 C.F.R. § 1508.9(a).  An agency's belief that the impacts are not significant does not excuse it from its obligations under NEPA to undertake the review process.  *See City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1190 (D.C. Cir. 2007) ("Regardless of the ultimate *outcome* of the environmental review, the FAA was still required by NEPA to engage in the review *process*.")

Ex-Im Bank's failure to prepare an EIS or an EA, and the absence of any agency determination justifying the failure to apply NEPA to the Xcoal loan guarantee, violate the statute and its implementing regulations.

1. **Ex-Im Bank's approval of a loan guarantee to finance coal exports is a major federal action subject to NEPA**

Under NEPA, "'Major Federal action' includes actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18. Federal actions "includ[e] projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a); *see also Sierra Club*, 777 F. Supp. 2d at 58.  Ex-Im Bank's loan guarantee is a major federal action subject to NEPA because it provides essential financial assistance without which the coal export activities would not occur, and the terms of its financing show influence or control over the transactions covered by the loan guarantee.  *See Sierra Club*, 777 F. Supp. 2d at 60 ("Actions which are 'approved by federal agencies' are only one type of major federal action.  CEQ regulations also define 'major federal

action' to include non-federal projects 'entirely or partly financed . . . by federal agencies,'"
(quoting 40 C.F.R. § 1508.18(a)").

      a. <u>Ex-Im Bank's financing is sufficient to bring Xcoal's coal export activities within the scope of a major federal action under NEPA.</u>

With respect to non-federal projects "partly financed ... by federal agencies," 40 C.F.R. §
1508.18(a), courts have found that "'federal funding is a significant indication that a project
constitutes a major federal action.'" *Sierra Club*, 777 F. Supp. 2d at 60 (federal agency's direct
loans and loan guarantee for coal plant expansion federalized company's otherwise non-federal
project) (quoting *Sw. Williamson Cnty. Cmty. Ass'n v. Slater*, 243 F.3d 270, 279 (6th Cir. 2001));
*see also Citizens Alert Regarding the Environment v. EPA*, 259 F. Supp. 2d 9, 19 (D.D.C. 2003)
("Typically, a project is considered a major federal action when it is funded with federal
money."). Several agencies have identified loan guarantees as major federal actions subject to
NEPA. *See, e.g.*, 7 C.F.R. Part 1794 (Rural Utilities Services's Environmental Policies and
Procedures); US Dep't of Energy, *Final Rule, Loan Guarantees for Projects That Employ
Innovative Technologies*, 74 Fed. Reg. 63548 (Dec. 4, 2009) ("[A]ppropriate NEPA project
review will be conducted prior to execution of a Loan Guarantee Agreement."); Department of
Energy, https://lpo.energy.gov/top-10-faqs/nepa-faq/ ("DOE's loan guarantees are considered
major Federal actions and are subject to NEPA review.").

To determine whether there is a major federal action, courts have considered the
proportion of federal funding to non-federal funding, as well as whether the funding applies to a
small segment of a project. *See Sierra Club*, 777 F. Supp. 2d at 61. In *Sierra Club*, the court
noted that the agency's "actions were subject to the requirements of NEPA" because it "did not
merely provide assistance to some discrete aspect of the Holcomb Expansion Project, nor was its
contribution insignificant." *Id.* Here, Ex-Im Bank provides a loan guarantee that makes possible

$1 billion in Xcoal's sales, AR000029A, which amounts to roughly 14 percent of Xcoal's 2012 sales. *See* AR000133. This directly results in five million tons of coal exports, representing 14 percent of Xcoal's annual exports that would not otherwise occur. *Cf. Nat'l Org'n for the Reform of Marijuana Laws v. US Drug Enforcement Admin.*, 545 F. Supp. 981, 983 (D.D.C. 1982) (non-federal party stated it would have proceeded with the project irrespective of the agency's assistance); *see supra* p. 4, n. 5. This level of financing is sufficient to bring the coal export activities within the scope of a major federal action under NEPA.

> b. Ex-Im Bank's financing allows it to influence and control Xcoal's coal export activities

Regardless of the level of federal funding, "where non-federal activity is involved, a court must look to whether an agency that provides financing to a project can influence or does possess actual power to control non-federal activity." *Friends of the Earth v. Mosbacher*, 488 F. Supp. 2d 889, 915 (N.D. Cal. 2007) (challenging Ex-Im Bank's failure to conduct environmental review under NEPA); *Citizens Alert*, 259 F. Supp. 2d. at 21 (agency's provision of just over ten percent of the project's funding was a major federal action where the court assumed that the agency's withholding of that funding would give it the "ability to stop ... or otherwise modify or control the project"). Ex-Im Bank had the ability to influence Xcoal's coal export activities because Ex-Im Bank's approval was required for all transactions under the Loan Facility, Ex-Im Bank had the authority to impose conditions on or otherwise modify Xcoal's activities, and Ex-Im Bank had the ability to stop the coal exports because without Ex-Im Bank's financing, the coal exports would not have occurred at all.

> i.   *Ex-Im Bank's approval was required for all specific transactions under the Loan Facility*

A requirement of agency approval before the activity can proceed is an indication of influence or control. *See Sierra Club*, 777 F. Supp. 2d at 58-59 (decisions to provide necessary

approvals and financial assistance, including loans and loan guarantees, constituted major federal

actions) (citing *Morris Cnty. Trust for Historic Pres. v. Pierce*, 714 F.2d 271, 278 (3rd Cir.

1983)).  In *Sierra Club*, which involved a contract between the Rural Utilities Service ("RUS")

and the company Sunflower, RUS restructured Sunflower's debt under contract terms requiring

Sunflower "to agree that it would not enter into any agreement or other arrangements … for the

development of [the project] without the prior written approval of RUS."  *Id.* (quotation

omitted).  The court concluded that this requirement of prior approval gave RUS sufficient

influence for its financing to constitute a major federal action because it gave RUS the ability to

influence Sunflower's ability to proceed with its proposed activities.  *Id.*  (By "Sunflower's

agree[ment] that '[a]ny RUS approval will be on such terms and conditions as RUS, in its sole

discretion, may require at such time,' … RUS ensured that Sunflower would be unable to

proceed with the development of a second power plant without the approval of RUS."  (Citation

omitted.)).

Here, the agreements between Ex-Im Bank and Xcoal indicate the same kind of control.

Each time Xcoal wants to make a transaction supported by the Ex-Im loan guarantee, it must

obtain Ex-Im Bank's approval.  AR000033A ("[A]ll transactions will require approval by Ex-Im

Bank staff prior to being included under the proposed Loan Facility.").  Without Ex-Im Bank's

prior approval, Xcoal could not have entered into at least 17 separate agreements with buyers in

at least five countries of export, including China, South Korea, and Japan.  *See supra* p. 11

(citing emails acknowledging inclusion of new contracts).  In each of those instances, Ex-Im

Bank approved the transaction, noting the name of the foreign buyer and country of export.  *See*

*supra* p. 11.  Just as the approvals in *Sierra Club* "reflect[ed] the intention of the parties that

RUS would maintain the ability to influence the [project]," *Sierra Club*, 777 F. Supp. 2d at 59,

the requirement that Xcoal obtain Ex-Im Bank's prior written approval before any specific

transaction could become part of the Loan Facility amounts to control sufficient to establish that Ex-Im Bank's approval constituted a major federal action.

ii.     *Ex-Im Bank imposed conditions on its loan guarantee to Xcoal*

To determine whether Ex-Im Bank has the requisite influence or control over Xcoal's coal export activities, a court "must consider carefully the nature of Defendants' involvement in these projects and particularly what conditions, if any, the agencies impose in connection with financing." *Friends of the Earth*, 488 F. Supp. 2d at 915-16.

Ex-Im Bank has the power to impose—and did impose—conditions on Xcoal, demonstrating Ex-Im Bank's influence and control over Xcoal's coal export activities. As explained above, Ex-Im Bank's approval is required on all transactions before they can be included in the Loan Facility. *See* AR000033A. In addition, the Master Guarantee Agreement and Loan Authorization Agreement establish that Ex-Im Bank can require Xcoal to meet certain financial obligations as conditions for the release of capital. *See* AR000077; Sanzillo Decl. ¶ 23. These conditions include compliance with a schedule of "Special Conditions" annexed to the Loan Authorization Agreement. *See* Sanzillo Decl. ¶ 24. Ex-Im Bank also has the ability to control Xcoal's export activities by prohibiting Xcoal from using the Loan Facility for specific transactions with any of the countries listed on Ex-Im Bank's country limitation schedule. *See* AR000077. Ex-Im Bank also requires Xcoal to undergo field examinations, including inspection and valuation of export-related inventory and accounts to ensure compliance with the loan agreement. AR000079-000080; *see also* Sanzillo Decl. ¶ 24. The field examination also entails a review of Xcoal's compliance with the special conditions under the loan agreement, AR000080, and requires that Xcoal periodically deliver a summary to Ex-Im Bank detailing the outstanding shipments financed under the Loan Facility for each party to the loan documents. AR000079. Ex-Im Bank's financing is also contingent upon Xcoal's ability to meet certain due

diligence requirements.  *See* AR000040 (results of Character, Reputational, and Transaction

Integrity due diligence search "stated that all parties involved with the subject transaction did not

appear on any lists upon which Ex-Im Bank was required to search"); AR000177 ("names have

been cleared").

      Most importantly, Ex-Im Bank had "sufficient discretion" to impose environmental

conditions on Xcoal's activities such that the purposes of NEPA could be accomplished through

Ex-Im Bank's involvement in the project.  Whether the terms of the contract in fact specify

environmental, as opposed to financial or other conditions is immaterial to whether the financed

activity falls under NEPA.  *See Sierra Club*, 777 F. Supp. 2d at 60.  In *Sierra Club*, RUS had

argued that the control it maintained was "irrelevant because the control reflected RUS's

financial concerns, rather than environmental concerns." *Id.*  Specifically, RUS had stated that

the agreements reflected RUS's primary concern: to make sure that Sunflower did "not enter any

financial relationships that would jeopardize its further and continued ability to repay RUS,"

adding that under the loan documents, RUS had "retained the authority to approve certain

financial arrangements that Sunflower enter[ed] with regard to further development of the

[project] in order to ensure repayment of its loans and loan guarantees." *Id.* (citation omitted).

The court reasoned that, "[e]ven assuming that RUS's primary objective … has been to

maximize federal debt recovery, the fact remains that … RUS elected to retain authority over the

[project] and gave necessary approvals which allowed the project to proceed.  As such, RUS's

actions became major federal actions within the meaning of NEPA." *Id.*  Similarly, although the

conditions Ex-Im Bank imposed on Xcoal are financial or reflect national policy concerns, Ex-

Im Bank's ability to impose such conditions demonstrates the requisite level of authority over the

project for purposes of NEPA.  *See Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267

F.3d 1144, 1151 (D.C. Cir. 2001) ("If … the agency does not have sufficient discretion to affect

the outcome of its actions, and its role is merely ministerial, the information that NEPA provides can have no effect on the agency's actions, and therefore NEPA is inapplicable."); *see also Sierra Club*, 777 F. Supp. 2d at 66.

In addition, Ex-Im Bank has statutory authority under the Export-Import Bank Act and NEPA to issue regulatory requirements imposing environment conditions on borrowers, along with the authority to withhold financing for environmental reasons. *See* 12 U.S.C. § 635i-5(a) (Export-Import Bank Act directing the agency to establish environmental procedures); Ex-Im Bank, Environmental Procedures and Guidelines (implementing 12 U.S.C. § 635i-5(a)); 12 C.F.R. § 408.1 (implementing NEPA). For example, the Export-Import Bank Act requires Ex-Im Bank to establish environmental procedures to account for "the potential beneficial and adverse environmental effects" of goods and services when considering direct lending and guarantee proposals. 12 U.S.C. § 635i-5(a)(1). These procedures require submission and public disclosure of environmental assessments and supplemental environmental reports, including remediation or mitigation plans and procedures, and related monitoring reports, *id.*, and allow Ex-Im Bank to "withhold financing from a project for environmental reasons or to approve financing after considering the potential environmental effects of a project." *Id.* § 635i-5(a)(2).

Finally, in another case involving the application of NEPA to Ex-Im Bank financing, the court suggested that if the financing would impact the project's operations or the applicants could not have found other funding, the ability to impose conditions would make the financing a major federal action. *See Friends of the Earth*, 488 F. Supp. 2d at 917 (conditions would not amount to sufficient control if the level of financing tied to those conditions "would not impact the project's operations[,] or if the applicants could have found financing elsewhere."). Here, Ex-Im Bank's justification for the loan guarantee was that Xcoal was unable to internally generate the necessary working capital, it had historically relied on bank financing for its sales,

and that domestic financial institutions were unwilling to provide sufficient financing to Xcoal without the Ex-Im Bank guarantee.  AR000037A.  The fact that Xcoal's other financing was unavailable and that Ex-Im Bank represented a stable and secure credit source suggests that Xcoal would have had to comply with additional environmental conditions from Ex-Im Bank to realize its projected growth because the financing was not available elsewhere.  *Cf. Friends of the Earth*, 488 F. Supp. 2d at 917; *see also* Sanzillo Decl. ¶ 22.[9]

The nature of Ex-Im Bank's involvement in Xcoal's activities and the conditions placed on its financing demonstrate Ex-Im Bank's ability to influence and its actual control over Xcoal's exports.  Ex-Im Bank's decision to finance Xcoal's coal exports therefore amounts to a major federal action under NEPA.

> **2.      Ex-Im Bank's approval of a loan guarantee to finance coal exports "significantly affects the quality of the human environment" within the meaning of § 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C)**

Ex-Im Bank's approval of a $90 million loan guarantee to finance coal exports "significantly affect[s] the quality of the human environment."  42 U.S.C. § 4332(2)(C).  To determine whether the impacts of a project are significant, CEQ regulations identify two factors: context and intensity.  40 C.F.R. § 1508.27(a)-(b).  Context refers to action's significance "in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality," considering short- and long-term effects.  *Id.* § 1508.27(a).  "Intensity refers to the severity of impact," based on a number of possible factors, including effects on public health or safety; cumulatively significant environmental impacts that are reasonable to anticipate; and the "degree to which the action may establish a precedent for future

---

[9] As Sanzillo further explains, "[g]iven Xcoal's risk analysis and its subsequent use of the Ex-Im Loan Facility, its importance to the company's current business model is evident.  Any environmental conditions required of the company "are unlikely to deter Xcoal from seeking Ex-Im Bank financing."  Sanzillo Decl. ¶ 7.

actions with significant effects or represents a decision in principle about a future consideration."
*Id.* § 1508.27(b)(2), (6), (7).

Ex-Im Bank's loan guarantee has significant impacts based on the intensity of effects on
public health and safety; the cumulative nature of the effects, particularly near ports in Norfolk
and the Curtis Bay neighborhood of Baltimore; and the potential for establishing a precedent
requiring Ex-Im Bank to consider the environmental impacts of financing coal exports in the
future, especially with respect to Xcoal, whose coal exports activities Ex-Im Bank has supported
for five years. AR000273.

Other agencies have recognized the impacts of coal mining and coal transport are
sufficiently significant to require preparation of an EIS. *See e.g.*, *WildEarth Guardians*, 738
F.3d at 311 (Department of Interior prepared EIS for coal mining leases, where impacts included
local air pollution, including ozone and nitrous oxides); *Natural Res. Def. Council, Inc. v.
Jamison*, 815 F. Supp. 454, 457 (D.D.C. 1992) (Department of Interior prepares EIS to assess
impact of leasing proposed sites for coal mining); US Army Corps of Engineers, *Notice of
Amendment to the Intent To Prepare an Environmental Impact Statement (EIS) for the
Millennium Bulk Terminals—Longview Shipping Facility Project*, 78 Fed. Reg. 54873 (Sept. 6,
2013) (EIS to be prepared due to potentially significant impacts related to proposed construction
and operation of a facility to ship coal, which included air and water quality, noise, traffic, and
recreation). Ex-Im Bank's loan guarantee facilitates coal mining, rail transport, and shipping
activities that have significant effects on public health and safety and requires an EIS. As
described above at page 9, coal mining causes acid mine drainage—one of the most pervasive
surface water quality problems in Appalachian coal-mining areas—and generates gigantic ponds
of toxic slurry, which can cause fish deformities and kill fish and other aquatic life, and can
result in the death of a stream, meaning that little or no life can survive. Transporting the coal to

ports releases coal dust from open rail cars, as well as diesel exhaust from train engines, along

the rail lines.  Coal dust particles themselves contribute to lung disease, asthma, and

cardiopulmonary diseases, and can contain toxic heavy metals like arsenic and lead, which pose

additional health risks, such as skin, bladder, liver, and lung cancers and damage to the nervous

system.  At the ports, unloading the coal, storage in piles, and reloading it onto ships all emit

large quantities of coal dust.  Trains and ships used to transport coal also emit diesel exhaust and

other harmful air pollutants, which worsen respiratory and pulmonary conditions and can cause

premature death.  The severity of these impacts makes the significant for purposes of NEPA.

     In addition to the significance of impact based on health and safety effects, the

cumulative impact of the coal exports that Ex-Im Bank facilitates is significant.  *See* 40 C.F.R. §

1508.27(b)(7).  CEQ regulations define "cumulative impact" as "the impact on the environment

which results from the incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions."  *Id.* § 1508.7.  When an agency's action involves an

increase in existing impacts, the relevant environmental impact is the cumulative impact, not

merely the incremental difference between the new and existing level of activity.  *See Grand*

*Canyon Trust v. FAA*, 290 F.3d 339, 342 (D.C. Cir. 2002) (EA should have considered

cumulative impact of new airport, and not merely incremental difference between noise

associated with new airport and noise associated with existing airport.).  The cumulative impacts

of Ex-Im Bank's loan guarantee to Xcoal are significant because the ports at Norfolk and

Baltimore are among the busiest US shipping terminals, and neighborhoods like Baltimore's

Curtis Bay neighborhood, near the CSX terminal, are among the most polluted.  *See* Sahu Decl. ¶

24.  Along with the impacts of the five million tons of additional coal exports facilitated by Ex-

Im Bank's financing, the cumulative impacts on air and water pollution, rail and ship traffic, and

noise due to existing and reasonably foreseeable future coal exports from these ports are

considerable.  For instance, VDEQ data show that in 2011, the Norfolk Southern facility

processed 21 million tons of coal and emitted 42.5 tons of PM10.  *Id.* ¶ 14.  Increasing the

amount of coal, and thus PM10, in this vicinity, is a cumulative impact Ex-Im Bank should have

considered, especially given the existing levels of pollution in nearby residential areas.  *See*

Johannesson Decl. ¶¶ 15, 23 (describing coal and arsenic in soils in areas where Plaintiffs'

members Joe Cook and Carolyn Ware live); Cook Decl. ¶ 2; Ware Decl. ¶ 2.  Similarly, the

Curtis Bay neighborhood near the CSX terminal in Baltimore is a heavily industrial and highly

polluted area.  *See* Reed Decl. ¶ 6; Sahu Decl. ¶ 24.  Increasing the level of coal export activity

in Curtis Bay would add to an area already suffering from high levels of pollution and incidence

of asthma, among other health problems.  Furthermore, Ex-Im Bank has financed Xcoal's coal

exports on several occasions in the past, *see* AR000273, but has never conducted environmental

review of that activity.  In determining whether the impacts of financing coal exports are

significant, Ex-Im Bank is obligated to consider the effects of those exports, "incorporating the

effects of other projects into the background 'data base' of the project at issue."  *Grand Canyon*

*Trust*, 290 F.3d at 342 (citation omitted).

Finally, recognizing the potentially significant impacts of Ex-Im Bank's financing for

Xcoal's coal exports would set a precedent that would require Ex-Im Bank to apply NEPA to its

decisions to finance other coal projects.  Ex-Im Bank's failure to conduct environmental review

of the impacts of its $90 million loan guarantee continues its history of financing Xcoal's coal

exports without assessing the environmental impacts or requiring any mitigation.  Requiring Ex-

Im Bank to conduct NEPA review of its loan guarantee to Xcoal would create precedent

applicable to future financing decisions for coal-related activities.  In addition, Ex-Im Bank's

Board's decision not to require environmental review when it approved the $90 million loan

guarantee indicates that it will not impose environmental conditions when it approves the

specific transactions within the Loan Facility.  *Cf. Fund for Animals v. Norton*, 281 F. Supp. 2d

209, 234, (D.D.C. 2003).

Ex-Im Bank's loan guarantee facilitates coal exports that have a significant impact on the

environment, especially in light of the effects on health and safety, the cumulative impact, and

the ability to set a precedent that would require Ex-Im Bank to consider the environmental

impacts of its coal-export financing.  Ex-Im Bank's approval of the loan guarantee to finance

Xcoal's coal exports thus significantly affects the environment and falls within the scope of

NEPA.

### 3.    Ex-Im Bank's loan guarantee to Xcoal does not properly fall within any categorical exclusion

Ex-Im Bank may argue that the loan guarantee is categorically excluded from NEPA's

requirement that Ex-Im Bank conduct an EA or EIS.  Although an agency may identify "a

category of actions which do not individually or cumulatively have a significant effect on the

human environment … and for which, therefore, neither an environmental assessment nor an

environmental impact statement is required," 40 C.F.R. § 1508.4, when applying a categorical

exclusion, the agency must ensure that "extraordinary circumstances" are not present that would

trigger NEPA's requirements to conduct an EA or EIS.  *See* 40 C.F.R. § 1508.4.

Ex-Im Bank's regulations implementing NEPA list "[a]pplications for Eximbank

financing in the form of insurance or guarantees" as "actions normally not requiring assessments

or EIS's."  12 C.F.R. § 408.6(a).  However, "where … the presence of extraordinary

circumstances indicates that some other level of environmental review may be appropriate," Ex-

Im Bank "will independently determine whether an EIS or an environmental assessment is

required."  12 C.F.R. § 408.6(b).  Nothing in the record indicates that Ex-Im Bank considered

whether the Xcoal loan guarantee should be categorically excluded from NEPA's EA and EIS

requirements or whether extraordinary circumstances exist that would require environmental

review of the project.  In fact, there is nothing in the record at all to suggest that the agency

considered the application of NEPA or its implementing regulations to this project.  This court

has held that "[a]n agency cannot invoke a categorical exclusion for the first time in legal

briefings when no such invocation exists in the record."  *Humane Soc'y of U.S. v. Johanns*, 520

F. Supp. 2d 8, 33 (D.D.C. 2007) (citing *Fund for Animals, Inc. v. Espy*, 814 F. Supp. at 152

("Invocation of the categorical exclusion for the first time by counsel after the complaint was

filed in this case appears to be a *post hoc* rationalization, and is inadequate as a basis for

review.").  Furthermore, "[p]laintiffs do not shoulder the burden of proving that Defendants

should have determined that extraordinary circumstances existed when it is clear from the record

… that no environmental consideration of any kind was undertaken with respect to the

[action].").  *Humane Soc'y of U.S. v. Johanns*, CIV A 06-265 CKK, 2007 WL 1120404 (D.D.C.

Apr. 13, 2007).  Ex-Im Bank cannot justify its complete failure to apply NEPA with *post hoc*

invocation of its regulations governing categorical exclusions.

Regardless, to the extent Ex-Im Bank argues that the loan guarantee was categorically

excluded, extraordinary circumstances make the categorical exclusion inapplicable to this loan

guarantee.  Ex-Im Bank's NEPA regulations do not define what constitutes "extraordinary

circumstances" rendering a categorical exclusion inapplicable.  However, other agencies have

identified factors that can indicate extraordinary circumstances, often similar to the "intensity"

factors related to the significance of the environmental impact, such as effect on public health

and safety.  *Compare* 43 C.F.R. § 46.215 (Department of Interior), *and* 23 C.F.R. § 771.117

(Federal Highway Administration), *with* 1508.27(b); *see also Brady Campaign to Prevent Gun*

*Violence v. Salazar*, 612 F. Supp. 2d 1, 14-15 (D.D.C. 2009) (quoting 43 C.F.R. § 46.215(a)-(d))

(agency improperly determined no "extraordinary circumstances" present regarding Final Rule

allowing possession of concealed firearms, where administrative record demonstrated that rule's effects may have a significant impact on public health or safety).

As described in sections II(B) and III(C)(2), the Xcoal loan guarantee has significant environmental and human health impacts, including direct, indirect, and cumulative impacts on air and water quality, noise, and traffic.  Ex-Im Bank's failure to consider whether these significant impacts warrant environmental review of the Xcoal loan guarantee regardless of whether loan guarantees are actions "normally not requiring assessments or EIS's," 12 C.F.R. § 408.6(a), violates NEPA and Ex-Im Bank's implementing regulations.  *See* 42 U.S.C. § 4332(2)(C); 12 C.F.R. § 408.6(b); *Humane Soc'y of U.S.*, 520 F. Supp. 2d at 8, 33-34 ("Defendants' failure to give any consideration as to whether or not the [action] invoked 'extraordinary circumstances' such that it 'may have a significant environmental effect' violated … NEPA's implementing regulations.").  "[A]ny notion that [the agency] may avoid NEPA review simply by *failing* even to consider whether a normally excluded action may have a significant environmental impact flies in the face of the CEQ regulations."  *Humane Soc'y of U.S.*, 520 F. Supp. 2d at 33-34.  Here, the significant environmental impacts of the activities financed by Ex-Im Bank's $90 million loan guarantee present extraordinary circumstances that require environmental review, regardless of whether other loan guarantees are normally excluded.  Ex-Im Bank's failure to consider whether extraordinary circumstances apply is arbitrary and capricious, and violates NEPA.

IV.    **CONCLUSION**

For the foregoing reasons, Ex-Im Bank's failure to prepare an EIS or an EA in accordance with NEPA before granting the loan guarantee to Xcoal for its coal export activities is arbitrary and capricious, an abuse of discretion, not in accordance with law and without observance of procedure required by law within the meaning of the APA, 5 U.S.C. § 706(2).  Ex-

Im Bank's failure to prepare an EIS or an EA is also agency action unlawfully withheld or

unreasonably delayed within the meaning of the APA, 5 U.S.C. § 706(1).  Plaintiffs respectfully

request that this Court grant their motion for summary judgment and declare that Ex-Im Bank's

approval of the $90 million loan guarantee to Xcoal without preparing an EIS or an EA violated

NEPA and its implementing regulations.  Further, Plaintiffs respectfully request that this Court

vacate the $90 million loan guarantee and remand with instructions to Ex-Im Bank to provide the

environmental analysis that NEPA requires.


Dated: March 21, 2014                J. MARTIN WANGER (DC Bar #435730)
                                     SARAH H. BURT (admitted *pro hac vice*)
                                     *s/ Abby L. Rubinson*
                                     ABBY L. RUBINSON (admitted *pro hac vice*)
                                     Earthjustice
                                     50 California Street, Suite 500
                                     San Francisco, CA 94111
                                     Tel.: (415) 217-2000
                                     Fax: (415) 217-2040
                                     mwagner@earthjustice.org
                                     sburt@earthjustice.org
                                     arubinson@earthjustice.org

                                     *Counsel for Plaintiffs*