**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


CHESAPEAKE CLIMATE ACTION )    Civil Action No. 13-1820 RC
NETWORK, et al.,                          )
                                                       )
        Plaintiffs,                           )
                                                       )    **MEMORANDUM IN SUPPORT OF**
      v.                                      )    **FEDERAL DEFENDANTS' MOTION**
                                                       )    **FOR SUMMARY JUDGMENT, AND**
EXPORT-IMPORT BANK OF THE     )    **OPPOSITION TO PLAINTIFFS'**
UNITED STATES, et al.                    )    **MOTION FOR SUMMARY**
                                                       )    **JUDGMENT**
        Federal Defendants.             )
                                                       )
_____)

# TABLE OF CONTENTS

BACKROUND........................................................................................................... 2

    1.    The Export-Import Bank of the United States........................................................ 2

    2.    The Guarantee to PNC ....................................................................................... 5

    3.    Plaintiffs' Complaint ........................................................................................... 7

ARGUMENT ......................................................................................................... 8

    I.    The Administrative Procedure Act....................................................................... 8

    II.    Plaintiffs Lack Standing to Assert Their Claims ................................................ 10

        A.    Elements of Standing ............................................................................ 10

        B.    Plaintiffs Have Not Shown that Their Alleged Injuries Are Fairly Traceable to the Bank's Guarantee to PNC Bank. ................................. 12

            1.    Plaintiffs Have Failed to Establish a Chain of Causation that Would Make  Their Injuries "Traceable" to the Bank's Guarantee. ............................................................................. 13

                a.    Plaintiffs have not shown that without the guarantee, PNC would not have issued the line of credit to Xcoal.14

                b.    Plaintiffs have not shown that without the line of credit from PNC, Xcoal would have lacked the credit necessary to export the same volume of coal. ............................. 14

                c.    Plaintiffs Have Not Shown that But for Xcoal's Actitivies, the Coal Mining and Transportation Injuries they Allege Would Not Have Occurred. ...................... 16

            2.    Plaintiffs Fail to Prove that the Bank Could Have Imposed Contractual Conditions that Would Have Prevented their Alleged Environmental Injuries............................................................ 17

            3.    The Bank's Charter does not support Plaintiff's traceability argument.................................................................................... 19

        C.    Plaintiffs Have Not Demonstrated that Their Alleged Injuries Are Redressable by Relief From this Court .................................................. 21

        D.    Plaintiffs Pacific Environment and Center for International Environmental Law Have Failed to Show Injury-in-Fact ...................... 25

    III.    Plaintiffs Complaint Must Be Dismissed Because They Have Failed to Plead a "Major Federal Action" that could support their NEPA Claim........................... 26

A.  The Bank's Guarantee to PNC is Not a Major Federal Action Under CEQ Regulations.................................................................................... 29

B.  The Bank's Guarantee Does Not Constitute Significant Federal Funding of Xcoal's Export Activities.................................................................. 31

C.  Federal Defendants Lack Responsibility and Control Over the Environmental Impacts of Coal Mining and Transportation by Third Parties With Whom Xcoal Contracts.. .................................................. 33

IV.  If the Court Finds a Violation of Law, It Should Permit the Parties to Submit Further Briefing on Remedy................................................................................ 38

CONCLUSION ............................................................................................................................. 39

# TABLE OF AUTHORITIES

## CASES

Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S.,
    840 F. Supp. 2d 327 (D.D.C. 2012) ................................................................38

Allen v. Wright,
    468 U.S. 737 (1984) ..........................................................................21, 24

Allied-Signal, Inc. v. Nuclear Regulatory Comm'n,
    988 F.2d 146 (D.C.Cir.1993) ................................................................38

*Appalachian Voices v. Bodman,
    587 F. Supp. 2d 79 (D.D.C. 2008) ........................................11, 13, 15, 20, 23

Appalachian Voices v. Chu,
    262 F.R.D. 24 (D.D.C. 2009) ................................................................16

Atlanta Coal. on the Transp. Cirsis, Inc. v. Atlanta Reg'l Comm'n,
    599 F.2d 1333 (5th Cir. 1979) ................................................................27, 28

Cal. Forestry Ass'n v. Thomas,
    936 F. Supp. 13 (D.D.C. 1996) ................................................................21, 22

Camp v. Pitts,
    411 U.S. 138 (1973) ..........................................................................8

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986) ..........................................................................8

Chamber of Commerce of U.S. v. EPA,
    642 F.3d 192 (D.C. Cir. 2011) ................................................................11, 26

Chevron v. Natural Res. Defense Council,
    467 U.S. 837 (1984) ..........................................................................9

Citizens Against Rails-to-Trails v. Surface Transp. Bd.,
    267 F.3d 1144 (D.C. Cir. 2001) ................................................................9, 10, 27, 28

Citizens Alert Regarding the Env't v. EPA,
    259 F. Supp. 2d 9 (D.D.C. 2003) ................................................................32, 35

Citizens to Pres. Overton Park v. Volpe,
    401 U.S. 402 (1971) ..........................................................................9

Clapper v. Amnesty Int'l.,
    133 S. Ct. 1138 (2013) ...................................................................................11

Cmty. For Creative Non-Violence v. Pierce,
    814 F.2d 663 (D.C. Cir. 1987) ..................................................................13, 22

*Ctr. for Biological Diversity v.  U.S. Dep't of Housing & Urban Dev.,
    359 Fed. Appx. 781, 2009 WL 4912592 (9th Cir. 2009).................................37

*Ctr. for Biological Diversity v. U.S. Dep't of Housing & Urban Dev.,
    541 F. Supp. 2d 1091 (D. Ariz. 2008) ................................................32, 36, 37

Defenders of Wildlife v. Andrus,
    627 F.2d 1238 (D.C. Cir. 1980) ...........................................................29, 36

Defenders of  Wildlife v. Babbitt,
    130 F. Supp. 2d 121 (D.D.C. 2001) ..............................................................8

*Dellums v. U.S. Nuclear Regulatory Comm'n,
    863 F.2d 968 (D.C. Cir. 1988)..............................................11, 17, 20, 21, 26

Delta Airlines, Inc. v. Export-Import Bank of the U.S.,
    718 F.3d 974 (D.C. Cir. 2013) ...................................................................38

*Dep't of Transp. v. Public Citizen,
    541 U.S. 752 (2004).................................................................28, 34, 35, 36

Equal Rights Ctr. v. Post Properties, Inc.,
    633 F.3d 1136 (D.C. Cir. 2011) ...................................................................10

*Fla. Audubon Soc'y v. Bentsen,
    94 F.3d 658 (D.C. Cir. 1996) ...............................................12, 13, 17, 20, 21

Fla. Power & Light Co. v. Lorion,
    470 U.S. 729 (1985)..................................................................................8

Freedom Republicans, Inc. v. Fed. Election Comm'n,
    13 F.3d 412 (D.C. Cir. 1994) .................................................................12, 20

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,
    528 U.S. 167 (2000)..................................................................................25

Friends of the Earth, Inc. v Mosbacher,
    488 F. Supp. 2d 889 (N.D. Cal. 2007) ...........................................................30

Fund for Animals, Inc. v. Thomas,
    127 F.3d 80 (D.C. Cir. 1997) .......................................................................27

Hamilton v. Geithner,
    666 F.3d 1344 (D.C. Cir. 2012) ....................................................................3

Hamilton v. Paulson,
    542 F. Supp. 2d 37 (D.D.C. 2008) ................................................................3

*Humane Soc'y v. Vilsack,
    No. 12-1582 (ABJ), 2013 WL 5346065 (D.D.C. Sept. 25, 2013) ..................11, 13, 23, 25

Kandra v. United States,
    145 F. Supp. 2d 1192 (D.Or. 2001) ..............................................................33

Karst Envtl. Educ. and Protection, Inc. v. E.P.A.,
    475 F.3d 1291 (D.C. Cir. 2007) ....................................................................8

Kleppe v. Sierra Club,
    427 U.S. 390 (1976) .....................................................................................31

Kokkonen v. Guardian Life Ins. Co. of Am.,
    511 U.S. 375 (1994) .....................................................................................10

*Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992) .....................................................................................10, 11, 12

*Macht v. Skinner,
    916 F.2d 13 (D.C. Cir. 1990) ........................................................................27

Marsh v. Oregon Natural Res. Council,
    490 U.S. 360 (1989) .....................................................................................9

Metro. Edison Co. v. People Against Nuclear Energy,
    460 U.S. 766 (1983) .....................................................................................28

*Mineral Policy Ctr. v. Norton,
    292 F. Supp. 2d 30 (D.D.C. 2003) ................................................................27, 28, 29

Mississippi ex rel. Moore v. Marsh,
    710 F. Supp. 1488 (S.D. Miss. 1989) ...........................................................33

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983) .......................................................................................9

NORML v. U.S. DEA,
    545 F. Supp. 981 (D.D.C. 1982) ...................................................................28

Natural Res. Def. Council, Inc. v. Jamison,
    815 F. Supp. 454 (D.D.C. 1992) ..................................................................27

Natural Res. Def. Council v. EPA,
    859 F.2d 156 (D.C. Cir. 1988) ...................................................................34

Northcoast Envtl. Ctr. v. Glickman,
    136 F.3d 660 (9th Cir.1998) .......................................................................9

Occidental Eng'g Co. v. INS,
    753 F.2d 766 (9th Cir. 1985) .......................................................................8

Raytheon Co. v. Ashborn Agencies, Ltd.,
    372 F.3d 451 (D.C. Cir. 2004) ...................................................................10

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.,
    489 F.3d 1267 (D.C. Cir. 2007) ...........................................................11, 21

Sierra Club v. Hodel,
    848 F.2d 1068 (10th Cir. 1988) ...........................................................35, 36

Sierra Club v. U.S. Dep't of Agriculture,
    777 F. Supp. 2d 44 (D.D.C. 2011) .......................................................30, 31

*Sierra Club v. U.S. Dep't of Energy,
    825 F. Supp. 2d 142 (D.D.C. 2011) .............................................13, 22, 24, 25

*St. John's United Church of Christ v. FAA,
    520 F.3d 460 (D.C. Cir. 2008) .........................................................22, 24, 25

Steel Co. v. Citizens for a Better Env't,
    523 U.S. 83 (1998) ..................................................................................10

Sugarloaf Citizens Ass'n v. FERC,
    959 F.2d 508 (4th Cir. 1992) .....................................................................35

Summers v. Earth Island Inst.,
    555 U.S. 488 (2009) ...............................................................................5, 11

*Touret v. Nat'l Aeronautics & Space Admin.,
    485 F. Supp. 2d 38 (D.R.I. 2007) ...........................................................16, 35

United Transp. Union v. Interstate Commerce Comm'n.,
  891 F.2d 908 (D.C. Cir. 1989) ...................................................................12, 20

Vill. of Los Ranchos de Albuquerque v. Barnhart,
  906 F.2d 1477 (10th Cir. 1990) ...................................................................33, 35

*Village of Bensenville v. FAA,
  457 F.3d 52 (D.C. Cir. 2006) .......................................................................22, 25

Warth v. Seldin,
  422 U.S. 490 (1975).............................................................................................11

WildEarth Guardians v. Jewell,
  738 F.3d 298 (D.C. Cir. 2013) ............................................................................27

Winnebago Tribe of Nebraska v. Ray,
  621 F.2d 269 (8th Cir. 1980) ..............................................................................35

Winter v. Natural Resources Def. Council, Inc.,
  555 U.S. 7 (2008)................................................................................................38

**STATUTES**

5 U.S.C. §§ 702, 704....................................................................................................8

5 U.S.C. § 706(2)(A)....................................................................................................9

12 U.S.C. § 235k.........................................................................................................32

12 U.S.C. § 635(a)(1)...........................................................................................1, 2, 34

12 U.S.C. § 635(b)(1)(A).............................................................................................4

12 U.S.C. § 635(b)(1)(B)..........................................................................................2, 4

12 U.S.C. § 635a-4..................................................................................................3, 19

12 U.S.C. § 635i-5(a)(1) .........................................................................................4, 30

12 U.S.C. § 635k....................................................................................................2, 32

42 U.S.C. §§ 4321-4370(h)..........................................................................................1

42 U.S.C. 4332(C) ......................................................................................................27

## REGULATIONS

12 C.F.R. §§ 408.4(a), 408.4(b)(1) ................................................................30

40 C.F.R. § 1508.18 .......................................................................29, 30, 31, 34

74 Fed. Reg. 63544 (Dec. 4, 2009) ...............................................................33

78 Fed. Reg. 54873 (Sept. 6, 2013) ...............................................................27

## RULES

Fed. R. App. Proc. 32.1(a) ...........................................................................37

Fed. R. Civ. P. Rule 56 ...................................................................................8

Fed. R. Evid. 201(b)(2) ...................................................................................3

**TABLE OF ACRONYMS**

APA           Administrative Procedure Act

CEQ           Council on Environmental Quality

CIEL          Center for International Environmental Law

CRTI          Character, Reputational, and Transaction Integrity

EPA           Environmental Protection Agency

FAA           Federal Aviation Administration

HUD           Housing & Urban Development

MGA           Master Guarantee Agreement

NEPA          National Environmental Protection Act,

PNC           PNC Bank

SBA           Small Business Administration

WCGP          Working Capital Guarantee Program

W.C. Manual   Working Capital Guarantee Program Manual, EXPORT-IMPORT BANK OF THE UNITED STATES, at 3 (Dec. 21, 2005)

Xcoal         Xcoal Energy & Resources, LLC

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CHESAPEAKE CLIMATE ACTION NETWORK, et al., | ) | Civil Action No. 13-1820 RC |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **FEDERAL DEFENDANTS' MOTION** |
| | ) | **FOR SUMMARY JUDGMENT, AND** |
| EXPORT-IMPORT BANK OF THE | ) | **OPPOSITION TO PLAINTIFFS'** |
| UNITED STATES, et al. | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Federal Defendants. | ) | |
| | ) | |
| _____ | ) | |

In this action, filed in July 2013, Plaintiffs challenge a 2012 decision by the Export-Import Bank of the United States[1] to guarantee a working capital revolving line of credit from PNC Bank ("PNC") to Xcoal Energy & Resources, LLC ("Xcoal"), an exporter of coal.  The Bank is an independent agency of the Federal Government authorized to do a "general banking business," including authority "to guarantee notes . . . and other evidences of indebtedness" such as the line of credit from PNC to Xcoal.  12 U.S.C. § 635(a)(1).  Plaintiffs allege that the coal export process — particularly, the coal's extraction by coal companies, its shipment by rail companies, its storage at port terminals, and its loading onto ships bound for overseas end-users — results in environmental contamination that harms the Plaintiffs' members.  Plaintiffs further argue that the Bank violated the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370(h) ("NEPA"), by not analyzing these potential environmental harms.[2]

The relationship between the Bank's guarantee to PNC and the alleged impacts to Plaintiffs' members (from the incremental increase in emissions from third-party activities coordinated by Xcoal) is so attenuated that it is insufficient as a matter of law to support this Court's jurisdiction or Plaintiff's NEPA claim.  Federal Defendants are entitled to summary judgment on Plaintiffs' claims for two reasons.  First, the chain of causation and redressability between the Bank's guarantee to PNC and the impacts of

---

[1] The Export-Import Bank of the United States and Chairman Fred P. Hochberg, sued in his official capacity, are referred to in this Memorandum collectively as "the Bank" or "Federal Defendants."

[2] Plaintiffs do not sue the lender (PNC) that issued the line of credit, the borrower (Xcoal), or the unrelated companies that mine, carry (by rail), or ship the coal, even though environmental harms Plaintiffs allege result from the independent decisions of those companies (who are not parties to the PNC line of credit).  Nor do Plaintiffs seek relief from any federal or state agency with regulatory jurisdiction over environmental contamination or releases from the various processes that occur during the export of coal.

1

fugitive coal dust generated by Xcoal's suppliers, transport companies and shippers is too attenuated and too speculative to permit Plaintiffs to establish constitutional standing under Article III.   Second, Federal Defendants' role in producing the complained-of impacts is neither a necessary precondition for those third party activities nor otherwise substantial enough to trigger NEPA's requirements.   The guarantee for PNC's working capital line of credit to XCoal is not a "major federal action," and Plaintiffs have failed to establish this essential element of their NEPA claim.

## BACKROUND

### 1.   The Export-Import Bank of the United States

The Bank is the official export credit agency of the United States.   Established in 1934, the Bank's core mission is "to facilitate exports of goods and services . . . and in so doing to contribute to the employment of United States workers."  12 U.S.C. § 635(a)(1).  The Bank is governed by a Charter that is periodically reapproved by Congress.   The Bank accomplishes its mission through a variety of programs, including "loans, guarantees, insurance, and credits," that all support the exports of U.S. goods and services, and thereby support U.S. jobs.  Id.   Loans authorized under the statute must, "in the judgment of the Board of Directors, offer reasonable assurance of repayment[.]" 12 U.S.C. § 635(b)(1)(B).  The Bank's guarantees carry the Full Faith and Credit of the United States. 12 U.S.C. § 635k.

Since its founding, the Bank has provided financing, or issued guarantees or insurance in support of financing, to foreign purchasers of exports of U.S. goods and services.   In 1982, Congress directed the Bank to establish a new program whereby the Bank would guarantee loans to U.S. export companies.   These loans were to be

collateralized by inventory and accounts receivable.  12 U.S.C. §635a-4.  This came to be

known as the Bank's working capital guarantee program ("WCGP").

Under its working capital guarantee program, the Bank enters into master

guarantee agreements ("MGA"s) with lenders.  The MGA is an umbrella document that

sets forth the terms and conditions under which the lender must operate in extending a

Bank-guaranteed working capital line of credit to a borrower.  These working capital

lines of credit are secured with the export-related inventory and/or accounts receivables

of the borrower.  Since these inventories and accounts receivables generally "turn over"

on a regular basis, the lender is required to monitor the inventory and receivables.  After

the Bank approves a working capital transaction, it issues a loan authorization agreement

which then triggers the guarantee provisions of the MGA.  The lines of credit guaranteed

pursuant to the MGA are short-term working capital lines of credit extended by the

guaranteed lender to U.S. exporters. See generally Working Capital Guarantee Program

Manual, Export-Import Bank of the United States, at 3 (Dec. 21, 2005),

http://www.exim.gov/tools/applicationsandforms/upload/EBD-W-15.pdf (last visited Jan.

10, 2014)  [hereinafter, the "W.C. Manual"].[3]  In the event that the U.S. exporter defaults

on its obligation to the guaranteed lender, the Bank will indemnify the lender up to the

amount of the guarantee, take assignment of the borrower's obligation to repay the line of

credit, and pursue collection against the borrower.  Id. at 4, 23.  Although the program

benefits U.S. exporters by providing them with access to export financing, "the

---

[3] The manual is cited in Plaintiffs' brief.  See Pls.' Mem. for Summ. J., ECF. No. 56
(hereinafter "Pls.' Mem."), at 10.  This Court may take judicial notice of documents on
the Bank's website under Federal Rule of Evidence 201(b)(2). Hamilton v. Paulson, 542
F. Supp. 2d 37, 52 n.15 (D.D.C. 2008), rev'd on other grounds sub nom. Hamilton v.
Geithner, 666 F.3d 1344 (D.C. Cir. 2012) (documents maintained on the website of a
United States agency are "subject to judicial notice by the Court") (citations omitted).

Guarantee protects the Lender.  It does <u>not</u> protect the Borrower in the event of non-payment from a foreign buyer."  <u>Id.</u> 4 (emphasis in original); AR00071 (MGA § 2.01) (if borrower fails to pay, Bank "shall pay Lender").  The Lender pays the facility fees associated with the guarantee.  AR000071 (MGA § 2.01)

Once the Bank's guarantee is approved, the guaranteed lender enters into the loan agreement with the borrower/U.S. exporter.  The loan agreement between the guaranteed lender and the borrower can take various forms depending upon the guaranteed lender. The Bank dictates one such form (called the "Borrower Agreement") which acts as an adjunct to whatever form of loan or credit agreement that the guaranteed lender enters into with the Borrower.  However, the Bank is not a party to the loan agreements -- not even the Borrower Agreement - between the borrower and the guaranteed lender  <u>Id.</u> 43 The repayment term for such loans is one year or less, but they can be renewed for up to three years before requiring a new application and approval. W.C. Manual 5.  The loans are reviewed annually.  <u>Id.</u> at 25.

Because part of the Bank's purpose is to maintain the competitiveness of U.S. export companies, 12 U.S.C. § 635(b)(1)(A) & (B), the Charter contains multiple provisions to ensure that information submitted by applicants will remain confidential. <u>See, e.g.</u>, 12 U.S.C. § 635i-5(a)(1) (procedures for environmental disclosure subject to caveat that provision "shall not be interpreted to require the public disclosure of any information described in section 1905 of Title 18 [Trade Secrets Act].").

 **2. The Guarantee to PNC**

On May 24, 2012, pursuant to the MGA between the Bank and PNC, the Bank approved a $90 million guarantee to PNC for a $100 million revolving working capital

line of credit issued by PNC to Xcoal.  AR000001.[4]  The Bank issued its guarantee to

PNC and is not a party to the underlying loan agreement between PNC and Xcoal.  Id.

(listing "Applicant" as PNC).  Xcoal is a Pennsylvania-based company that markets

metallurgical and thermal coal produced by mining operations located in Appalachia for

international export.  AR00032A; Decl. of Craig McLane dated May 1, 2014 (hereinafter

"McLane Decl.") (attached hereto as "Exhibit A")[5], ¶¶ 1, 3.   Xcoal markets the coal to

foreign buyers and secures contracts to arrange for its delivery from the mines to the

ports to the end-users.  AR000034-35A.  To augment and diversify its available working

capital, Xcoal has loans or lines of credit from seven private lenders, in addition to PNC.

AR000036-37A; McLane Decl. ¶  7.  At the time the Bank's Board approved the

guarantee to PNC, Xcoal utilized approximately 70% of the credit available under these

lines.  Id. Today, Xcoal has approximately $535 million in available lines of credit from 8

---

[4] The Export-Import Bank has a delegated authority lender program under which certain qualified lenders, within certain financial limits (up to $10 million), may "approve loans and receive an Ex-Im Bank guarantee without having to submit individual applications to Ex-Im Bank for approval."  W.C. Manual at 31.  A Fast Track Lender Program enables lenders who meet certain criteria, for loan facilities between $10 and 25 million, to receive approval on an expedited basis. Id. at 40.  Because PNC's loan to Xcoal was for $100 million, it was not eligible for either of these two programs, and thus an application and board approval were required.

[5] Mr. McLane is the Vice President of Xcoal.  McLane Dec. ¶ 1.  His declaration may be considered by this Court in connection with its threshold determination of whether Plaintiffs have established standing to assert their claims. Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (citations omitted).  The parties are currently briefing two motions related to whether third-party declarations may also be considered by this Court when it rules upon the merits of Plaintiffs' claims.  See ECF Nos. 57, 59 & 61.  Although Federal Defendants dispute that third-party declarations may be considered for merits issues in a suit brought under the Administrative Procedure Act, the Bank could be prejudiced if it has not submitted evidence to refute the Plaintiffs' declarations and the Court rules that such evidence is admissible. Federal Defendants have cited Mr. McLane's declaration in Sections II (standing) and III (merits) of their brief.  If the Court grants the motion to strike, however, Federal Defendants will re-submit a brief that eliminates all references to the McLane declaration in Section III.

different lenders (including PNC) with a utilization rate of approximately 30%.  Id.  In other words, Xcoal has over $370 million in available unused credit.  McLane Decl. ¶8.

By securing lines of credit from multiple lenders, Xcoal is able to mitigate against the risks of being dependent on any one lender.  Xcoal's lenders other than PNC are European banks.  McLane Decl. ¶ 7.  Prior to the Bank's approval of the guarantee in question, the Bank had approved smaller guarantees to PNC for working capital loans to Xcoal.  AR000035-36A; McLane Decl. ¶ 5.   However, the 2010 European debt crisis created uncertainty about the ability and willingness of European banks to finance Xcoal's working capital needs reliably.  AR000032A ("[G]iven the uncertainty of the European sovereign debt crisis the Company is concerned that its European banks may not be in a position to fund the Company in the future[.]"); AR000037A; McLane Decl. ¶ 6. As a result, Xcoal sought an increase in its existing line of credit with PNC. McLane Decl.  ¶ 9.  After evaluating the application, including the Bank's past dealings with PNC and Xcoal, as well as Xcoal's financial condition, the Bank concluded that the criteria for its WCGP were met and that it was reasonably reassured of repayment.

One type of line of credit available under the WCGP is a "transaction specific" line of credit.  For such instruments, the line of credit may only be used in connection with specifically identified contracts between the borrower and foreign purchasers.  This is primarily so that, in the event of a bankruptcy or liquidation of the borrower, the guaranteed lender and the Bank can more readily identify the inventory and the receivables related to the approved contracts in order to assert their rights in that collateral vis a vis other creditors.  In addition, as part of the underwriting leading up to the Board approval, the Bank typically checks the names of the participants in the

transaction against a database of "bad actor" lists.  The Bank calls this its "Character, Reputational, and Transaction Integrity ("CRTI") process.

Because of the nature of the contracts between Xcoal and its purchasers, however, Xcoal cannot necessarily identify the purchasers well in advance.  Thus, in May 2012, at the time of the approval of the Bank's guarantee by the Board of Directors, the specific underlying contracts were not identified.  For the Xcoal line of credit, because the Bank could not identify Xcoal's purchasers prior to the Board's approval of the guarantee, the Bank required that PNC submit each contract or purchaser order for review and approval by the Bank.  This also enabled Bank to run the names of these purchasers through its CRTI process before those purchase contracts were included in the PNC line of credit.

### 3.   Plaintiffs' Complaint

The Complaint, originally filed in the Northern District of California, challenges the Bank's decision to issue the guarantee under NEPA.  According to the Complaint, the Bank's guarantee to PNC Bank will allow Xcoal "to broker an estimated $1 billion in sales of coal for export from mines in Appalachia; transport that coal by rail to port facilities in Baltimore, MD and Hampton Roads, VA; unload, store and otherwise handle that coal in port; and then transport that coal by ship to clients in China, Japan, South Korea and elsewhere."  Compl. (ECF No. 1)  ¶ 2.  The Complaint alleges that such activities will have impacts on human health and the environment because "coal mining, transport by rail in open cars, unloading from rail cars to storage piles at port, and reloading onto ships, all emit large quantities of coal dust." Id. ¶ 3; see also id. ¶¶ 24-31 (describing effects).   Plaintiffs assert that the Bank's failure to analyze such impacts before approving the guarantee to PNC violates NEPA and asks for declaratory relief and

an order requiring the Bank to rescind the guarantee.  Id. ¶ 4; ECF No. 16-14 (proposed

order enjoining "any activity in furtherance of the loan guarantee").

## ARGUMENT

### I.      The Administrative Procedure Act

Summary judgment may be granted to a moving party when it shows that there are no

material facts in dispute and that the moving party is entitled to judgment as a matter of

law.  See Fed. R. Civ. P. Rule 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Courts review challenges brought under NEPA pursuant to the Administrative Procedure

Act ("APA").  5 U.S.C. §§ 702, 704; Karst Envtl. Educ. and Protection, Inc. v. E.P.A.,

475 F.3d 1291, 1297 (D.C. Cir. 2007). In reviewing final agency action under the APA,

the relevant facts, with few exceptions, are limited to those presented in the

administrative record of the agency.  Fla. Power & Light Co. v. Lorion, 470 U.S. 729,

743 (1985); see also Camp v. Pitts, 411 U.S. 138, 143 (1973).  Because the role of the

Court under the APA is not to "find facts" but is limited to reviewing the administrative

record to determine whether the federal agencies considered the relevant factors and

reached conclusions that were not arbitrary and capricious, there can be no genuine issue

of material fact, and summary judgment is the appropriate process to resolve this case.

See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985); Defenders of

Wildlife v. Babbitt, 130 F.Supp.2d 121, 124 (D.D.C. 2001) (summary judgment is

appropriate for resolving a challenge to a federal agency's administrative decision)

(citation omitted).

In addition to prescribing the scope of judicial review, the APA provides a

deferential standard for review of a challenge to an agency action.  In examining such a

8

challenge, a reviewing court applies the standard in 5 U.S.C. § 706(2)(A), and determines whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  The question is not whether the Court itself would have made the same decision, because "the court is not empowered to substitute its judgment for that of the agency." <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 415-16 (1971) (citations omitted).  Rather, the Court must uphold the decision if the agency followed required procedures, evaluated relevant factors, and reached a reasoned decision which did not constitute a clear error of judgment or exceed the bounds of its statutory authority. <u>Id.</u>  It is the plaintiff's burden to prove that these criteria are not met and that the agency's decision was arbitrary and capricious.  <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).[6]

---

[6] Plaintiffs claim that under <u>Citizens Against Rails–to–Trails v. Surface Transp. Bd.</u>, 267 F.3d 1144, 1151 (D.C. Cir. 2001), this Court should apply <u>de novo</u> review to the issue of whether the loan guarantee was a "major federal action."  The D.C. Court of Appeals in <u>Citizens Against Rails-to-Trails</u> equated <u>de novo</u> review with review for "reasonableness." <u>Id.</u> at 1151, n.7 (citing with approval cases from other circuits that reviewed threshold NEPA questions under a "reasonableness" standard).  However, the court in that case was addressing the agency's determination that "NEPA is inapplicable to the Trails Act," and whether the agency's authority over the Act entitled its determination to deference under <u>Chevron v. Natural Res. Defense Council, 467 U.S. 837 (1984)</u>.  Here, in contrast, the issue is whether NEPA applied based on the facts before the agency. In <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360 (1989), the Supreme Court considered the standard of review for NEPA claims (including a claim that the agency failed to prepare, or to document its decision not to prepare, a supplemental Environmental Impact Statement) and expressly rejected any standard other than "arbitrary and capricious." 490 U.S. at 377 & n.23. Accordingly, Plaintiffs' claim should be reviewed under that standard.  In any event, the Supreme Court in <u>Marsh</u> recognized that "the difference between the 'arbitrary and capricious' and 'reasonableness' standards is not of great pragmatic consequence." <u>Id.</u> at 377 n.23.  Under the "reasonableness" standard, an agency's action should be upheld unless it is unreasonable. <u>See, e.g.</u> <u>Northcoast Envtl. Ctr. v. Glickman</u>, 136 F.3d 660, 667 (9th Cir.1998) (cited in <u>Citizens Against Rails–to–Trails</u>, 267 F.3d at 1151, n.7).

## II.     Plaintiffs Lack Standing to Assert Their Claims

### A.    Elements of Standing

A party's standing under Article III of the Constitution is a "threshold jurisdictional question" that a court must decide before it may consider the merits.   Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102 (1998); Raytheon Co. v. Ashborn Agencies, Ltd., 372 F.3d 451, 453 (D.C. Cir. 2004) (citation omitted).  Because federal courts are courts of limited jurisdiction, the presumption is that a party lacks jurisdiction unless the contrary appears affirmatively from the record. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citation omitted).  The party seeking to invoke jurisdiction bears the burden of establishing standing "with the manner and degree of evidence required at the successive stages of the litigation."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (citations omitted); see also Equal Rights Ctr. v. Post Properties, Inc., 633 F.3d 1136, 1141 n. 3 (D.C. Cir. 2011) (noting that although "the burden imposed on a plaintiff at the pleading stage is not onerous," that burden "increases . . . as the case proceeds").

To establish Article III standing, a plaintiff must plead and show that: (1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's challenged action; and (3) that it is likely, as opposed to merely speculative, that a favorable judicial decision will prevent or redress the injury. Summers, 555 U.S. at 493 (2009). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Defenders of Wildlife, 504 U.S. at 562 (citations omitted).

A plaintiff whose alleged injury hinges on actions taken by one or more third parties must "adduce facts showing that those [third party] choices have been or will be made in such manner as to produce causation and permit redressability of injury." Id. at 562(citing Warth v. Seldin, 422 U.S. 490, 505 (1975)); see also Chamber of Commerce of U.S. v. EPA, 642 F.3d 192, 201 (D.C. Cir. 2011); Clapper v. Amnesty Int'l., 133 S.Ct. 1138, 1150 (2013) (noting Court's "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").   Stated differently, "when numerous third parties and independent variables lead to an injury, the complainant has the burden of showing that but for the particular governmental action he is challenging, the injury would abate." Dellums v. U.S. Nuclear Regulatory Comm'n, 863 F.2d 968, 980 (D.C. Cir. 1988) (citations omitted).  Failure to sufficiently allege the elements of standing is fatal because "even at the pleading stage, a party must make factual allegations showing that the relief it seeks will be likely to redress its injury." Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs., 489 F.3d 1267, 1276 (D.C. Cir. 2007); see also Appalachian Voices v. Bodman, 587 F. Supp. 2d 79, 88 (D.D.C. 2008) (granting motion to dismiss based on lack of traceability); Humane Soc'y v. Vilsack, No. 12-1582 (ABJ), 2013 WL 5346065, at *9, *11-12 (D.D.C. Sept. 25, 2013) (granting motion to dismiss based on lack of causation, redressability). An allegation of injury or of redressability that is too speculative will not "suffice to invoke the federal judicial power." United Transp. Union v. Interstate Commerce Comm'n., 891 F.2d 908, 911 (D.C. Cir. 1989) (citations omitted).

Here, Plaintiffs fail to meet that burden because they have not shown, and cannot show, that the injury they allege is traceable to the Bank's guarantee to PNC, or would be

redressed by an order invalidating the guarantee.   To the contrary, the asserted impacts

from coal mining and fugitive coal dust Plaintiffs identify as the cause of their alleged

injuries result from combined actions taken by, and decisions made by, Appalachian

mining companies, rail companies, shipping companies and port terminals, commercial

lenders, and foreign manufacturers that use coal produced in the United States.   The

defect in Plaintiffs' theory, whether characterized as an overly attenuated (and

speculative) chain of causation, or a failure to show that their injuries would be redressed

by the relief they seek against Federal Defendants, is the same: Plaintiffs' alleged injuries

could only be caused by the independent actions of multiple third parties, not the Bank.

> **B.   Plaintiffs Have Not Shown that Their Alleged Injuries Are Fairly Traceable to the Bank's Guarantee to PNC Bank.**

Plaintiffs do not have standing because none of their asserted injuries are "fairly

traceable" to the Bank's guarantee to PNC.  <u>Defenders of Wildlife</u>, 504 U.S. at 560.

Courts have a "duty to scrutinize closely" the relationship between the challenged

government activity and the alleged harm at issue.  <u>Freedom Republicans, Inc. v. Fed.</u>

<u>Election Comm'n</u>, 13 F.3d 412, 417 (D.C. Cir. 1994). "[U]nless there is a substantial

probability that the substantive agency action . . . created . . . or caused a demonstrable

increase in an existing risk, of injury to the particularized interests of the plaintiff, the

plaintiff lacks standing." <u>Fla. Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 669 (D.C. Cir.

1996) (internal citation omitted);  <u>Humane Soc'y v. Vilsack</u>, 2013 WL 5346065, at *9

(citations omitted).

Here, Plaintiffs have failed to show a substantial probability that their alleged

injury --  effects to their members from increased levels of fugitive coal dust emitted

during the mining (by coal companies) and transportation (by rail and shipping

companies) of coal brokered by Xcoal -- is traceable to the Bank's guarantee to PNC.

See Sierra Club v. U.S. Dep't of Energy, 825 F. Supp. 2d 142, 152 (D.D.C. 2011) ("That

the Sierra Club may be harmed by the [] project, however, is not the same as saying it

will be harmed by the federal funding, which is what it seeks to enjoin.") (emphasis

added).

 1. Plaintiffs Have Failed to Establish a Chain of Causation that Would Make
 Their Injuries "Traceable" to the Bank's Guarantee.

Where, as here, a chain of causation rests on the acts of third parties, the plaintiff

"must show that the agency's action is more than only one of the many factors whose

relative influence may affect the third parties' behavior." Cmty. For Creative Non-

Violence v. Pierce, 814 F.2d 663, 669 (D.C. Cir. 1987); Appalachian Voices, 587 F.

Supp. 2d at 88 ("[T]o establish standing, the plaintiffs . . . must demonstrate that it is

substantially probable that the [challenged federal action] will demonstrably threaten the

environmental quality" near areas where the Plaintiffs live or recreate.).  Moreover,

where the causal chain that purportedly links a defendant's actions to a plaintiff's injury

"relies on the acts of not one, but several groups of third parties . . . none of whom are

before this court," the plaintiff's burden is even more difficult: "the greater [the] number

of uncertain links in a causal chain, the less likely it is that the entire chain will hold

true." Fla. Audubon Soc'y, 94 F.3d at 670.

Here, Plaintiffs' burden is particularly arduous because Plaintiffs must establish

(1) that PNC would not have extended the line of credit to Xcoal without the Bank's

guarantee; and (2) that Xcoal would not have obtained credit from another domestic or

foreign lender, or drawn on its existing but underutilized lines with foreign lenders, had it

not received a loan from PNC; and (3) that Xcoal's suppliers and buyers would not have

made alternative arrangements with another intermediary, if Xcoal had been unavailable to broker the transactions or had insisted upon their agreement to non-standard contractual terms.

  a. Plaintiffs have not shown that without the guarantee, PNC would not have issued the line of credit to Xcoal.

Plaintiffs have failed to show that absent the guarantee, PNC (or some other domestic lender) would not have extended the line of credit to Xcoal under different terms. The administrative record contains a statement that PNC had "traditionally" been unwilling to engage in such transactions without the Bank's support. AR000032A. That is insufficient for Plaintiffs' to meet their burden of demonstrating that PNC would have not have issued the line of credit on different terms that would compensate for the additional risk.

  b. Plaintiffs have not shown that without the line of credit from PNC, Xcoal would have lacked the credit necessary to export the same volume of coal.

Even if Plaintiffs could prove that PNC would not have issued the $100 million line of credit without the guarantee, Plaintiffs cannot establish that Xcoal would have been prevented from conducting the same volume of exports. The extra-record evidence Plaintiffs have submitted in support of their claims here, even if admissible under the Rules of Evidence, does not demonstrate such a connection. Plaintiffs' putative expert, former New York State Comptroller Tom Sanzillo,[7] citing a memorandum to the Board

---

[7] Plaintiffs cite Mr. Sanzillo's declaration in support of their argument that but for the Bank's approval of a guarantee for PNC's line of credit, Xcoal would have had to limit or end its business. Pls.' Mem. 10. Federal Defendants have moved to strike Mr. Sanzillo's declaration on the grounds that Mr. Sanzillo's experience with commercial lending is insufficient and his conclusions are not adequately supported to make his testimony admissible under Rule 702. ECF No. 59. Federal Defendants' reply in support of this motion will be filed May 5, 2014.

recommending approval of the guarantee, points to "Xcoal's perceptions of its risk with European lenders" at the time of its application, Sanzillo Decl., ECF No. 57-4, ¶ 22, but cites no evidence that any – much less all – of Xcoal's European lenders actually failed to honor their credit agreements with Xcoal during the relevant timeframe.  Mr. Sanzillo seems to simply assume that if Xcoal was concerned about the liquidity of one or more of its European lenders, then Xcoal's only source of financing was PNC.  To the contrary, the record and Mr. McLane's declaration establish that PNC's line of credit represented only a small portion of the overall credit available to Xcoal at the time, which remains true today.  See McLane Decl. ¶¶ 7-8.

Plaintiffs' failure to prove that Xcoal would have lacked the necessary credit through its existing lines with foreign banks or other alternatives to export the same quantity of coal but for the PNC line of credit is fatal.  In Appalachian Voices, the plaintiffs challenged the allocation of a tax credit for a power plant. 587 F. Supp. 2d at 89.  Acknowledging allegations that the challenged tax credits represented seven percent of the funding for the power plant, the court nonetheless held that the plaintiffs had failed to establish that the tax credit was "a substantial factor in Duke Energy's decision to go forward with the project."  Id.  More specifically, in finding that plaintiffs lacked standing, the court noted that "the plaintiffs' assertion that the [tax] credits prompted Duke Energy to build the Cliffside plant is severely undermined by the fact that Duke Energy was preparing to build the plant even before it was awarded the tax credit." Id.[8]

---

[8] The court later permitted the plaintiffs to amend their complaint to add more specific allegations linking their alleged injuries to the agency conduct identified in their complaint.  Appalachian Voices v. Chu, 262 F.R.D. 24, 29 (D.D.C. 2009).  Noting a "challenging question" as to whether the amendment would be futile, the court granted the motion, finding that the proposed allegations would enable the complaint to withstand a motion to dismiss "-- albeit by only a slight margin." Id. at 28-29.

<u>See</u> <u>also</u> <u>Klein v. U.S. Dep't of Energy</u>, Case No. 2:11-cv-514, *17-18 (W.D. Mich. Dec. 11, 2012) (attached hereto as "Exhibit B") (plaintiffs failed to show standing absent evidence that project would not have gone forward without federal funding); <u>Touret v. National Aeronautics and Space Admin.</u>, 485 F.Supp.2d 38, 44 (D.R.I. 2007) (no standing, and no "major federal action," where project would have been built even without federal funds).

Like the claims advanced in <u>Appalachian Voices</u>, Plaintiffs' assumption that the guarantee here prompted Xcoal to secure purchase orders that it otherwise would have been unable to obtain is undermined by the fact that Xcoal had existing relationships for both marketing coal and financing its exports before the challenged guarantee was approved.  AR000032A (Xcoal "is seeking to <u>replace</u> [pre-existing] financing arrangements with an increase in the Ex-Im Bank Loan Facility") (emphasis added); <u>id.</u> (noting shipping agreements in place) AR00036A-37A (Xcoal had $530 million in lines of credit available with nine different European banks).  The company's pre-existing relationships included relationships with other lenders, PNC and seven European banks among them.  McLane Decl. ¶¶ 5, 7.

> c.     Plaintiffs Have Not Shown that But for Xcoal's Activities, the Coal Mining and Transportation Injuries they Allege Would Not Have Occurred.

Plaintiffs make no showing in their motion and supporting exhibits that if Xcoal had been unable to obtain the necessary funding to continue or expand its export activities, coal suppliers in Appalachia and end users in Japan, South Korea, China, or Brazil, AR000020, would not have accomplished the same transactions with assistance

from one of Xcoal's competitors.[9] See AR000133 (listing other brokers).  Cf. Fla. Audubon Soc'y, 94 F.3d at 670 (no standing where one link in causal chain was that increased demand for ethanol must "not simply displace existing markets for currently produced ethanol, but in fact increase demand for the agricultural products from which ethanol is made."); Dellums, 863 F.2d at 974-75 (petitioners that had not sought to demonstrate "that an increase in demand for domestic uranium-if it resulted-would be sufficient in magnitude to make domestic processing profitable" lacked standing). Plaintiffs have not shown that the impacts of coal mining and export they complain of are fairly traceable to the Bank's guarantee of PNC's line of credit to Xcoal.  On the contrary, the McLane Declaration demonstrates that Xcoal operates in a competitive industry and that any void left by Xcoal would be quickly filled by its competitors. McLane Decl. ¶11.

 2. Plaintiffs Fail to Prove that the Bank Could Have Imposed Contractual Conditions that Would Have Prevented their Alleged Environmental Injuries.

---

[9] Plaintiffs attempt to extrapolate the incremental volume of coal Xcoal was able to export using the PNC line, and claim that without the line, Xcoal would not have been able to support the export of the same volume of coal.  These calculations, see Pls.' Mem. 4 n.5 & n.6, rely primarily on 2012 sales price and volume data in the record that is clearly designated as projected or predicted rather than actual numbers. See AR000271 (providing "2011" and "2012e" data) & AR000133 (2011 and 2012 data indicate "est"). Regardless of whether any increase in Xcoal's business would have been possible but for the PNC line, Plaintiffs have not claimed that there was an increase in overall volume of U.S. coal exports.  See Sanzillo Decl. ¶ 15 (discussing "declines in market activity" but citing only price and revenue data).  If Xcoal's claimed expansion came at the expense of other brokers, rather than indicating an overall expansion of U.S. coal markets, the impacts of coal export on Plaintiffs' members would have been the same; the coal to fill orders for other brokers is mined at the same facilities in Appalachia, carried on the same lines and under the same conditions, and shipped out from the same terminals. See Pls.' Mem. 35-36 (describing pollution at Norfok Southern facility in 2011 [before loan guarantee approved]).

Plaintiffs rely upon Mr. Sanzillo's declaration to support their contention that the Bank would have had sufficient leverage to require, as a condition of issuing the guarantee to PNC, that Xcoal agree to certain (unspecified) environmental conditions, Pls.' Mem. 33 (citing Sanzillo Decl. ¶¶ 22-24).  However, Mr. Sanzillo's analysis fails for several reasons.  First, Mr. Sanzillo lacks the credentials to establish that he is an expert in banking, trade or international finance, and his declaration is therefore inadmissible under Federal Rule of Evidence 702.  Mr. Sanzillo's experience in accounting and government service do not equip him to opine on the workings of credit institutions such as the Export-Import Bank or PNC Bank, nor does it qualify him to speculate on the future behavior of world commodities markets such as the coal market. Mr. Sanzillo's purported "expert" testimony should be rejected in full.  See Fed. Def.' Mot. to Strike, ECF No. 59.

Second, Mr. Sanzillo fails to explain that, in order for his unspecified conditions to have any effect: a) PNC would have to agree to impose these conditions on Xcoal; b) Xcoal would have to agree to impose these conditions on its contracting parties such as suppliers, shippers, etc.; and c) these contracting parties would have to agree to comply with these conditions.  Mr. Sanzillo's declaration provides no basis to believe that either PNC or Xcoal would have agreed to these hypothetical conditions.  More importantly, it is wildly speculative to assert that the contracting parties - the coal suppliers and transporters - would agree to the non-standard terms (e.g., to use covered coal cars for all Xcoal shipments when they don't cover the coal cars for any other shipments) simply because Xcoal demanded it.  Nothing Plaintiffs have identified suggests that Xcoal has

such leverage.[10] The evidence suggests the opposite conclusion.  See McLane Decl. ¶¶

12-13 (stating that based on knowledge of market and standard industry practices,

Xcoal's suppliers and shippers would not have agreed to environmental conditions).

Significantly, Mr. Sanzillo's declaration – which acknowledges that Xcoal's role

as a broker is primarily to add value "at the nexus of supply and demand," id. ¶ 13, --

fails to make any representation that the transactions Xcoal coordinates using the loan

facility could not have been accomplished by Xcoal's competitors if, for some reason,

Xcoal was not available.  But such a showing is critical to Plaintiffs' assumption that a

greater volume of coal was exported from the United States, and thus environmental

impacts were greater, as a result of the PNC loan.  Plaintiffs' failure to establish any of

the many links in the causal chain between the Bank's guarantee and the impacts they

allege should result in summary judgment for Federal Defendants because Plaintiffs lack

standing to bring their claims.

     3.     The Bank's Charter does not support Plaintiff's traceability argument.

Other than the declaration evidence they submit, the only basis Plaintiffs identify

to support the traceability of their alleged harms to the Bank's action is the statute

establishing the Bank's WCGP.  See, e.g., Pls.' Mem 16 (citing 12 U.S.C. § 635a-4).

This provision authorizes and directs the Bank to "establish a program . . . to "provide

loan guarantees . . . when in the judgment of the Board of Directors – (1) the private

credit market is not providing adequate financing to enable otherwise creditworthy export

trading companies or exporters to consummate export transactions; and (2) such

---

[10] Because subjecting one broker to such requirements would distort the market in favor
of other brokers, Plaintiffs' policy goals regarding practices for coal mining and handling
would be better addressed by across-the-board changes from the state or federal agency
with regulatory authority over environmental contamination.

guarantees would facilitate expansion of exports which would not otherwise occur." 12 U.S.C. § 635a-4.  Plaintiffs' interpretation of this provision is misguided. The provision articulates criteria that apply to certain types of working capital transactions at a programmatic level, but does not require those criteria to be satisfied at the level of individual transactions.

Furthermore, the statute itself can not satisfy Plaintiffs' burden as a matter of law, because "[this] Circuit has made clear that when conducting a standing analysis, courts should not defer to the views of Congress or administrative agencies as to the effect of a law or policy."  Appalachian Voices, 587 F. Supp. 2d at 89 (citing Fla. Audubon Soc'y., 94 F.3d at 670-71); Dellums, 863 F.2d at 978-79; see also Freedom Republicans, Inc., 13 F.3d at 417 ("Defenders of Wildlife stresses the importance of immediate factual context in establishing causation and redressability, to the exclusion of broader, statutory technique-oriented rationales.").   As Judge Silberman explained:

> [W]e do not believe that congressional predictions either typically or in this case answer the same analytical question that the redressability component of Article III presents to us.  We must bear in mind that Congress need not meet constitutional causation standards before employing legislative power. . . . Congress is not constitutionally obliged to demonstrate that its exercise of legislative power will have a foreseeable proximate effect on any specific individual.  Congress may and often does pass legislation that seeks only approximately or imprecisely and perhaps over a long period of time to affect the behavior of men and nations. . . . [But the courts] must ask rigorously whether our use of judicial power will remedy the particular injury suffered by a person or a group of persons, and that question will rarely be the same as that which Congress addressed.

Dellums, 863 F.2d at 979; see also United Transp. Union, 891 F.2d at 916 ("Even if a proposed bill has but one chance in 1000 of solving or even mitigating a certain problem, Congress is free to enact it.").  Accordingly, courts do "not defer" to the views of

Congress or agencies "as proof of any causal chain necessary for standing." <u>Fla.</u>
<u>Audubon Soc'y.</u>, 94 F.3d at 670.   The statutory basis of the Bank's authority to issue
guarantees cannot supply the essential fact-specific context that is critical to establish
Plaintiffs' standing, but missing from their case-in-chief.   Plaintiffs have not satisfied
their requirement to "precisely trace the connection between injury and relief that is
indispensable to [the court's] jurisdiction," <u>Dellums</u>, 863 F.2d at 975, and Federal
Defendants are therefore entitled to summary judgment.

     **C.**     **Plaintiffs Have Not Demonstrated that Their Alleged Injuries Are**
          **Redressable by Relief From this Court**

     Plaintiffs also fail to demonstrate Article III standing "because they are unable to
show that [their] injury will be redressed by a favorable decision of this Court." <u>Cal.</u>
<u>Forestry Ass'n v. Thomas</u>, 936 F. Supp. 13, 18 (D.D.C. 1996); <u>Allen v. Wright</u>, 468 U.S.
737, 751 (1984)  ("relief from the injury must be 'likely' to follow from a favorable
decision") (citing <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26, 38, 41 (1976)).  A
plaintiff challenging a government decision must show that but for that decision, its
"injury would abate," <u>Dellums</u>, 863 F.2d at 980, and must plead facts that are sufficient
to carry that burden.  <u>Renal Physicians Ass'n</u>, 489 F.3d at 1275 ("[T]o establish
redressability . . . we require[] that the facts alleged be sufficient to demonstrate a
substantial likelihood that the third party directly injuring the plaintiff would cease doing
so as a result of the relief . . .  sought.").

     In cases where the plaintiff alleges a procedural violation, such as a NEPA claim,
the standards for showing redressability may be relaxed to the extent that the plaintiff is
not required to "establish with any certainty" that the <u>agency</u> would have reached a
different decision after following the omitted procedures.  <u>See</u> <u>St. John's United Church</u>

of Christ v. FAA, 520 F.3d 460, 463 (D.C. Cir. 2008).  But a plaintiff must satisfy the

normal -- and more stringent -- requirements to demonstrate redressability where it relies

on injury from the actions of third parties.  Id.; Cmty. for Creative Non-Violence, 814

F.2d at 669-70.  Particularly important for purposes of this motion, "when a third party 'is

prepared to obtain funding from other sources if federal money is unavailable,' the

plaintiff lacks standing due to a lack of redressability."  Sierra Club, 825 F. Supp. 2d at

150 (quoting St. John's United Church, 520 F.3d at 463).  See also Ex. B, Klein, at pp.

17-18.

       In this case, Plaintiffs have failed to demonstrate redressability.  Their arguments

and declarations fail to establish (a) that Xcoal could not secure – if it has not already --

the requisite level of credit to conduct its export activities even without the Bank's loan

guarantee, or (b) that the third-party suppliers and freight companies that are the source

of coal's alleged environmental impacts would have been unable to market their coal

without Xcoal's assistance.  Cf. Mclane Decl. ¶¶ 11, 13 (other export companies would

be available if Xcoal were unable to render services); AR00133 (listing competing

brokers).  Thus, "it is entirely speculative whether the injunction Plaintiffs seek would

either prevent or remedy their alleged injuries." Cal. Forestry, 936 F. Supp. at 18.  Other

cases within this Circuit have found redressability insufficient under similar

circumstances.  In Village of Bensenville v. FAA, 457 F.3d 52 (D.C. Cir. 2006), the

Court of Appeals dismissed a petition for lack of standing because the challenged federal

funding represented "only . . . a tenth of the funding" of the allegedly injurious airport

expansion. Id. at 70.  The court found that a result of "the relatively minor role of the

[federal] dollars in funding Phase I of the [airport] expansion, the fact that the City could

return to the FAA for a grant in a new application, and the existence of alternative

sources of funding," the relief requested was "unlikely to redress the petitioners' injury."

Id.  Similarly in Humane Society v. Vilsack, this Court held that even where contractual

payments by the Pork Board to an industry trade association (approved by the Secretary

of Agriculture) constituted as much of 32% of the trade association's annual budgeted

revenue, injuries from the association's lobbying activities were not redressable by a

court order invalidating the Secretary's approval because the association's "advocacy

could continue unabated." 2013 WL 5346065, at *12.  See also Appalachian Voices, 587

F. Supp. 2d at 89 (no standing where challenged tax credits represented seven percent of

the funding for challenged project).

The theory of redressability Plaintiffs advance in the instant case is even more

tenuous than those posited in Village of Bensenville and Humane Society because those

cases involved direct federal assistance (in the form of grants or loans), whereas the

agency action at issue here is a guarantee that will result in the disbursement of federal

dollars to PNC only in the event of a default by Xcoal.  AR000071 (MGA § 2.01)  These

cases weigh strongly in favor of awarding summary judgment to Federal Defendants

given the absence of any proof by Plaintiffs that the Bank-guaranteed PNC line is the sole

– or even a significant – source of funding for Xcoal's export activities.   On the contrary,

the McLane declaration demonstrates that Xcoal has sufficient alternative sources of

financing that it could, at this time, continue its business substantially unabated even in

the absence of the Bank's guarantee to PNC or the PNC line of credit to Xcoal.  McLane

Decl. ¶ 10 ("Had the PNC Bank/Ex-Im Bank loan facility not been extended to Xcoal in

July of 2012, or had it subsequently been cancelled, Xcoal still would have been able to

finance its export business to international coal markets through its European trade banks.").

Plaintiffs' asserted injury cannot be redressed by the relief sought because there is no way to predict how the third parties (PNC, Xcoal, coal companies, and foreign buyers) would respond to an order from this Court invalidating the loan guarantee, and certainly no reason to believe that Xcoal would discontinue export activities that have been underway since well before 2012. St. John's United Church, 520 F.3d at 463 (dismissing petition where petitioners had "not shown a 'substantial probability' that Chicago would scrap the O'Hare project if the court vacated the $29.3 million grant."); Sierra Club, 825 F. Supp. 2d at 151 (plaintiffs' standing doubtful where plaintiffs failed to show that relief sought "would imperil the project.").  Even if Plaintiffs could prove that at the time of the May 24, 2012 approval their injuries were traceable to the Bank's action, they cannot show that the injuries would be redressed by a decision from the Court at this time. Sierra Club, 825 F. Supp. 2d at 150-51 (injunctive relief  not warranted where there was "some evidence that [power company] would not have gone forward with the [] project had DOE not initially provided funding" but "the relevant question is what effect an order from this Court would have now") (emphasis in original); see also Allen, 468 U.S. at 753 n. 19 (distinguishing between causation, which looks at the relationship between the alleged unlawful conduct and the injury, and redressability, which concerns the relationship between the injury and the requested relief).   At this point, two years into the three-year term of the loan agreement between Xcoal and PNC, it is at least equally plausible that PNC would renegotiate its agreement with Xcoal to compensate the lender for any additional risk, or to require an alternative form of credit enhancement.   Cf. Vill.

of Bensenville v. FAA, 457 F.3d at 70  (plaintiffs failed to show redressability despite possibility that  renegotiations might be necessary absent proof that such renegotiations would significantly increase the likelihood "that the project would be scuttled altogether rather than merely delayed."); Sierra Club, 825 F. Supp. 2d at 151 (acknowledging that injunctive relief "would disrupt the current financing of the . . . project and ultimately make the project more expensive"); Humane Soc'y, 2013 WL 5346065, at *12 (no redressability where Pork Board and trade association could simply enter into new contract if court ordered relief requested).

Alternatively, with the debt crisis that motivated its application for the working capital guarantee program having eased considerably, McLane Decl. ¶ 10, Xcoal itself could obtain additional lines of credit, or draw on existing ones, with lenders other than PNC.  Although Xcoal's internal ability to generate capital may have been limited, Xcoal had the financial wherewithal to export eleven million tons of coal in 2010, before the guarantee at issue in this case was approved.  Compl. ¶ 20.   Mr. McLane's declaration establishes that Xcoal was and is "prepared to obtain funding from other sources if federal money is unavailable.' Sierra Club, 825 F. Supp. 2d at 150 (quoting St. John's United Church, 520 F.3d at 463; McLane Decl. ¶¶ 8-10.   Plaintiffs therefore lack Article III standing to assert their claims.

### D. Plaintiffs Pacific Environment and Center for International Environmental Law Have Failed to Show Injury-in-Fact

Federal Defendants are also entitled to summary judgment as to Plaintiffs Pacific Environment and CIEL for the additional reason that these advocacy organizations cannot show injury-in-fact.  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 169 (2000) ("An association has standing to bring suit on behalf of its members

when its members would otherwise have standing to sue in their own right, the interests

at stake are germane to the organization's purpose, and neither the claim asserted nor the

relief requested requires individual members' participation in the lawsuit.") (citation

omitted); <u>Chamber of Commerce</u>, 642 F.2d at 201.  Both organizations assert claims on

their own behalf.

Neither Pacific Environment nor CIEL can rely on injury to its organizational

interests.[11]  Under the law of this Circuit, "[i]t is clear that mere 'interest in a problem'"

coupled with unfavorable government action is not sufficient to meet the injury in fact

requirement of Article III." <u>Dellums</u>, 863 F.2d at 972 (organization that "alleged no

particularized injury to its members" lacked standing).  Thus, Plaintiffs' assertions that

the Bank's challenged actions force Pacific Environment and CIEL "to put extra time and

resources into monitoring Ex-Im Bank's policies," Pls.' Mem. 22 & 24, do not state

cognizable injuries.  Because an organization's policy agenda standing alone cannot

support Article III standing, the claims of Pacific Environment and CIEL are defective on

that ground as well.

**III.    Plaintiffs Complaint Must Be Dismissed Because They Have Failed to Plead a "Major Federal Action" that could support their NEPA Claim.**

NEPA requires federal agencies to complete an environmental impact statement

for "major federal actions significantly affecting the quality of the human environment."

42 U.S.C. 4332(C).[12]  Absent major federal action, NEPA does not apply.  <u>Mineral Policy</u>

---

[11] It is also unclear that the impacts of fugitive coal dust in Virginia and Maryland, alleged in the Complaint, are germane to Pacific Environment's organizational purpose of "protect[ing] the environment and peoples of the Pacific Rim."  Compl. ¶ 16a.

[12] Federal Defendants do not dispute that processes to extract and transport coal or other natural resources have the potential to "significantly affect the quality of the human environment." Nonetheless, such activities must be meaningfully connected to some federal decision in order to constitute "major federal action" subject to NEPA review.

<u>Ctr. v. Norton</u>, 292 F. Supp. 2d 30, 53 n.27 (D.D.C.  2003) ("If there is no 'major Federal action,' that is the end of the inquiry.") (citing <u>Citizens Against Rails–to–Trails v. Surface Transp. Bd.</u>, 267 F.3d 1144, 1151 (D.C. Cir. 2001)); <u>Fund for Animals, Inc. v. Thomas</u>, 127 F.3d 80, 84 (D.C. Cir. 1997).

"Congress did not intend NEPA to apply to state, local, or private actions hence, the statute speaks only to 'federal agencies' and requires impact statements only as to 'major federal actions.'" <u>Atlanta Coal. on the Transp. Crisis, Inc. v. Atlanta Reg'l Comm'n</u>, 599 F.2d 1333, 1344 (5th Cir. 1979); <u>see also</u> <u>Macht v. Skinner</u>, 916 F.2d 13, 18 (D.C. Cir. 1990) (purpose of NEPA is to "inject environmental considerations into the federal agency's decisionmaking process").  Under some circumstances, federal involvement in the activities of a state or private entity may be significant enough in degree to trigger NEPA's requirements.  But NEPA does not apply to a state or private project where the government has discretion "only over a negligible potion of it." <u>Citizens Against Rails-to-Trails</u>, 267 F.3d  at 1151.   To determine whether a major federal action exists, courts in this Circuit consider factors such as whether the project or program is a federal or non-federal one; whether significant funding for the project exists; and whether the agency has influence or control over the project in material respects. <u>See, e.g.</u>, <u>Mineral Policy Ctr.</u>, 292 F. Supp. 2d at 55; <u>Nat'l Org. for the Reform of</u>

---

Thus, some degree of NEPA undoubtedly is proper when, e.g., the Bureau of Land Management exercises its authority to issue leases for coal mining on public lands under its stewardship, or when the Corps of Engineers considers whether to exercise its permitting authority under the Rivers and Harbors Act and Clean Water Act so that a private party may construct two piers in U.S. navigable waters. <u>See</u> Pls.' Mem. at 34 (citing <u>WildEarth Guardians v. Jewell</u>, 738 F.3d 298 (D.C. Cir. 2013); <u>Natural Res. Def. Council, Inc. v. Jamison</u>, 815 F. Supp. 454 (D.D.C. 1992); and US Army Corps of Engineers, Notice of Amendment to the Intent To Prepare an Environmental Impact Statement (EIS) for the Millennium Bulk Terminals—Longview Shipping Facility Project, 78 Fed. Reg. 54873 (Sept. 6, 2013)).  But these authorities in no way illuminate the question before this Court.

Marijuana Laws v. U.S. Drug Enforcement Admin., 545 F. Supp. 981, 984 (D.D.C. 1982) (NEPA inapplicable where "federal funding, federal control, and federal 'go-ahead' actions are lacking.").  No one factor is dispositive.  Mineral Policy Ctr., 292 F. Supp. 2d at 55;  Atlanta Coal. on the Transp. Crisis, Inc., 599 F.2d at 1347 ("The presence of federal financial assistance is generally just one factor in the analysis of whether there is sufficient federal control over, responsibility for, or involvement with an action to require preparation of an EIS.").

With respect to the degree of influence or control over the project that is necessary to make it a major federal action, "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause." Dep't of Transp. v. Public Citizen, 541 U.S. 752, 767 (2004) (quoting Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 774 (1983)).  The Supreme Court has analogized this relationship to the requirement of proximate causation in tort law.  Id. (citing Metro. Edison Co., 460 U.S. at 774). To determine whether an agency must consider a particular environmental effect, courts must "look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." Metro. Edison Co., 460 U.S. at 774 n. 7; see also Public Citizen, 541 U.S. at 768.

An effect need not be considered "where an agency has no ability to prevent [the effect] due to its limited statutory authority."  Id. at 770; Citizens Against Rails–to–Trails, 267 F.3d at 1151 ("The touchstone of whether NEPA applies is discretion."). Even for actions that are not purely ministerial, the agency's ability to influence a particular environmental impact may be insufficient to trigger NEPA. Defenders of

28

Wildlife v. Andrus, 627 F.2d 1238, 1245 (D.C. Cir. 1980) (federal agency must be able to influence or control outcome "in material respects.") (emphasis added).    This reasoning accords with NEPA's purposes of improving agency decisionmaking.  See id. ("The EIS process is supposed to inform the decisionmaker. This presupposes he has judgment to exercise. Cases finding "federal" action emphasize authority to exercise discretion over the outcome.") (quoting W. Rodgers, Environmental Law 763 (1977).

In this case, Xcoal's activities and those of its clients are clearly not "federal." The PNC line of credit itself, neither a "project" nor "program," does not fall within the language of CEQ regulations interpreting NEPA's "major federal action" requirement. Nor do any of the factors developed under the caselaw warrant a finding that the Bank's guarantee of the line of credit is "major federal action." Thus Federal Defendants are entitled to summary judgment.

### A.    The Bank's Guarantee to PNC is Not a Major Federal Action Under CEQ Regulations.

"In determining what constitutes a "major Federal action," the court may first look to the regulations implementing NEPA."  Mineral Policy Ctr., 292 F. Supp. 2d at 54. CEQ regulations explain that "[m]ajor Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.  Such actions include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals."  Id. § 1508.18(a).

Here, Plaintiffs have challenged the Bank's approval of a working capital line of credit provided by a private commercial lender to be used by the borrower for coal export

transactions.   There is no "project" or "program" that the Export-Import Bank has

"financed, assisted, conducted, regulated, or approved," and therefore the challenged

agency decision does not fall within any of the categories enumerated in the regulation.

40 C.F.R. § 1508.18(a).  The transaction challenged in this case distinguishes it from

cases in which discrete, large-infrastructure projects slated to occur at particular locations

were found to implicate "major federal action."  Compare with Sierra Club v. U.S. Dep't

of Agriculture, 777 F. Supp. 2d 44, 50 & n.3 (D.D.C. 2011) (granting judgment in favor

of plaintiffs in environmental challenge to power plant expansion project); Friends of the

Earth, Inc. v Mosbacher, 488 F. Supp. 2d 889, 917 (N.D. Cal. 2007) (finding that court

lacked sufficient information to determine whether specific Bank-financed projects in

foreign countries were major federal actions).  Indeed, virtually every regulation,

provision or case cited in Plaintiffs' brief involved or applies to a "project."  See, e.g., 12

U.S.C. § 635i-5(a)(1) (authorizing Bank to "withhold financing from a project for

environmental reasons or to approve financing after considering the potential

environmental effects of a project.") (emphasis added), cited at Pls.' Mem. 32.[13]  Such

review may be appropriate for undertakings, like power plants or highways, whose

dimensions are known and whose design and impacts can be reasonably ascertained. Cf.

40 C.F.R. § 1508.18(b)(4) (one category of major federal actions is "[a]pproval of

specific projects, such as construction or management activities located in a defined

---

[13] Although the Bank has authority to implement (and has implemented) environmental
procedures, those procedures (which are separate from the Bank's NEPA procedures, see
12 C.F.R. Pt. 408), expressly apply only to "long-term" transactions, 12 U.S.C. § 635i-5
(a)(1)(A), and permit the Bank to withhold financing in connection with "a project." 12
U.S.C. § 635i-5 (a)(2).  Analogously the Bank's NEPA regulations address "[p]rojects in
foreign countries" and speak to a "project-by-project" review.  12 C.F.R. §§ 408.4(a),
408.4(b)(1).

geographic area.") (emphasis added); Sierra Club, 777 F. Supp. 2d at 58 (citing 40 C.F.R.

§ 1508.18(b)(4)).  Here, in contrast, the Bank's approval is limited to guaranteeing an

underlying line of credit from a third party that will be used to finance particular coal

shipments whose buyer, seller, volume, and route were unknown and unknowable at the

time the loan guarantee was approved.  Kleppe v. Sierra Club, 427 U.S. 390, 401 (1976)

(NEPA not required because absent proposal for a regional plan of development, "there is

nothing that could be the subject of the analysis envisioned by the statute for an impact

statement.").   It is indisputable that the Bank's guarantee is far removed from the

underlying coal processing activities and, moreover, that the Bank does not in any way

control, direct, approve, or otherwise have any direct relationship or responsibility over

those activities.  No case holds or in any way suggests that a working capital line of credit

guarantee is a "project" or may be deemed to be one for purposes of NEPA's regulations.

> **B.     The Bank's Guarantee Does Not Constitute Significant Federal
>          Funding of Xcoal's Export Activities.**

Plaintiffs assume that a loan or line of credit guarantee should be considered

"significant federal funding" for purposes of determining whether major federal action

exists.[14]  That assumption is incorrect.  Here, there is no direct federal funding of Xcoal's

coal export transactions, but rather a contingent obligation to PNC that will materialize

---

[14] Plaintiffs improperly characterize Sierra Club v. U.S. Dep't of Agriculture as having
involved a loan guarantee.  Pls.' Mem. 28-29.  Although the agency (the Rural Utilities
Service) had issued loans and  loan guarantees for a power plant project  (for which it
prepared an EIS), the action challenged in the case was not the loan and loan guarantee
but a series of restructurings that occurred 7, 22, and 27 years after the loan guarantee
was approved.  Sierra Club, 777 F.Supp. 2d at 47 (question was whether "RUS's
approvals relating to the expansion of the power plant, as well as the financial assistance
provided by RUS in the form of debt forgiveness and consent to lien subordination
constituted major federal action."). The Court found that the agencies had provided direct
financial assistance by writing off the company's debt. Id. at 47-48.

only in the event of a default and unsuccessful collection efforts by PNC.  See 12 U.S.C.§

235k (describing guarantees as a contingent obligation); Citizens Alert Regarding the

Env't v. EPA, 259 F. Supp. 2d 9, 20 (D.D.C. 2003) ("The possibility that federal funding

will be provided in the future is not sufficient to federalize a state project, even when

such funding is likely.").  A guarantee is not commensurate with financial assistance in

the form of federal grants, tax credits, or decisions to write off debt, which result in an

immediate, dollar-for-dollar impact on the U.S. treasury.  For this reason, one district

court, in a decision upheld by the Ninth Circuit Court of Appeals, has rejected the

premise that a loan guarantee is equivalent to direct financial assistance for purposes of

NEPA's "major federal action" threshold:

> The Defendants do not directly fund the various projects that are at issue in this
> case.  Rather, the Defendants guarantee loans, dispersed to various recipients by
> private lenders.  Therefore, the actual funding by the Defendants is negligible or
> non-existent.

Ctr. for Biological Diversity v. U.S. Dep't of Housing and Urban Development, 541 F.

Supp. 2d 1091, 1098 (D. Ariz. 2008); id. at 1095 ("[T]here is no initial investment made

by the federal agencies.  The agencies merely provide a guarantee should the borrower

default on the loan.").

Plaintiffs cite regulations and policies adopted by other agencies purportedly

determining that guarantees are major federal actions subject to NEPA.  However, other

agencies have different authorities and prerogatives.  To the extent these agencies'

guarantees are more typically associated with "projects," they are not precedent for the

Bank's working capital guarantee approvals.  See, e.g., U.S. Dep't of Energy, Final Rule,

Loan Guarantees for Projects That Employ Innovative Technologies, 74 Fed. Reg. 63544,

63548 (Dec. 4, 2009) (cited at Pls.' Mem. 27) ("[A]ppropriate NEPA project review will

be conducted prior to execution of a Loan Guarantee Agreement.") (emphasis added).

Nor are these policies dispositive of the question of whether NEPA is required for loan

guarantees, since an agency is free to do more than NEPA requires.  See, e.g, Vill. of Los

Ranchos de Albuquerque v. Barnhart, 906 F.2d 1477, 1482 (10th Cir. 1990) (holding

preparation of an EIS did not federalize an otherwise private project); Kandra v. United

States, 145 F. Supp. 2d 1192, 1203, n. 4 (D.Or. 2001) (rejecting the contention that the

agency, by issuing an EA, had admitted the applicability of NEPA); Mississippi ex rel.

Moore v. Marsh, 710 F. Supp. 1488, 1502, n.24 (S.D. Miss. 1989) ("CEQ regulations

specifically allow the preparation of an EA at any time, whether required by the

regulations or not.").

Even if the full amount ($90 million) of the guarantee to PNC could be considered

on par with direct funding, it represents only a small portion (less than twenty percent) of

the total amount of credit available to Xcoal.  Accordingly, this factor does not support a

finding of major federal action.

### C. Federal Defendants Lack Responsibility and Control Over the Environmental Impacts of Coal Mining and Transportation by Third Parties With Whom Xcoal Contracts.

Regardless of whether a guarantee may constitute "major federal action" under

some circumstances, however, the Bank's guarantee to PNC -- for a working capital line

of credit that is available to cover expenses related to brokering coal transactions – does

not qualify as one because the Bank had no actual ability to prevent or mitigate the

environmental impacts of coal commerce.  Cf. 40 C.F.R.§ 1508.18(a) (excluding from

definition of major federal action "funding assistance solely in the form of general

revenue sharing funds . . . with no Federal agency control over the subsequent use of such

funds."). The alleged health and environmental impacts from the release of fugitive coal dust by activities undertaken by third parties in the chain of distribution for coal exports are not subject to the Bank's responsibility and control.[15]  The Bank, authorized by statute "to do a general banking business," 12 U.S.C. § 635(a)(1), does not make or supervise day-to-day business decisions regarding the purchase, sale, and shipment of coal, nor is the Bank vested with regulatory authority over the environmental impacts of those types of decisions.  See Public Citizen, 541 U.S. at 767-68 (courts should "look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.").

Plaintiffs claim that the Bank had leverage, because of problems in the European credit market, to impose environmental conditions on its loan guarantee to PNC, see Pls.' Mem. 33 & n.9.  But this claim is not supported by competent evidence, see pp.15-16 supra.  To the contrary, the McLane declaration is evidence that Xcoal would have been able to transact the same volume of business with or without the Bank's loan guarantee. McLane Decl. ¶ 10.  Moreover, even if true, such leverage would be insufficient to connect the environmental impacts of coal mining to the "underlying policies or legislative intent" to support U.S. exports expressed in the Bank's charter and enabling authorities.  In addition to undermining Plaintiffs' claims of standing, see supra § II.A.- C., the company's ability to obtain financing from other lenders refutes Plaintiffs' theory

---

[15] Plaintiffs' claim that the Bank "has statutory authority under . . . NEPA to issue regulatory requirements imposing environmental conditions on borrowers, along with the authority to withhold financing for environmental reasons," is remarkable; NEPA does not expand either "the range of final decisions an agency is authorized to make" or its "substantive powers." Natural Res. Def. Council v. EPA, 859 F.2d 156, 169 (D.C. Cir. 1988) (citing additional cases).

of major federal action.  See Citzens Alert Regarding the Env't., 259 F. Supp. 2d at 22

(action was not major federal action where outcome of NEPA process would "neither

prevent the project from being built nor cause it to be significantly altered."); Touret v.

National Aeronautics and Space Admin., 485 F.Supp.2d 38, 44 (D.R.I. 2007) (no

standing, and no "major federal action," where project would have been built even

without federal funds).

     To be sure, the Bank has the discretion to deny an application for a guarantee

based on specifically enumerated statutory criteria.  That authority is insufficient under

NEPA to federalize Xcoal's export activity.  Even if Plaintiffs had shown that Xcoal or

its clients could not proceed without the Bank's guarantee (which they have not), the bare

ability of a federal agency to prevent a nonfederal project from going forward does not

constitute federal involvement sufficient to trigger the need for a NEPA analysis.  Public

Citizen, 541 U.S. at 767 (rejecting argument that project was "major federal action"

because "but for" the federal involvement, the project would not have gone forward);

Sugarloaf Citizens Ass'n v. FERC, 959 F.2d 508, 514 (4th Cir. 1992) (holding FERC's

"but for" power over certification of facility did not federalize the facility); Winnebago

Tribe of Nebraska v. Ray, 621 F. 2d 269, 272  (8th Cir. 1980) (holding federal agency's

"but for" veto power did not federalize entire project).

     Instead, the federal agency must exercise "'actual power to control the nonfederal

activity'" and that control is simply not present in this case. Vill. of Los Ranchos, 906

F.2d at 1482 (emphasis added) (quoting Sierra Club v. Hodel, 848 F.2d 1068, 1089 (10th

Cir. 1988)).  Here, the Bank has no authority to prevent PNC from extending a line of

credit or Xcoal from exporting coal; no significant control over Xcoal's business even

after the line of credit is approved; and no say over adherence to hypothetical

environmental procedures used by the third parties at either end of the supply and

distribution chain for coal exports. Therefore, the Bank had no obligation to analyze the

environmental effects of coal mining and transportation under NEPA. See Public Citizen,

541 U.S. at 766 (federal agency that had no authority to exclude Mexican motor carriers

from operating within the United States not required to consider environmental impacts

of increase in cross-border operations of Mexican trucks); Andrus, 627 F.2d at 1245

(D.C. Cir. 1980) (critical element is ability "to influence or control the outcome in

material respects").

   The reasoning in Center for Biological Diversity is instructive.  There, the

plaintiffs (environmental organizations) sued three federal agencies (HUD, the VA, and

the SBA) that made loan guarantees for residential and commercial development in an

area near the San Pedro River.  Plaintiffs alleged that the development had detrimental

effects on the river and aquatic and wildlife species that relied on it, and that the agencies

were therefore required to comply with NEPA and the ESA in connection with their

approvals.  541 F. Supp. 2d at 1095.  The court found that the involvement of the agency

defendants, in each case, was limited to approval based on the financial status and needs

of the applicant.  Id. at 1099.  There was no indication "that the Defendants have any type

of ongoing control over the borrower, nor of the property involved."  Id.  Rather:

> The federal agencies are not involved in choosing the home for the homeowner or
> advising the business on which structure to purchase and/or renovate.  This Court
> finds the federal involvement by the Defendant agencies in Sierra Vista
> development to be marginal.

Id. at 1100.  On these facts, the court found no "major federal action," and that even if the

agency conduct did rise to the level of "major federal action," it did not "significantly

affect[] the environment" because of the limited nature of the federal action in contributing to any environmental impacts.  The court explained that "[t]he Defendant agencies do not control where loan guarantees are used by the individual applicants"; instead, "[l]ocal developers and planners are responsible for the number of physical structures that may have an actual effect on the watertable." Id. at 1101.

In an unpublished opinion, the Ninth Circuit, citing Public Citizen's requirement that plaintiffs must show a "reasonably close causal relationship" between an environmental effect and an alleged cause to establish "major federal action," concluded:

> The agencies guarantee loans issued by private lenders to qualified borrowers, but do not approve or undertake any of the development projects at issue.  The agencies' loan guarantees have such a remote and indirect relationship to the watershed problems allegedly stemming from the urban development that they cannot be held to be a legal cause of any effect on protected species for purposes of either the ESA or the NEPA.

Ctr. for Biological Diversity v. HUD, 359 Fed. Appx. at 783, 2009 WL 4912592,*783.[16] Here, too, where the Bank has no involvement in the day-to-day operations of Xcoal's business (see AR000135-205), its relationship is too "remote and indirect" to be a legal cause of any effect of coal dust releases that are incidental to such activities.   Because a "major federal action significantly affecting the quality of the human environment" is a necessary element of Plaintiffs' NEPA claim, Federal Defendants are entitled to summary judgment.[17]

---

[16] Although the case is not binding precedent in the Ninth Circuit, it may be cited for its persuasive authority.  See Fed. R. App. Proc. 32.1(a), Advisory Comm. Notes to Subdivision (a).

[17] For the reasons discussed in Section III, the loan guarantee was not subject to NEPA. Because Federal Defendants do not rely upon a particular categorical exclusion, Section 3 of Plaintiffs' brief is irrelevant.

IV.    **If the Court Finds a Violation of Law, It Should Permit the Parties to Submit Further Briefing on Remedy.**

Plaintiffs' motion asks this Court to vacate the loan guarantee, remand the decision to the Bank, and enjoin "any activity in furtherance of the $90 loan guarantee." ECF No. 56-14.  But Plaintiffs' memorandum contains no attempt to meet its burden of showing that the equitable factors warrant this extraordinary relief.  The Supreme Court has directed "courts of equity [to] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter v. Natural Resources Def. Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted); see Delta Airlines, Inc. v. Export-Import Bank of the U.S., 718 F.3d 974, 978 (D.C. Cir. 2013) (directing district court to remand decision to agency without vacating any of its decisions), citing Allied–Signal, Inc. v. Nuclear Regulatory Comm'n, 988 F.2d 146, 150–51 (D.C.Cir.1993) (vacatur not required if "it is conceivable" that agency may correct error and vacatur would be too disruptive).  Those consequences are particularly compelling here, given Congress' intent that Bank guarantees commit the Full Faith and Credit of the United States.  Air Transp. Ass'n of Am., Inc. v. Export-Import Bank of the U.S., 840 F. Supp. 2d 327, 340 (D.D.C. 2012) ("To the extent the Ex–Im Bank succeeds in carrying out its purpose of fostering the export of U.S. goods and services and supporting employment of U.S. workers, the Bank's interest and the public interest are aligned."); id. at 341 (issuance of injunction could  "harm the Bank's reputation as a reliable source of financing, which may prompt potential foreign buyers of U.S. goods to seek foreign sellers that can provide financing from the export credit agencies of other nations—which, in turn, could result in a decrease in demand for exported U.S. goods.").  Accordingly, in the event the Court finds any violation of law, Federal  Defendants request the opportunity for further briefing on

whether the Plaintiffs have made the requisite showing to justify equitable relief, as well as the nature and scope of any relief.

## CONCLUSION

Because Plaintiffs' alleged harms are the product of the independent decisions of multiple individuals and companies in the supply chain for the manufacture and export of coal, responding to market forces, Plaintiffs have not shown standing to bring their claims.  Federal Defendants are also entitled to summary judgment because Plaintiffs have failed to show a "reasonably close causal connection" between the impacts they allege and the actions of the Bank, and therefore have failed to demonstrate an essential element of their NEPA claim -- the presence of "major federal action."


Dated: May 2, 2014                         ROBERT G. DREHER
                                           Acting Assistant Attorney General

                                           By:  */s/ Stacey Bosshardt*
                                           STACEY BOSSHARDT
                                           D.C. Bar No. 458645
                                           stacey.bosshardt@usdoj.gov
                                           (202) 514-2912
                                           Senior Trial Attorney
                                           United States Department of Justice
                                           Environment & Natural Resources Division
                                           Natural Resources Section
                                           P.O. Box 7611
                                           Washington, D.C. 20044-7611

                                           Attorney for Federal Defendants