# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CHESAPEAKE CLIMATE ACTIION    :
NETWORK, *et al.*,    :
   :
     Plaintiffs,    :    Civil Action No.:    13-1820 (RC)
   :
     v.    :    Re Document Nos.:    56, 57, 58, 63, 69
   :
EXPORT-IMPORT BANK OF THE UNITED   :
STATES, *et al.*,    :
   :
     Defendants.    :

## MEMORANDUM OPINION

**DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT; DENYING AS MOOT PLAINTIFFS' MOTION FOR ADMISSION OF EXTRA-RECORD EVIDENCE; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO STRIKE; AND GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO STRIKE**

## I. INTRODUCTION

Chesapeake Climate Action Network, Friends of the Earth, Sierra Club, West Virginia Highlands Conservancy, Center for International Environmental Law, and Pacific Environment (collectively, "Plaintiffs") initiated the present action to challenge the Export-Import Bank of the United States' ("the Bank") approval of a $90 million loan guarantee.  The guarantee supports a three-year, $100 million loan from PNC Bank ("PNC") to Xcoal Energy & Resources, LLC ("Xcoal").  According to Plaintiffs, the Bank's guarantee allows Xcoal to export $1 billion in U.S. coal, which in turn results in significant adverse effects on human health and the environment.  Plaintiffs contend that the Bank's failure to consider such environmental impacts prior to approving the loan guarantee violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

("APA").  As a consequence, Plaintiffs seek a declaration that the Bank's authorization of the loan guarantee violated NEPA, and an injunction ordering the Bank to rescind the guarantee and to comply with NEPA before providing any additional financing to Xcoal.  In response, the Bank and its Chairman, Fred Hochberg (collectively, "Defendants"), argue first that Plaintiffs lack standing to assert their claims, and second, that the Bank was not required to consider the potential environmental impact of a loan guarantee under NEPA.

Now before the Court are the parties' cross-motions for summary judgment, as well as competing motions to admit and exclude extra-record evidence offered by both Plaintiffs and Defendants.  After considering the parties' motions, their memoranda in support thereof and opposition thereto, and the administrative record, the Court hereby allows the introduction of extra-record declarations proffered by both parties for the limited purpose of assessing standing, excludes those portions of the parties' declarations that are inadmissible, finds that Plaintiffs lack standing, and grants summary judgment in favor of Defendants.

## II.  FACTUAL BACKGROUND

### A.  Statutory background

NEPA was enacted in 1970 "to promote efforts which will prevent or eliminate damage to the environment and biosphere . . . ."  42 U.S.C. § 4321.  Specifically, NEPA instructs any agency contemplating a "major Federal action[] significantly affecting the quality of the human environment," to first prepare and solicit public comment on an environmental impact study ("EIS").[1]  *See* 42 U.S.C. § 4332(C).  The goals of the Act are two-fold: first, "it places upon an

---

[1] By statute, an EIS must address:
(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship

agency the obligation to consider every significant aspect of the environmental impact of a proposed action," and second, "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 302 (D.C. Cir. 2013) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). Thus, although NEPA does not require federal agencies to act on the basis of environmental concerns or to make the best decision for the environment, it does require that all agencies take a "'hard look' at the environmental consequences before taking a major action." *Balt. Gas & Elec.*, 462 U.S. at 97.

NEPA's implementing regulations further explain that the term "[m]ajor Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18. Covered actions include "new and continuing activities, including projects and programs entirely or partly financed, assisted . . . or approved by federal agencies . . . ." *Id.* To determine whether a given action significantly affects the environment, an agency must take into account the action's cumulative impact on the environment. 40 C.F.R. § 1508.27. However, where a category of agency actions "do not individually or cumulatively have a significant effect on the human environment," environmental analysis is not required, and the agency can establish procedures for categorically excluding those actions so long as it allows for exceptions in "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4.

---

between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C).

Plaintiffs who believe that they have been harmed by an agency's failure to comply with NEPA may bring suit under the APA, which provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," 5 U.S.C. § 702, if the agency action is final and "there is no other adequate remedy in a court," 5 U.S.C. § 704.

### B.  The Export-Import Bank of the United States

Established as an independent federal agency in 1954, the Bank's purpose is "to facilitate exports of goods and services . . . and in so doing to contribute to the employment of United States workers."  *See* 12 U.S.C. § 635(a)(1).  It does so by providing "loans, guarantees, insurance, and credits" to support U.S. exports.  *Id.*  Since 1982, Congress has specifically directed the Bank to:

> establish a program to provide guarantees for loans extended by financial institutions . . . [to] exporters, when such loans are secured by export accounts receivable, [or] inventories of exportable goods . . . , and when in the judgment of the Board of Directors -- (1) the private credit market is not providing adequate financing to enable otherwise creditworthy export trading companies or exporters to consummate export transactions; and (2) such guarantees would facilitate expansion of exports which would not otherwise occur.

12 U.S.C. § 635a-4.  In accordance with these instructions, the Bank established the working capital guarantee program ("WCGP"), which allows the Bank to enter into Master Guarantee Agreements ("MGAs") with lenders on behalf of an exporter-borrower.  *See generally* Export-Import Bank of the United States, Working Capital Guarantee Program Manual (effective Dec. 21, 2005), *available at* http://www.exim.gov/tools/applicationsandforms/working-capital-applications-and-forms.cfm.

The Bank has promulgated a number of regulations to fulfill its obligations under NEPA.  Although the Bank determined that "[h]istorically, virtually all financing provided by Eximbank has been in aid of U.S. exports which involve no effects on the quality of the environment within

the United States," 12 C.F.R. 408.3, it adopted procedures to govern "the relatively rare cases where Eximbank financing of U.S. exports may affect environmental quality in the United States . . . ." *Id*.  More specifically, the Bank determined that "[a]pplications for Eximbank financing in the form of insurance or guarantees" normally do not require environmental assessments and are categorically excluded from NEPA's EIS requirement unless "the presence of extraordinary circumstances indicates that some other level of environmental review may be appropriate."  12 C.F.R. § 408.6.

### C.  The Bank's Approval of the Loan Guarantee

Xcoal is one of the largest coal exporters in the United States, sending millions of tons of metallurgical coal overseas each year since its founding in 2004.  AR 32A, 34A, 133.  The company takes possession of coal at mines in Pennsylvania and West Virginia, and it transports the coal by rail to port terminals in Maryland and Virginia.   AR 34A, 35A.  From there, Xcoal sends the coal to its export destination, usually China, South Korea, or Japan.  AR 29A, 39A.  To finance its export business, Xcoal has obtained lines of credit from PNC in the United States, as well as from several European banks.  AR 35A–37A.

In December 2011, Xcoal's Vice President of Finance Craig McLane and a Senior Vice President at PNC completed a joint application for an export working capital guarantee from the Bank.  AR 21.  Xcoal had previously obtained a $25 million line of credit from PNC with the Bank's support, and it sought to replace the preexisting guaranteed loan with a guaranteed loan of $100 million.  AR 19, 273.  At the time, Xcoal's export sales were increasing and the company had $530 million in uncommitted lines of credit provided by nine European banks in addition to the $25 million from PNC.  AR 32A, 36A.  However, due to the European sovereign debt crisis, Xcoal was "concerned that its European banks may not be in a position to fund the

Company in the future, and [it sought] to replace those financing arrangements with an increase in the Ex-Im Bank Loan Facility." AR 32A. For that reason, and because PNC "traditionally does not (without Ex-Im Bank support) provide financing against accounts receivable due from foreign buyers," Xcoal and PNC applied for a loan guarantee from the Bank. AR 32A. According to the joint application, the $100 million loan from PNC would support $1 billion in export sales of metallurgical coals, AR 20, and would primarily be used for working capital advances and to support the issuance of standby letters of credit as performance bonds, AR 20, 33A.

Bank staff subsequently reviewed the application and prepared a written report recommending approval of the loan guarantee. *See* AR 31A–52A. In a section titled "Justification for Ex-Im Bank Support," the Bank observed that Xcoal did "not have the ability to internally generate the necessary working capital," that "[d]omestic financial institutions are not willing to provide enough financing to XCoal without the Ex-Im Bank guarantee," and that with the Bank's support, the company "will be able to ensure liquidity and access to capital should XCoal's European banks hesitate in providing the necessary working capital financing." AR 37A. At no point during its consideration of the application did the Bank ever request or receive an EIS or an environmental analysis.

On May 24, 2012, the Bank approved a $100 million transaction-specific revolving working capital guarantee loan from PNC to Xcoal with a term of 36 months. AR 1, 30A, 273. The loan is supported by the Bank's $90 million loan guarantee, AR 30A, and is subject to the Bank's Master Guarantee Agreement, AR 53–99. The Bank's WCGP procedures dictate that "all transactions . . . require approval by Ex-Im Bank staff prior to being included under the . . .

Loan Facility." AR 33A. Since the Bank approved the loan guarantee, Xcoal has sought and received the Bank's approval for more than a dozen transactions. *See* AR 135–205.

On July 31, 2013, Plaintiffs initiated this suit to challenge the Bank's authorization of the $90 million loan guarantee by filing a complaint in U.S. District Court for the Northern District of California. The case was transferred to this Court on November 20, 2013, and it is presently before the Court on the parties' cross-motions for summary judgment.

## III. ANALYSIS

### A. Standing

Federal courts are courts of limited jurisdiction, possessing "only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citations omitted). The judicially created doctrine of standing derives from Article III of the U.S. Constitution, which confines the federal courts to adjudicating actual "Cases" and "Controversies, U.S. Const. art. III, § 2, cl. 1, and from "the separation-of-powers principles underlying that limitation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). Thus, a showing of standing "is an essential and unchanging" predicate to any exercise of this Court's jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Court must therefore determine first if it has jurisdiction over a given action before ruling on the merits. *Al–Zahrani v. Rodriguez*, 669 F.3d 315, 318 (D.C. Cir. 2012).

Ordinarily, a party has established standing if it shows that, at the time the complaint was filed: (1) "the party has suffered an 'injury in fact,'" (2) "the injury is 'fairly traceable' to the

challenged action of the defendant," and (3) "it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 174 (D.C. Cir. 2012) (citing *Defenders of Wildlife*, 504 U.S. at 560–61); *La Botz v. Fed. Election Comm'n*, No. 13-cv-997, 2014 WL 3686764, at *4-5 (D.D.C. July 25, 2014) ("[S]tanding in the present action is ascertained from the facts as they existed when [the plaintiff] first filed his complaint in this Court in 2013.").

The standing inquiry is modified, however, in cases where a plaintiff alleges a violation of his or her procedural rights. In such cases – as when a plaintiff sues over the failure to conduct an EIS under NEPA – the plaintiff must "show that the interest asserted is more than a mere general interest in the alleged procedural violation common to all members of the public, the plaintiff must show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (internal quotation marks and citation omitted). Although procedural rights plaintiffs need not show that, but for the procedural defect, the agency would have reached a different decision, they must establish "a causal relationship between the final agency action and the alleged injuries." *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005). The causation prong of the standing inquiry looks to the "causal nexus between the agency action and the asserted injury, while redressability centers on the causal connection between the asserted injury and judicial relief." *Id.* at 1160 n.2 (quoting *Freedom Republicans v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994)).

Furthermore, in those cases where the plaintiff was not the subject of government action or inaction, and where the harm to the plaintiff comes instead from the agency's regulation of an independent third party not before the court, standing is ordinarily "substantially more difficult to

establish." *See Defenders of Wildlife*, 504 U.S. at 562 (internal quotation marks omitted). In such instances, the elements of causation and redressability "hinge on the independent choices of the regulated third party," and "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Ctr. for Law & Educ.*, 396 F.3d at 1161 (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004)).

The Plaintiffs, as the parties invoking this Court's jurisdiction, bear the burden of establishing all three elements of standing. *WildEarth Guardians*, 738 F.3d at 305. At the summary judgment stage, Plaintiffs bear the burden of showing that, taking their facts as true and drawing all reasonable inferences in their favor, a reasonable juror could find that they have standing. *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1362 (D.C. Cir. 2012). To meet this burden, Plaintiffs must put forth specific facts – not mere allegations – that show a "substantial probability" that Plaintiffs were injured, that the Defendants caused the injury, and that a favorable decision of this Court could redress that injury. *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002).

Where a plaintiff is an organization suing on behalf of its members – as is the case here for Plaintiffs Chesapeake Climate Action Network ("CCAN"), Friends of the Earth, Sierra Club, and West Virginia Highlands Conservancy ("WVHC")[2] – the organization has "representative" or "associational" standing if: "(1) at least one of its members would have standing to sue in his own right; (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the

---

[2] *See* Pls.' Mot. Summ. J. at 12–13 (stating that these four plaintiffs are suing on their members' behalf while the Center for International Environmental Law and Pacific Environment are suing on their own behalf).

association participate in the lawsuit." *Id.* at 898.  Because the Center for International

Environmental Law ("CIEL") and Pacific Environment are organizations suing on their own

behalf, however, they "must make the same showing required of individuals: an actual or

threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and

likely to be redressed by a favorable court decision." *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13,

24 (D.C. Cir. 2011).

Ultimately, the Court need only find that one plaintiff has established standing to allow a

case to proceed to the merits.  *See Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009) ("[I]f

one party has standing in an action, a court need not reach the issue of the standing of other

parties when it makes no difference to the merits of the case.").

### B.  Admissibility of Extra-Record Evidence

Although judicial review of agency action is typically confined to the administrative

record, where there is not sufficient evidence of standing in the record because the question was

not before the agency, plaintiffs may submit extra-record evidence to establish standing.  *Sierra

Club*, 292 F.3d at 899.  Indeed, if standing is not self-evident, a plaintiff "*must* supplement the

record to the extent necessary to explain and substantiate its entitlement to judicial review." *Id.*

at 900 (emphasis added).  In this case, both parties have submitted declarations to support or

oppose a finding of standing.[3]  Additionally, both parties argue that a declaration offered by their

---

[3] Plaintiffs, in addition to providing extra-record declarations to show standing, have
asked the Court to consider four of their declarations when analyzing the merits of Plaintiffs'
claims.  *See* Pls.' Mot. Admis. of Extra-R. Evidence at 2, ECF No. 57.  Because the Court
ultimately finds that Plaintiffs lack standing, and thus does not reach the merits of their claims,
Plaintiffs' motion to admit extra-record declarations is denied as moot.  Relatedly, to the extent
that Defendants' motion to strike Plaintiffs' extra-record declarations argues that the Court
should not consider the declarations in its merits analysis, *see* Defs.' Mot. Strike, ECF No. 58,
the motion is denied as moot.  The Court will, however, address Defendants' motion to strike to

opponents is inadmissible and cannot be considered even for the limited purpose of determining standing. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009) (holding that affidavits and other evidence offered to establish standing at the summary judgment stage are subject to the provisions of Federal Rule of Civil Procedure 56); *see also* Fed. R. Civ. P. 56(c)(4) (requiring that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). As a consequence, before the Court can conduct its standing analysis, it must first resolve the question of which declarations can be considered for standing purposes. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.").

Collectively, Plaintiffs have provided the Court with a total of thirteen declarations to establish standing. Seven of those declarations are from individual members of CCAN, Sierra Club, WVHC, and Friends of the Earth, who live, work, or recreate in Maryland, Virginia, or West Virginia.[4] Two of the declarations are from representatives of CIEL and Pacific Environment.[5] In addition, Plaintiffs have provided three declarations from experts to describe the environmental impact of coal exports.[6] Defendants do not object to the Court's consideration of any of these twelve declarations for the limited purpose of assessing standing. *See* Defs.'

---

the extent that it argues that one of Plaintiffs' declarations cannot be considered even for standing purposes because it is inadmissible. *See* Defs.' Mot. Strike at 2.

[4] *See* Bullard Decl. Ex. 5, ECF No. 56-5; Cook Decl. Ex. 6, ECF No. 56-6; Fox Decl. Ex. 7, ECF No. 56-7; Ortega Decl. Ex. 10, ECF No. 56-10; Rank Decl. Ex. 11, ECF No. 56-11; Reed Decl. Ex. 12, ECF No. 56-12; Ware Decl. Ex. 13, ECF No. 56-13.

[5] *See* Johl Decl. Ex. 8, ECF No. 56-8; Norlen Decl. Ex. 9, ECF No. 56-9.

[6] *See* Hansen Decl. Ex. 1, ECF No. 56-1; Johannesson Decl. Ex. 2, ECF No. 56-2; Sahu Decl. Ex. 3, ECF No. 56-3.

Mot. Strike at 1, ECF No. 58; Defs.' Mem. Support Mot. Strike at 1 n.2, ECF No. 59.

Defendants do, however, object to Plaintiffs' introduction of the declaration of Tom Sanzillo, a

purported expert in finance, to explain the financial importance of the Bank's loan guarantee to

Xcoal.  *See* Sanzillo Decl. Ex. 4, ECF No. 56-4.  Defendants argue that the Sanzillo declaration

cannot be considered even for standing purposes because Mr. Sanzillo's findings are unreliable,

irrelevant, and unsupported such that they are inadmissible under the Federal Rules of Evidence.

Defs.' Mem. Support Mot. Strike at 8–9.

Plaintiffs, on the other hand, argue that the declaration of Xcoal's Vice President of

Finance Craig McLane, offered by Defendants to show that Xcoal's coal export activities do not

depend upon the loan guarantee, is inadmissible.[7]  Plaintiffs argue first that the McLane

declaration should not be considered because the Court should accept as true the facts averred by

Plaintiffs with respect to standing, Pls.' Mot. Strike McLane Decl. at 2 n.1, ECF No. 69, and

second, that portions of the declaration constitute inadmissible speculation, Pls.' Reply Mot.

Strike McLane Decl. at 5–6, ECF No. 74.

The Court addresses the admissibility of the Sanzillo declaration and the McLane

declaration in turn.

### 1.  The Sanzillo Declaration

Plaintiffs have asked the Court to consider the extra-record declaration of Tom Sanzillo, a

purported financial expert[8] and co-founder of the Institute for Energy Economics and Financial

---

[7] Like Plaintiffs, Defendants have offered a declaration for consideration in the Court's standing analysis and its merits analysis, but as stated in n.3, *supra*, the merits issue is moot in light of the Court's finding that Plaintiffs lack standing.  The Court will, however, consider those portions of Plaintiffs' motion to strike the McLane declaration that argue that it ought not be considered even for the limited purposes of assessing standing.

[8] Defendants challenge Mr. Sanzillo's qualification as an expert in lending practices, pointing out that his formal education was in politics and that he lacks sufficient experience in

Analysis, an "organization dedicated to finding alternatives to fossil fuels, particularly coal."

Sanzillo Decl. App'x A at 1.  Mr. Sanzillo reviewed the administrative record, nine online

sources and one additional document in this case in order to reach three conclusions regarding

Xcoal's financial need for the Bank's guarantee.[9]  *See* Sanzillo Decl. ¶ 7.  Defendants challenge

the admissibility of Mr. Sanzillo's declaration generally and his conclusions specifically,[10]

arguing that they cannot be considered even for standing purposes because they are not

sufficiently supported, relevant, or reliable to satisfy the Federal Rules of Evidence.  Defs.'

Mem. Support Mot. Strike at 11.  After careful consideration, the Court agrees with Defendants.

Rule 702, which governs the use of expert testimony, provides that a qualified expert may

testify to assist the trier of fact "if the testimony is based on sufficient facts or data," "the

testimony is the product of reliable principles and methods," and "the expert has reliably applied

the principles and methods to the facts of the case."  Fed. R. Evid. 702.  The Rule requires trial

courts to assume a "gatekeeping role," ensuring that the methodology underlying an expert's

testimony is valid and the expert's conclusions are based on "good grounds."  *Daubert v. Merrell*

*Dow Pharm., Inc.*, 509 U.S. 579, 590–97 (1993); *see also Meister v. Med. Eng'g Corp.*, 267 F.3d

---

private lending.  Because the resolution of that issue does not affect the Court's analysis, the
Court will assume without deciding that Mr. Sanzillo is, as Plaintiffs proffer, an expert in
finance.

[9] Mr. Sanzillo's "List of Documents Referenced" includes: one internet link to Xcoal's
website, two links to financial disclosures by a different coal exporter, one link to the financial
information of an Xcoal customer, three links to Bank guidelines and manuals, one link to a U.S.
Energy report on coal production, one link to an article on coal prices, and a citation to a text on
file with Mr. Sanzillo describing the Chinese coal market.  Sanzillo Decl. App'x B.

[10] Mr. Sanzillo makes – and Defendants challenge – three conclusions in his declaration.
Because only the first conclusion has any potential to affect the Court's standing analysis, the
Court need not address the admissibility of Mr. Sanzillo's second conclusion – that volatility in
the coal trade has made investment capital harder to come by – or his third conclusion – that
because of the importance of the Bank's loan guarantee, Xcoal likely would have agreed to
environmental conditions had the Bank imposed them.

1123, 1127 (D.C. Cir. 2001).  Testimony based on "subjective belief or unsupported speculation" is not admissible as expert testimony.  *Daubert*, 509 U.S. at 590.  "A court may refuse to admit expert testimony if it concludes that 'there is simply too great an analytical gap between the data and the opinion proffered.'" *Groobert v. President & Directors of Georgetown Coll.*, 219 F. Supp. 2d 1, 6 (D.D.C. 2002) (quoting *Gen. Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Fla. Audubon Soc.*, 94 F.3d at 667–68 (holding that Plaintiffs failed to produce competent evidence of injury where they relied on expert's speculative testimony that a tax credit would encourage farmers to increase corn or sugar production in a manner that would increase agricultural pollution and damage wildlife areas).

As an initial matter, this Court is presented with substantial difficulty in assessing the reliability of the principles or methodology used by Mr. Sanzillo as required by Rule 702 because Mr. Sanzillo has not identified any such principles or methodology.  Mr. Sanzillo notes only that he reviewed certain documents and reached a series of conclusions.  *See* Sanzillo Decl. ¶ 7 ("Based on my review of these documents I conclude as follows . . . .").  Precisely how Mr. Sanzillo's review of the materials led him to reach his conclusions is nowhere described.  For example, he offers no explanation as to how the administrative record's discussion of Xcoal's growth and limited access to alternative lines of credit caused him to determine that the removal of a specified percentage of Xcoal's available financing would cause a reduction in or cessation of business.  Put another way, the Court is unable to determine from Mr. Sanzillo's declaration how he journeyed from the Bank's finding that third-party banking is necessary for Xcoal to his conclusion that the loss of a particular $100 million line of credit in Xcoal's $630 million credit

14

portfolio would cause the company to limit or end its business.[11]  And despite the fact that

Defendants have raised a number of challenges to Mr. Sanzillo's qualifications and the reliability

and admissibility of his conclusions, Plaintiffs have not suggested that additional information

about Mr. Sanzillo's methodology is forthcoming or could be expected at trial.  *See* Fed. R. Civ.

P. 56(c)(2) advisory committee notes (2010 Amendments) (explaining that at the summary

judgment stage, "[t]he burden is on the proponent to show that the material is admissible as

presented or to explain the admissible form that is anticipated").

 However, the failure of Mr. Sanzillo to identify the methodology or principles he applied

is only the first of several problems presented by his declaration.  The Court is also concerned

about Mr. Sanzillo's silence regarding whether financial experts are typically able to analyze a

business's dependence on a particular source of financing from the type and quantity of evidence

that Mr. Sanzillo considered.  Also troubling is Mr. Sanzillo's failure to state how successful he

has been in the past at predicting whether a business would be able to continue to operate if a

certain percentage of its funding was rescinded.  *Cf. Estate of Gaither ex rel. Gaither v. District

of Columbia*, 831 F. Supp. 2d 56, 70 (D.D.C. 2011) (holding that plaintiffs failed to show that

their expert's opinion was the product of reliable principles and methods where there was no

record evidence indicating how often the expert's predictions turn out to be correct).  These

omissions are particularly concerning in light of the fact that Mr. Sanzillo reached his conclusion

regarding Xcoal's financial dependence on the Bank's guarantee without ever actually reviewing

Xcoal's financials, which were redacted from the administrative record.  While Mr. Sanzillo

could hardly be blamed for failing to analyze documents not available to him, the Court does

---

[11] Mr. Sanzillo observes that Bank guarantees are generally intended to provide borrowers with the liquidity and confidence to grow their business, and that Xcoal's business did grow in 2013, *id.* at 5–6, but he does not suggest that Xcoal's other pre-established lines of credit provided insufficient liquidity or were otherwise unable to support Xcoal's business in 2013.

have serious reservations about his failure to acknowledge this limitation in his analysis or to explain how he was able to determine Xcoal's response to the rescission of the Bank's guarantee without access to facts or data regarding the company's operating costs or credit utilization rate. *Cf. Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 89 (D.D.C. 2012) (explaining that the court was unable to understand how plaintiff's expert could "opine on whether defendant's writings were properly substantiated," without first "investigating defendant's source materials in any systematic way," and finding that "the 'facts and data' [the expert] relied on were patently insufficient for the task he was given"); *id.* at 95 ("[I]t is hard to see how 'doing the math' could be of any help to the factfinder when the math is so untethered from the reality of [the company's] finances.").

Perhaps most significant, however, is the fact that Mr. Sanzillo's declaration fails to reconcile the limited facts he did consider with the ultimate conclusion that he reached.  Mr. Sanzillo found that Xcoal had already assembled a pre-existing line of credit totaling $530 million spread across multiple European banks "to support the company's activities" before it obtained the Bank's $90 million loan guarantee.  Sanzillo Decl. ¶ 10.  Although he notes that in December 2011, Xcoal was concerned about the future availability of its European lines of credit in light of the then-existing European debt crisis, *id.* ¶ 11, he suggests neither that a $530 million credit portfolio is insufficient to support Xcoal's export business nor that the availability of that line of credit was in jeopardy at the point in time relevant to determining Plaintiffs' standing: the date the complaint was filed, July 31, 2013.  *See Defenders of Wildlife*, 504 U.S. at 569 n.4 ("The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." (internal quotation marks omitted)).  In fact, Mr. Sanzillo offers no means of connecting or reconciling the existence of sizeable alternative lines of credit with his conclusion regarding

what Xcoal would do if it lost the Bank's support.  There is thus a significant analytical gap

between Mr. Sanzillo's conclusion and the data on which he relies, and without any information

regarding the methodology Mr. Sanzillo used, the Court is unable to bridge the gap.  *See* Federal

Rule of Evidence 702 (allowing an expert witness to testify "if . . . the testimony is based on

sufficient facts or data" and "the expert has reliably applied the principles and methods to the

facts of the case"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in

either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert." (quoting *Gen.*

*Elec. Co.*, 522 U.S. at 146).[12]

Accordingly, the Court finds that Mr. Sanzillo's opinion as to what Xcoal would do

without the loan guarantee is inadmissible and will not be considered because Plaintiffs have

failed to establish that it is a product of a reliable methodology properly applied to sufficient

facts and data such that it "rests on a reliable foundation."  *See Daubert*, 509 U.S. at 597

(1993).[13]

---

[12] Although Mr. Sanzillo offers no explanation for the analytical gap, to the extent that his declaration could be read to suggest that his experience fills the void, such an explanation, standing alone, would clearly be inadequate.  *See* Fed. R. Evid. 702 advisory committee's note (2000 amends.) (explaining that when an expert relies "primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts").

[13] Alternatively, the Court holds that even if Mr. Sanzillo's opinion is admissible, it would not alter the Court's standing analysis, largely for the same reasons described above. Although the Bank's May 2012 explanation of Xcoal's need for the loan guarantee may have supported "the view that Xcoal would have to limit or end its business without the Ex-Im revolving loan guarantee," Sanzillo Decl. at 3, it does not suggest that the continuation of Xcoal's business was dependent upon the guarantee after the easing of the European bank crisis and at the time that the operative complaint was filed, more than a year after the Bank authorized the guarantee.

### 2.  The McLane Declaration

Defendants have submitted to the Court the declaration of Craig McLane, Xcoal's Vice President of Finance.  The McLane declaration details Xcoal's financial position both at the time that it sought the loan guarantee in 2011 and presently, disputes the ability of Xcoal to impose environmental conditions on its service providers, and asserts that continuation of Xcoal's business operations did not in the past and does not at present depend on the Bank's guarantee. McLane Decl. at 1–2.  In response, Plaintiffs first argue that because this case is currently at the summary judgment stage, the Court should accept Plaintiffs' standing-related assertions as true and not consider contradictory assertions contained in the McLane declaration.  Second, they argue that portions of the McLane declaration are too speculative to be admissible.  Neither argument passes muster.

Beginning with Plaintiffs' first argument, they are correct to the extent that they argue that at summary judgment, this Court must take as true all "specific facts" set forth in Plaintiffs' affidavits or other evidence, including those facts related to standing.  *See Defenders of Wildlife*, 504 U.S. at 561; *see also Earle v. District of Columbia.*, 707 F.3d 299, 304 (D.C. Cir. 2012) ("[T]he court must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." (internal quotation marks omitted)).  At the same time, however, a non-movant "may not rest upon mere allegation or denials of his pleading but must present *affirmative evidence* showing a genuine issue for trial."  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted) (emphasis added); *Defenders of Wildlife*, 504 U.S. at 561 ("In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence

specific facts . . . ." (internal quotation marks and citation omitted)).  Additionally, there is a difference between accepting as true a plaintiff's specific facts offered to show standing and accepting as true the plaintiff's conclusion that he or she has standing.  *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (explaining that even at the motion to dismiss stage, "[t]here is a difference between accepting a plaintiff's allegations of fact as true and accepting as correct the conclusions plaintiff would draw from such facts").  Thus, while the Court will not credit any statements in the McLane declaration that are contradicted by Plaintiffs' specific facts, Plaintiffs go too far in asking the Court to disregard the entirety of the McLane declaration simply because Plaintiffs allege they have standing.

Next, Plaintiffs argue that portions of the McLane declaration on which Defendants depend to contest Plaintiffs' assertions of standing are inadmissible because they are too speculative.  Plaintiffs rely on Federal Rule of Evidence 602, which provides that the testimony of a lay witness is admissible only if based on the witness's personal knowledge.  Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").  Specifically, Plaintiffs take aim at Mr. McLane's assertions that "[h]ad the PNC Bank export facility not been extended to Xcoal in July of 2012, or had it subsequently been cancelled, Xcoal still would have been able to finance its export business to international coal markets through its European trade banks." McLane Decl. ¶ 10.  Plaintiffs argue that this statement constitutes impermissible speculation because Mr. McLane could not possibly know how such events would have unfolded, and that Plaintiffs are not required to negate such speculation to establish standing.  Pls.' Reply Support Mot. Strike McLane Decl. at 5–6 (citing *Duke Power Co. v. Carolina Evtl. Study Grp., Inc.*, 438 U.S. 59, 78 (1978)).  Plaintiffs also note that Mr. McLane's assertion is contrary to the implicit

findings of the Bank that Xcoal lacked sufficient financing and that the guarantee would support exports that would not otherwise occur. *See* 12 U.S.C. § 635a-4 (directing the Bank to "establish a program to provide guarantees . . . when in the judgment of the Board of Directors -- (1) the private credit market is not providing adequate financing . . . ; and (2) such guarantees would facilitate expansion of exports which would not otherwise occur").

Defendants dispute Plaintiffs' interpretation of the Bank's authorizing statute, which they argue requires consideration of factors like the availability of financing and the facilitation of exports at the programmatic level, and does not require every individual guarantee to meet those requirements. In addition, Defendants argue that Mr. McLane's statement is based on first-hand knowledge. According to the declaration, Mr. McLane has been Xcoal's director of finance since 2008, his duties include negotiating and administering "all of the credit facilities required, or deemed prudent, for Xcoal's exporting business," and his statement is supported by the fact that Xcoal "was only drawing down approximately 70% of [its] total available credit" when it applied for the loan guarantee. McLane Decl. ¶¶ 1, 4, 7. Nevertheless, the Court is not persuaded that Mr. McLane's assertion is of any relevance in determining Plaintiffs' standing. The assertion that Xcoal "would have been able to finance its export business," even if true, is of little value standing alone because it makes no representation that Xcoal would have been able to finance the *same volume* of coal exports in the absence of the Bank's guarantee. On this basis, and in light of the record evidence suggesting that the Bank did, in fact, consider Xcoal's need for the Bank's financing prior to authorizing the guarantee, *see* AR 263, the Court will disregard the McLane declaration's statement regarding what Xcoal would have done had it not received the financing in question in July 2012.

**C.  Associational Standing: CCAN, Friends of the Earth, Sierra Club, and WVHC**

Having disposed of the preliminary questions of admissibility, the Court now considers whether the four Plaintiffs bringing suit on behalf of their members – CCAN, Friends of the Earth, Sierra Club, and WVHC – have established associational standing to bring the instant action.[14]  To establish standing to sue in a representative capacity, at least one of the plaintiffs must show that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit."  *Sierra Club*, 292 F.3d at 898.  At issue in this case is the first prong of the associational standing test: whether Plaintiffs have established that their members would have standing to sue in their own right.  Defendants do not dispute Plaintiffs' assertions that their members are injured by pollution produced from the process of exporting coal, but they contend that Plaintiffs have failed to establish the second and third elements of standing: causation and redressability.  *See* Defs.' Mem. Support Mot. Summ. J. at 11–25, ECF No. 64. More specifically, Defendants argue that Plaintiffs have failed to show that the Bank's decision

---

[14] The Court notes that the nature of these Plaintiffs' standing claims is not always clear. Their complaint suggests that these four plaintiffs brought suit on behalf of themselves and their members, *see* Compl. ¶¶ 11(b), 12(b), 13(b), 14(b), ECF No.1, but their motion for summary judgment first states that they are bringing claims solely on behalf of their members, *see* Pls.' Mem. Support Mot. Summ. J. at 12–13, before reverting to the posture that the claims are brought both on behalf of the organizations and their members, *see id.* at 13–20.  However, when Plaintiffs describe the injuries giving rise to standing for these organizations, they only identify injuries to their members and do not describe any injuries suffered by any of their organizations. *See id.*  Accordingly, to the extent that Plaintiffs intended to claim organizational standing to sue on their own behalf in addition to associational standing to sue on behalf of their members, the Court finds that they have failed to identify any organizational injuries and thus have failed to establish standing to sue on their own behalf.  *See ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 24– 25 (D.C. Cir. 2011) (holding that an organization suing on its own behalf must show that the defendant's action caused "a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract societal interests'" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

to authorize the guarantee to PNC on behalf of Xcoal caused an increase in the volume of coal

exported, or that an order of this Court rescinding the guarantee would cause Xcoal to reduce the

volume of coal it exports, thereby reducing the pollution injuring Plaintiffs' members.  Because

Plaintiffs have failed to establish any likelihood that third party Xcoal's choices "will be made in

such manner as to . . . permit redressability of injury," this Court agrees with Defendants that

Plaintiffs have failed to establish redressability and thus lack associational standing to pursue

their claims.  *See Ctr. for Law & Educ.*, 396 F. 3d at 1161.

       The causation or traceability element of standing requires that "there must be a causal

connection between the injury and the conduct complained of—the injury has to be fairly

traceable to the challenged action of the defendant, and not the result of the independent action

of some third party not before the court."  *Defenders of Wildlife*, 504 U.S. at 560 (internal

quotation marks and alterations omitted).  To establish the redressability element of standing, "it

must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision."  *Id.* at 561 (internal quotation marks omitted); *see also Vill. of Bensenville v. FAA*, 457

F.3d 52, 69 (D.C. Cir. 2006) ("[F]or purpose of determining the petitioners' standing, the court

must decide whether the practical consequence of [vacating the agency's decision] would

amount to a significant increase in the likelihood that [plaintiffs'] would obtain relief that

directly redresses the injury suffered." (internal quotation marks omitted)).

       In a case like this concerning the alleged violation of procedural rights, the standards for

redressability and immediacy are relaxed to a certain extent, meaning that the Plaintiffs need not

establish with any certainty that the Bank would reach a different decision regarding the loan

guarantee if it first considered possible environmental consequences.  *See Defenders of Wildlife*,

504 U.S. at 572 n.7 (noting that if a federal agency issues a license to authorize construction of a

dam without first preparing an EIS, individuals living adjacent to the dam have standing without needing to show that the agency would have withheld the license had it prepared an EIS).[15]  But the agency's decision is only one piece of the redressability puzzle in a case where a plaintiff alleges that government funding to an independent third party[16] has caused the third party to injure the plaintiff.  In such cases, plaintiffs must satisfy normal redressability standards as to the third party whose actions are directly causing the plaintiff's injuries.  *St. John's United Church of Christ v. FAA*, 520 F.3d 460, 463 (D.C. Cir. 2008) (holding that where plaintiffs alleged that agency funding to a third party was authorized in violation of the plaintiff's procedural rights, redressability standards were relaxed only as to the agency and not the third party); *see also Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) ("The relaxation of procedural standing requirements would excuse [Plaintiffs] from having to prove the causal relationship regarding the [agency] action, but its burden regarding the action of the [third party] would not change.").

 As a consequence, although Plaintiffs need not show that the Bank's consideration of environmental impacts would cause it to modify its decision, they must provide some basis for

---

[15] The hypothetical scenario discussed by the Supreme Court in footnote 7 of *Defenders of Wildlife* appears to fit within a category of cases identified by the D.C. Circuit as giving rise to standing despite the fact that a plaintiff challenges government action on the basis of third-party conduct: those cases where an agency's action "permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action."  *See Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940–41 (explaining that redressability is satisfied in such cases "because the intervening choices of third parties are not truly independent of government policy").

[16] *See Bennett v. Donovan*, 703 F.3d 582, 587–88 (D.C. Cir. 2013) (defining an independent third party as a party who is "independent of government policy *with respect to the action at issue in a particular case*," and who can continue to act in the manner harming plaintiffs regardless of whether the agency action at issue is declared unlawful by a court).

finding that the "nonagency activity" that affects them – namely, Xcoal's exporting of coal – "will be altered or affected by the agency activity they seek to overturn." *St. John's United Church of Christ*, 520 F.3d at 463 (quoting *Defenders of Wildlife*, 504 U.S. at 571); *see also Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) (applying *Defenders of Wildlife*'s "third party" analysis to the redressability prong of the standing test); *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007) ("[T]o establish redressability . . . we required that the facts alleged be sufficient to demonstrate a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought.").

Plaintiffs contend that they have been injured by export-related pollution produced by coal mining and transportation, that the Bank's loan guarantee to PNC allowed Xcoal to export more coal than would have been possible without the Bank's assistance,[17] and that rescinding the Bank's financing for the remainder of the loan term will reduce the additional coal that Xcoal can export until the Bank conducts an EIS in compliance with NEPA.  Pls.' Reply Support Mot. Summ. J. at 1–2, ECF No. 70.  Plaintiffs' assertion of redressability thus hinges on the proposition that if this Court orders the Bank to rescind its guarantee and comply with NEPA: (1) regulated third party PNC will, in turn, rescind, reduce, or otherwise modify its loan to third party Xcoal, (2) Xcoal will respond to this change in available credit by reducing the amount of coal that it exports, and (3) the reduction in Xcoal's exports will decrease the coal-related

---

[17] Notably, although Plaintiffs argue that the loan guarantee enabled Xcoal to export more coal than otherwise would have been possible, they do not – and indeed, could not – argue that the Bank's decision to authorize the loan guarantee "permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action." *Nat'l Wrestling Coaches Ass'n,* 366 F.3d at 940 (identifying instances where an agency authorizes otherwise illegal conduct as one of the two categories of cases where standing has been found despite the fact that the plaintiff challenged government action on the basis of harm from a third-party's conduct).

pollution harming Plaintiffs' members.  Unfortunately for Plaintiffs, however, a review of the administrative record and the parties' declarations shows that Plaintiffs have failed to establish that any alteration in the Bank's decision to authorize the loan guarantee could or would affect the amount of coal that Xcoal exports.

The declarations of Plaintiffs members all describe the negative effects of coal pollution, concern that the loan guarantee will increase pollution, and the belief that the members' interests would be better protected by the Bank's compliance with NEPA.[18]  As Defendants point out, however, the members' hopes or beliefs that an order rescinding the guarantee would redress their injuries, however genuine, do not constitute "specific facts" showing redressability.  *See Wilkerson v. Wackenhut Protective Servs., Inc.*, 813 F. Supp. 2d 61, 67 (D.D.C. 2011) (explaining that personal belief, speculation, and hearsay are insufficient to defeat a motion for summary judgment).  Plaintiffs also assert in their reply brief that a favorable decision by this court ordering the Bank to rescind the guarantee "would reduce the volume of coal exported and directly redress Plaintiffs' substantive harms," Reply Support of Pls.' Mot. for Summ. J. at 10, but they cite nothing in the record to support this assertion.  *See Defenders of Wildlife*, 504 U.S. at 561 ("In response to a summary judgment motion, . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts . . . ." (internal quotation marks and citation omitted)).

The McLane declaration, in contrast, contains specific facts supporting Defendants' assertion that because Xcoal has accumulated enough alternative sources of credit, even if Plaintiffs obtain the relief they seek, the company's coal exports will continue unchecked and Plaintiffs' injury will not be redressed.  *Cf. Vill. of Bensenville*, 457 F.3d at 70 (holding that

---

[18] *See* Bullard Decl. at 2–4; Cook Decl. at 2–4; Fox Decl. at 2–4; Ortega Decl. at 2–5; Rank Decl. at 2–4; Reed Decl. at 2–4; Ware Decl. at 2–4.

petitioners' injury was not redressable by a decision vacating $337 million in agency funding for

a project because the project could continue on the basis of other sources of financing).

Specifically, Mr. McLane testified that because the "European banking crisis has eased

substantially" since Xcoal completed its application for the loan guarantee in December 2011,

"even in the absence of the PNC Bank export facility, Xcoal would readily be able to support its

current volume of business through its unused and available financing."  McLane Decl. ¶ 10.  As

support, Mr. McLane explains that "Xcoal has available approximately $535 million in

commodity trade facilities, including the $100 million facility from PNC, spread among eight (8)

lending institutions . . . ."  *Id.* ¶ 8.  The Bank's loan guarantee thus supports 18.7% of Xcoal's

total credit.  Although 18.7 is not an insignificant percentage, the McLane declaration further

reveals that Xcoal's credit utilization rate is only 30%, meaning that the company has

"approximately $374 million in unused credit available."  *Id.*

        In response to Mr. McLane's declaration, Plaintiffs have not come forward with any

specific facts that rebut or cast doubt on Mr. McLane's testimony.  They do not dispute his

assertion that the European banking crisis has eased substantially or that Xcoal is only using 30%

of its available lines of credit.  They do not suggest that Xcoal's existing alternative lines of

credit are unstable or insufficient, or that Mr. McLane has in any way misrepresented Xcoal's

available financing.  Although the Sanzillo declaration posits that it would be difficult for Xcoal

to obtain additional sources of funding at this time given the present state of the coal industry,

*see* Sanzillo Decl. at 6–9, that fact does nothing to dispute the Defendants' assertion that the

financing Xcoal has *already* obtained is sufficient to support its export business.  Similarly, even

if Mr. Sanzillo is correct that Xcoal "would have agreed" to environmental conditions imposed

by the Bank because its financing "was imperiled" by the European debt crisis when it sought the

Bank's assistance in 2011, *see id.* ¶ 22, he does not suggest that Xcoal's pre-existing financing was perceived to be at risk by the time that Plaintiffs filed their complaint in 2013.[19]  *See Freedom Republicans, Inc. v. FEC*, 13 F.3d 412, 418 (D.C. Cir. 1994) (observing that while "[c]ausation remains inherently historical[,] . . . redressability [is] quintessentially predictive").

On facts like these, the D.C. Circuit Court's redressability analysis in *St. John's United Church of Christ v. FAA*, 520 F.3d 460 (D.C. Cir. 2008), is particularly instructive.  In that case, plaintiffs sought to challenge the Federal Aviation Administration's ("FAA") $29.3 million airport improvement grant to the City of Chicago.  *Id.* at 462.  The grant was one of several from the agency designed to reimburse Chicago for up to $337 million spent on airport improvement projects that plaintiffs claimed would cause them a variety of injuries.  *Id.* at 461.  The plaintiffs argued that the FAA's decision to award the grant violated their procedural rights and caused their injuries, and that their injury was redressable because Chicago could not complete the projects in question without the FAA's assistance.  *Id.* at 462.  The Circuit Court disagreed, however, and found that Chicago provided most of its own funding "and [was] prepared to obtain funding from other sources if federal money is unavailable."  *Id.* at 463.  Because Chicago was committed to completing the project with or without FAA funding, which was replaceable, the court held that the plaintiffs had failed to establish redressability because they did not show a "substantial probability" that the city "would scrap the . . . project if the court vacated the $29.3

---

[19] As previously discussed, Mr. Sanzillo's conclusion that the "Bank's explanation of Xcoal's need for the loan guarantee supports the view that Xcoal would have to limit or end its business without the Ex-Im Bank revolving loan guarantee" is inadmissible, and because Plaintiffs have not provided any basis for this Court to conclude that it is capable of being converted into admissible evidence, it will not be considered by the Court.  *See* Part III.B.1, *supra*; *see also Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (explaining that where a plaintiff would not be permitted to testify about inadmissible evidence at trial, that inadmissible evidence "counts for nothing" at the summary judgment stage).

million grant." *Id.* (explaining that the plaintiffs' "redressability obstacle" was "uncertainty over what Chicago would do—not the FAA," so petitioners had to satisfy normal redressability standards despite their claim of procedural injury). The court concluded that on the facts before it, it was "entirely conjectural whether the nonagency activity that affects petitioners will be altered or affected by the agency activity they seek to overturn." *Id.* (internal quotation marks omitted).

Plaintiffs here run into the same "redressability obstacle" as the petitioners in *St. John's*. The proposition that Xcoal would export less coal if the Court orders the Bank to rescind its guarantee is, at best, entirely conjectural in light of the availability of alternative funds and Xcoal's stated commitment to exporting the same volume of coal regardless of whether the loan guarantee is rescinded. Such record evidence "that the third parties whose conduct injured the plaintiffs would have had reason to continue their injurious conduct unaltered in the absence of the challenged government action" is significant, and distinguishes the case at hand from those cases "where the record presented substantial evidence of a causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 941–43.

Accordingly, even if the Court accepts Plaintiffs' position that the guarantee authorized in May 2012 was intended to support an increase in exports, and even if the Court assumes traceability, in light of the uncontested specific facts of the McLane declaration, Plaintiffs are still no closer to establishing that their injury was redressable at the time they filed their complaint. *See Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007) ("[C]ausation does not inevitably imply redressability."); *see also Bennett v. Donovan*, 703 F.3d 582, 587 (D.C. Cir. 2013) (summarizing cases in which no redressability

was established despite the fact that "third parties . . . took actions because of allegedly unlawful agency decisions" where the third parties "would have no compelling reason to reverse those actions were the [agency] decisions held unlawful by a court"). As the D.C. Circuit Court explained in *Renal Physicians*, there are cases where "governmental action is a substantial contributing factor in bringing about a specific harm, but the undoing of the governmental action will not undo the harm, because the new status quo is held in place by other forces." 489 F.3d at 1278.

In sum, Plaintiffs have failed to show that a favorable decision from this Court is likely to cause Xcoal to reduce the volume of its exports. *See Defenders of Wildlife*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" of the Court. (internal quotation marks omitted)); *see also Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 938 ("[T]he Supreme Court has made clear that a plaintiff's standing fails where it is purely speculative that a requested change in government policy will alter the behavior of regulated third parties that are the direct cause of the plaintiff's injuries."). Defendants have presented specific facts establishing that the European banking crisis has eased substantially since December 2011, that Xcoal has $535 million in credit, that the company's credit utilization rate is only 30%, and that Xcoal "would readily be able to support its current volume of business" with its existing lines of credit even if the Bank rescinded its loan guarantee. *See* McLane Decl. ¶¶ 7, 10. Plaintiffs have not come forward with any evidence that casts doubt on these facts. *See also Brady Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft*, 339 F. Supp. 2d 68, 78 (D.D.C. 2004) ("[A]bsent such factual allegations to demonstrate how the relevant third parties are likely to conduct themselves if the requested judicial relief were to be granted, the [Plaintiff] fails to satisfy the heavy burden

imposed by the . . . redressability prong of the standing inquiry where third party action is a cause of injury.").

Accordingly, the Court concludes that Plaintiffs have failed to establish that a favorable decision by this Court could redress their injuries. *Cf. Defenders of Wildlife*, 504 U.S. at 571 (holding that the fact that agencies supplied only a fraction of the funding for a disputed project was an "impediment to redressability" where "Respondents have produced nothing to indicate that the projects they have named will either be suspended, or do less harm to listed species, if that fraction is eliminated."). Plaintiffs CCAN, Friends of the Earth, Sierra Club, and WVHC have thus failed to establish an essential element of Article III standing.

### D.  Organizational Standing: CIEL and Pacific Environment

Plaintiffs CIEL and Pacific Environment both allege that they have been harmed by the Bank's decision to authorize a $90 million loan guarantee on behalf of a coal exporter without first considering the potential environmental consequences. Unlike CCAN, Friends of the Earth, Sierra Club, and WVHC, however, Plaintiffs CIEL and Pacific Environment do not claim to have standing to sue on behalf of their members who are harmed by coal-export related pollution. Instead, both CIEL and Pacific Environment claim standing in their own right, arguing that they have each suffered injuries to their organizations' missions, activities, and resources sufficient to convey organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). *See* Pls.' Reply Support Mot. for Summ. J. at 13. Defendants dispute this claim, arguing that the organizations have failed to establish standing because they have failed to show injury-in-fact. Defendants point out that mere interest in a topic or tension between agency action and an organization's policy agenda is insufficient to convey standing under the test established by the Supreme Court in *Havens*. *See* Mem. Support Defs.' Mot. Summ. J. at 25–26.

Based on the record established by the parties, the Court agrees with Defendants that neither CIEL nor Pacific Environment has established the injury in fact necessary to convey organizational standing.

"To show injury-in-fact, an organization must allege more than a mere 'setback to [its] abstract social interests.'" *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 122 (D.C. Cir. 1990) (quoting *Havens Realty Corp.*, 455 U.S. at 378–79). Accordingly, mere organizational interest in the environment, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render [an] organization adversely affected or aggrieved within the meaning of the APA." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (internal quotation marks omitted) (holding that the Sierra Club's well-established interest in protecting the environment was not enough to give the organization standing to challenge governmental action that was harmful to the environment). As the Supreme Court explained in *Havens*, an organization suing on its own behalf can establish standing by showing that a defendant's actions have "perceptibly impaired" the organization's ability to provide services, such that there has been a "concrete and demonstrable injury to the organization's activities – with [a] consequent drain on resources." 455 U.S. at 379; *see also Competitive Enter. Inst.*, 901 F.2d at 122 (requiring organization claiming injury to allege "that discrete programmatic concerns are being directly and adversely affected by the challenged actions" (internal quotation marks omitted)). Building on the Supreme Court's analysis in *Havens*, the D.C. Circuit has established two other requirements that must be met in an organizational injury case. First, the government's conduct must "directly conflict with the organization's mission," *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("[I]n those cases where an organization alleges

that a defendant's conduct has made the organization's *activities* more difficult, the presence of a direct conflict between the defendant's conduct and the organization's *mission* is necessary – though not alone sufficient – to establish standing.").  And second, the organization must show that it has expended resources to counteract the injury to its ability to achieve its mission and not simply as a product of "unnecessary alarmism constituting a self-inflicted injury."  *Id.*

### 1. Pacific Environment

The Court begins by considering Plaintiff Pacific Environment's assertion of organizational injury.  To support its claim of injury in fact, Pacific Environment has provided the Court with the declaration of the organization's policy director, Douglas Norlen.  *See* Norlen Decl., ECF No. 56-9.  Citing the Norlen declaration, Plaintiffs argue that Pacific Environment has established *Havens* standing in this case by showing that the Bank's decision to authorize the loan guarantee: (1) conflicts with the organization's mission, and (2) "will require Pacific Environment to devote additional resources to its work promoting environmentally responsible financing."  Pls. Mot. Summ. J. at 23–24.  A careful review of the Norlen declaration, however, reveals that it falls short of establishing standing under *Havens*.

As the Norlen declaration explains, Pacific Environment is an organization incorporated and headquartered in California.  Norlen Decl. ¶ 3.  The organization's mission "is to strengthen democracy, support grassroots activism, empower local communities, and redefine international policies in order *to protect the living environment of the Pacific Rim*."  *Id.* ¶¶ 3–4 (emphasis added).  Although the organization has pursued its mission with a range of activities, including efforts to reform the Bank's regulations and to require the Bank to adequately assess the environmental impacts of fossil fuel projects, the declaration does not suggest that the specific agency action challenged in this case has any potential whatsoever to affect "the living

environment of the Pacific Rim." *Cf. Nat'l Treasury Emps. Union*, 101 F.3d at 1430 (granting motion to dismiss for lack of standing where organization failed to establish a direct conflict between its mission of improving worker conditions and the legislation it sought to challenge). In the absence of any evidence suggesting that the particular loan guarantee at issue in this case has even the potential to affect the environment of the Pacific Rim, the Court is unable to discern any direct conflict between the challenged agency action and the mission of Pacific Environment.

The Norlen declaration does assert that the Bank has harmed Pacific Environment by "impeding its objectives of requiring financial institutions to increase their accountability and improve their environmental policies." Norlen Decl. ¶ 12. But it is well-established in this Circuit that "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treasury Emps. Union*, 101 F.3d at 1429 (internal quotation marks omitted). Rather, it is the kind of "setback to the organization's abstract social interests," that does not constitute a "concrete and demonstrable injury to the organization's activities." *Id.* at 1428. *Compare Havens*, 455 U.S. at 379 (holding that organization could sue on its own behalf where challenged agency action "perceptibly impaired [the organization's] ability to provide counseling and referral services") *with Dellums v. U.S. Nuclear Regulatory Comm'n*, 863 F.2d 968, 972 (D.C. Cir. 1988) ("Even assuming the [agency's] orders would adversely affect the [organization's] general interest [in opposing nuclear proliferation and ensuring proper safeguards for nuclear energy], this court has consistently held that harm to an interest in 'seeing' the law obeyed or a social goal furthered does not constitute injury in fact." (internal quotation marks omitted)). At the summary judgment stage, Plaintiffs' failure to establish that the agency

action in question directly contradicts the organization's mission is fatal.[20]  *ASPCA*, 659 F.3d at

25 (explaining that "[i]f the challenged conduct affects an organization's activities, but is neutral

with respect to its substantive mission," the D.C. Circuit has "found it entirely speculative

whether the challenged practice will actually impair the organization's activities"  (internal

quotation marks omitted)).

Even if Pacific Environment had established a direct conflict between its mission and the

Bank's authorization of the loan guarantee, however, the group still would fall short of

establishing injury in fact under *Havens*.  Plaintiffs argue that Pacific Environment has

established concrete and particularized organizational injury by claiming that the Bank's

interference with its mission will cause the organization "to increase its resources for its

advocacy to strengthen environmental requirements in Ex-Im Bank's policies."  Norlen Decl. ¶

12.  But apart from stating the Bank has generally frustrated the organization's objectives, the

Norlen declaration does not identify a single organizational activity or service that the Bank's

decision has impeded.  Neither does the declaration explain how or why an increase in advocacy

resources is necessary to counteract the unidentified impediment to the organization's activities

caused by the Bank's decision.  *See Nat'l Treasury Emps. Union*, 101 F.3d at 1430 (explaining

the even accepting the truth of the factual allegation that the plaintiff expended additional

lobbying funds, the court would not credit the plaintiff's unsupported conclusion that the

---

[20] Typically, if an organization fails to establish a conflict between the defendant's action and the organization's mission, the Court need not proceed to the next step of the *Havens* standing inquiry.  *See ASPCA v. Feld*, 659 F.3d 13, 25 (D.C. Cir. 2011) ("[W]e begin our inquiry into *Havens* standing by asking whether the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission. If the answer is yes, we then ask whether the plaintiff used its resources to counteract that injury."). As the D.C. Circuit explained in *National Treasury*, "[a]bsent a direct conflict" between the organization's mission and the challenged legislation, it is difficult to determine whether an organization's "additional expenditure of [lobbying] funds is truly necessary" to achieve the group's mission "or rather is unnecessary alarmism constituting a self-inflicted injury.  101 F.3d at 1430.

expenditures were "a necessary link in achieving the organization's ultimate purpose").  In the absence of such facts, Pacific Environment's assertion that it will dedicate additional resources to advocacy at some unspecified date in the future resembles a self-inflicted harm and not injury in fact that is fairly traceable to the Bank's actions.  *See id.* (characterizing an organization's expenditures on lobbying as "unnecessary alarmism constituting a self-inflicted injury" where the plaintiff had failed to provide facts showing that the expenditures were a necessary link to achieve the organization's ultimate purpose); *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (holding that although "[t]he diversion of resources . . . might well harm the [plaintiff's] other programs, for money spent on testing is money that is not spent on other things," such self-inflicted harm was a budgetary choice and "not really a harm at all" where "the [plaintiff] and its programs would have been totally unaffected [by the defendant's act] if it had simply refrained from making the re-allocation").

Similarly, a plaintiff "cannot convert its ordinary program costs into an injury in fact," unless the government's actions have required the organization to expend resources to pursue its mission.  *See Nat'l Taxpayers Union*, 68 F.3d at 1434 (holding that where organization was dedicated to promoting fair and legal revenue-raising by the U.S. government, the group's decision to challenge the legality of  a tax provision did not constitute injury in fact, it was simply an ordinary program cost); *see also Humane Society of the U.S. v. Vilsack*, 19 F. Supp. 3d 24, 46 (D.D.C. 2013) (holding that where spending funds to counteract unfavorable legislation was a normal party of the Humane Society's mission and operations, "being prompted to do it can hardly qualify as an injury that confers constitutional standing"); *id.* ("[T]he fact that they have decided to redirect some of their resources from one legislative agenda to another is insufficient to give them standing.").

As the Norlen declaration explains, Pacific Environment has been advocating to reform and strengthen the Bank's environmental regulations since 1997.  Norlen Decl. ¶¶ 6, 7.  It thus appears that advocating for stronger environmental requirements for the Bank is an "ordinary program cost" for Pacific Environment and not a response to or consequence of the Bank's authorization of the loan guarantee in question.  *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) ("As for the other expenditures claimed, [plaintiff] has not shown they were for 'operational costs beyond those normally expended' to carry out its advocacy mission."); *Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, No. 13-cv-1762, 2014 WL 2001045, at *5 (D.D.C. May 16, 2014) ("Any resources that [plaintiff] expended . . . were in the normal course of [the organization's] operations, and it cannot convert its ordinary activities and expenditures . . . into an injury-in-fact."); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, No. 12-cv-0327, 2014 WL 449031, at *16 (D.D.C. Feb. 5, 2014) ("[Plaintiff] cannot convert an ordinary program cost—advocating for and educating about its interests—into an injury in fact.").

Also missing from the Norlen declaration is any mention of when such an allocation of organizational resources might take place, let alone a suggestion that the organization has in fact had to reallocate resources.  These omissions are particularly concerning in light of the fact that the Norlen declaration was filed nearly two years after the Bank approved the loan guarantee in question, which has a three year term due to expire in a matter of months.  *See Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1141-42 (D.C. Cir. 2011) (finding declaration and "frustration of mission damages" calculations by plaintiff inadequate to support claim of organizational injury at the summary judgment stage because "[d]espite the substantial passage of time from the filing of its lawsuit, the [organization did] not spell out when it engaged in the specified activities"); *see also Nat'l Taxpayers Union*, 68 F.3d at 1434 (holding that

organization's "self-serving observation that it has expended resources to educate its members and others regarding [challenged statutory provision] does not present an injury in fact").

As a final matter, the Court acknowledges that Pacific Environment is concerned that the Bank "will continue to fund major fossil fuel and mining projects throughout the world," and that if it does so, "[t]his will require Pacific Environment to devote additional resources to its work to promote environmentally responsible financing, including through monitoring Ex-Im Bank's financing policy and practice."  Norlen Decl. ¶ 13.

While these concerns regarding potential future actions of the Bank may be genuine, they are beyond the scope of this case, which is concerned only with the Bank's authorization of a single loan guarantee in May 2012 on behalf of Xcoal.  Plaintiffs have not presented any broader challenges to the Bank's policies or regulations, and they have not identified any other applications for Bank financing that could be implicated by the Court's decision.  In short, Pacific Environment's concerns about potential future harm caused by future actions of the Bank not challenged by Plaintiffs in the instant action, and its speculation about the expenditures the organization may need to take to counter such actions should they occur, is precisely the type of "conjectural" or "hypothetical" injury that is insufficient to establish injury in fact for standing purposes.  *See Clapper v. Amnesty Int'l USA*, ––– U.S. –––, 133 S.Ct. 1138, 1151 (2013) (holding that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

In sum, Pacific Environment has shown neither a conflict between the Bank's action and the organization's ultimate mission, nor a perceptible impediment to the group's activities that is traceable to the Bank's decision, nor a "consequent" drain on the organization's resources caused

by the group's efforts to counteract that harm.  Pacific Environment has failed to establish

organizational standing under *Havens*.

## 2.  CIEL

As to CIEL, Plaintiffs argue that the Bank's authorization of the loan guarantee

"demonstrably harms" the international environmental organization and its mission in two ways:

by undermining the group's energy policy work and by interfering with its public education

efforts.  Citing the declaration of Alyssa Johl, a senior attorney with CIEL, Plaintiffs first argue

that the approval of the loan guarantee "undermines CIEL's work" to promote sustainable energy

policies, requiring CIEL "to put extra time and resources into monitoring Ex-Im Bank's

policies."  Pls.' Mem. Support Mot. Summ. J. at 22.  Second, Plaintiffs argue that the Bank's

violation of CIEL's procedural rights "has caused CIEL to expend additional effort to inform the

public about coal financing and its potential effects."  *Id.*  Defendants, on the other hand, argue

that Plaintiffs have done no more than to establish an interest in a problem coupled with

unfavorable action, and they point out that a conflict with the organization's policy agenda alone

is insufficient to establish injury in fact.  Defs.' Mem. Support Mot. Summ. J. at 26.  The Court

considers each of CIEL's claims of injury in turn.[21]

CIEL's first claim of injury is that the Bank's approval of the $90 million loan guarantee

has undermined the group's energy policy work.  Applying the *Havens* standing inquiry to the

facts of this case, the Court asks first whether the Bank's allegedly unlawful authorization of the

---

[21] Although the Johl declaration also notes CIEL's concerns about possible Bank financing of other coal exports in the future and the possibility that CIEL would have to devote additional resources to counteract such decisions if that should occur, *see* Johl Decl. ¶ 11, Plaintiffs have wisely elected not to argue organizational injury on the basis of such hypothetical scenarios that are beyond the scope of the instant action.  *See Clapper*, 133 S.Ct. at 1151 (holding that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

$90 million loan guarantee directly conflicts with CIEL's mission and impedes the organization's activities, *Nat'l Treasury Emps. Union*, 101 F.3d at 1430, and if so, whether CIEL "undertook . . . expenditures in response to, and to counteract, the effects of" the Bank's authorization of the loan guarantee, *Equal Rights Ctr.*, 633 F.3d at 1140.  According to the Johl declaration, CIEL's mission is "to use the power of law to protect the environment, promote human rights, and ensure a just and sustainable society."  Johl Decl. ¶ 4.  Plaintiffs have provided evidence that coal mining and transportation has harmful consequences for the environment, *see generally* Hansen Decl.; Johannesson Decl.; Sahu Decl., which suggests that the Bank's provision of financial support to a coal exporter like Xcoal may well be in conflict with CIEL's overall environmental mission.

As the Supreme Court explained in *Defenders of Wildlife* and *Sierra Club*, however, a plaintiff must establish not only that it possesses a special interest in protecting the environment and that the agency action in question is likely to harm some part of the environment, but also that the plaintiff is "directly affected apart from their special interest in the subject" by the government's allegedly unlawful actions.  *See Defenders of Wildlife*, 504 U.S. at 563; *id.* at 567 ("It goes beyond the limit . . ., and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection."); *Sierra Club*, 405 U.S. at 739 ("[I]f a 'special interest' in [protecting the environment] were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived.").  Accordingly, the Court must next ask whether the Bank's authorization of the loan guarantee caused a "concrete and demonstrable

injury" to CIEL's activities, and whether CIEL undertook "expenditures in response to, and to counteract, the effects of" the Bank's action. *Equal Rights Ctr.*, 633 F.3d at 1138–40 (internal quotation marks omitted).

The Johl declaration, on which Plaintiffs rely to demonstrate standing, first asserts generally that the Bank's authorization "frustrates CIEL's efforts" to achieve its mission. But as discussed previously, mere "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treasury Emps. Union*, 101 F.3d at 1429 (internal quotation marks omitted). Ms. Johl next asserts that the Bank's decision to authorize the $90 million loan guarantee "frustrates CIEL's work to promote environmentally sustainable energy policies and has required CIEL to put extra time and resources into monitoring Ex-Im Bank's policies." Johl Decl. ¶ 9. At the motion to dismiss stage, such assertions may have been sufficient to establish standing. *See Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) ("At the motion to dismiss stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (internal quotation marks omitted)). But at the summary judgment stage, and in light of Defendants' challenge to plaintiffs' claims of organizational injury, Plaintiffs were obligated to provide "specific facts" to show concrete ways in which CIEL's programmatic activities were harmed by the Bank's authorization of the $90 million loan guarantee. *See Fla. Audubon Soc.*, 94 F.3d at 666 ("As we are reviewing a motion for summary judgment, we require specific facts, not 'mere allegations,' to substantiate each leap necessary for standing.").

The Johl declaration, however, does not contain such specific facts. For example, Ms. Johl suggests neither that approval of the loan guarantee has "perceptibly impaired" CIEL's

ability to advocate for energy policy reform in the United States or elsewhere, nor that it has

resulted in the spread of harmful information that was damaging to CIEL's policy work.

*Compare Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 28 (D.C. Cir. 1990) (finding injury where

defendant's advertisements allegedly encouraged discriminatory attitudes and steered black

home buyers and renters away from the advertised complexes) *with ASCPA*, 659 F.3d 27–28

(finding no standing where organization claimed that its animal advocacy efforts were impaired

by defendant's public poor treatment of animals but failed to show that defendants' actions

actually fostered a public impression that the poor treatment of animals was acceptable).

Although the Johl declaration makes clear that CIEL disapproves of the Bank's decision to

finance coal exports, more is required to connect the particular decision at issue with the alleged

harm to CIEL's sustainable energy policy work.  *See Fla. Audubon Soc'y*, 94 F.3d at 668

(holding that plaintiff must connect the agency's "substantive decision to the plaintiff's

particularized injury"); *see also Havens*, 455 U.S. at 379 (distinguishing organizational injury

giving rise to Article III standing from what is merely "a setback to the organization's abstract

social interest").

However, even if the Court assumes that the loan guarantee has perceptibly impaired

CIEL's policymaking efforts, two additional obstacles to a finding of injury in fact remain.  First,

case law in this circuit has cast significant doubt on the viability of a claim of organizational

injury premised solely on injury to an organization's advocacy efforts.  *See Ctr. for Law & Educ.*

*v. Dept. of Educ.*, 396 F.3d 1152, 1161–62 (D.C. Cir. 2005) (holding that organizational

plaintiffs failed to demonstrate standing where "the only 'service' impaired is pure issue-

advocacy – the very type of activity distinguished by *Havens*"); *Humane Society of U.S.*, 19 F.

Supp. 3d at 45–47 (explaining that the D.C. Circuit has not found standing when the only

organizational service impaired was pure advocacy, and finding inadequate the plaintiff's allegation of injury on the basis of needing to dedicate additional resources to lobbying); *Scenic Am., Inc. v. U.S.  Dep't of Transp.*, 983 F. Supp. 2d 170, 177 (D.D.C. 2013) (observing that "the law is also quite skeptical of alleged organizational injuries related to lobbying and issue advocacy").  As the D.C. Circuit Court has explained, a claim of organizational injury based solely on the impairment of issue advocacy efforts comes perilously close to conferring standing on the impermissible basis of mere frustration of an organization's objectives.  *Ctr. for Law & Educ.*, 396 F.3d at 1161.  *But see ASPCA*, 659 F.3d at 27 (declining to decide whether injury to an organization's advocacy efforts was sufficient injury for *Havens* standing when plaintiff failed to establish causation).

Second, CIEL has failed to provide sufficient facts that would allow the Court to find that the organization's expenditures on monitoring Bank policy are a consequence of the Bank's decision and not an ordinary program cost or self-inflicted harm.  In *National Treasury Employees Union*, the D.C. Circuit explained that although a court must accept as true an allegation that an organization has expended resources, "there is a difference between accepting a plaintiff's allegations of fact as true and accepting as correct the conclusions plaintiffs would draw from such facts."  101 F.3d at 1430.  For that reason, the court held that while it would accept the organization's assertion that it spent additional funds on lobbying in response to the defendant's action, it would not accept the plaintiff's "speculative conclusion that such expenditures are a necessary link in achieving the organization's ultimate purpose."  *Id.* (granting defendant's motion to dismiss organization's suit due to lack of Article III standing); *see also Nat'l Taxpayers Union*, 68 F.3d at 1434 (holding that organization's "self-serving observation

that it has expended resources to educate its members and others regarding [challenged statutory provision] does not present an injury in fact").

In this case, the Johl declaration asserts that the Bank's decision "has required CIEL to put extra time and resources into monitoring Ex-Im Bank's policies."  Johl Decl. ¶ 9.  But she does not so much as allege that CIEL's increased monitoring of the Bank's policies is necessary to achieve the organization's ultimate purpose.  *Cf. Nat'l Treasury Emps. Union*, 101 F.3d at 1430.  Additionally, like Pacific Environment, CIEL makes no mention of when the asserted dedication of time and resources occurred despite the fact that roughly two and a half years have passed since the loan guarantee was approved.  *Cf. Equal Rights Ctr.*, 633 F.3d at 1141–42 (holding that at the summary judgment stage, organization's allegation that it had to divert resources to counteract the defendant's action was insufficient when not supported by specific facts, such as when the organization's responsive activities took place).  Also omitted from the Johl declaration is any explanation as to how the expenditure of resources on monitoring Bank policies could be distinguished from the organization's ordinary program costs in light of her assertions that CIEL has been a "watchdog[ ]of public financial institutions" for twenty years and that U.S. energy policies and related decisions "are highly relevant to CIEL's work."  Johl Decl. ¶¶ 4, 6; *see also Conservative Baptist Ass'n of Am., Inc. v. Shinseki*, No. 13-cv-1762, 2014 WL 2001045, at *5 (D.D.C. May 16, 2014) ("Any resources that [organization] expended . . . were in the normal course of [the organization's] operations, and it cannot convert its ordinary activities and expenditures . . . into an injury-in-fact."); *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, No. 12-cv-0327, 2014 WL 449031, at *16 (D.D.C. Feb. 5, 2014) ("[Plaintiff] cannot convert an ordinary program cost—advocating for and educating about its interests—into an injury in fact.").  And finally, although the declaration asserts that the organization had to increase its

Bank-monitoring resources "as a result" of the Bank's alleged injury to the organization's

objectives, it does not explain how the increased monitoring of Bank policies is intended to or

could "counteract" the Bank's authorization of the loan guarantee to PNC on behalf of Xcoal.

And in the absence of such facts, CIEL's decision to increase its monitoring of Bank policies

looks more like a "self-inflicted injury" than an injury attributable to the Bank.  *See Equal Rights

Ctr.*, 633 F.3d at 1142 (holding that organization's expenditures on researching, investigating,

and testing the defendant constituted a self-inflicted injury and not one attributable to the

defendant); *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276

(D.C. Cir. 1994) ("[W]e explicitly reject the [plaintiff's] suggestion that the mere expense of

testing [defendant] constitutes 'injury in fact' fairly traceable to [defendant's] conduct."); *see

also ASPCA*, 659 F.3d at 27–28 (finding that organization lacked standing where it provided

extensive information about its advocacy expenditures but failed to show that the defendant's

actions actually caused the public misimpression that motivated the expenditures in the first

place).  In sum, CIEL has failed to show that its assertion of injury to the group's policy work is

sufficient to pass *Havens* muster and convey Article III standing.

Turning to Plaintiffs' second asserted injury, the Court considers the argument that the

Bank's actions have injured CIEL's public education efforts.  Specifically, Plaintiffs contend that

the Bank's decision to authorize the $90 million loan guarantee without first preparing an EIS

violated CIEL's procedural rights[22] and deprived the organization "of opportunities for public

---

[22] Plaintiffs' motion for summary judgment states that approval of the loan guarantee
without an EIS violated CIEL's right to information about the environmental impact of the
Bank's decision and violated its right to participate in the Bank's decision making process.  Pls.'
Mem. Support Mot. Summ. J. at 22.  A fair reading of Plaintiffs' briefs, however, reveals that
Plaintiffs have not argued that the violation of their procedural rights supports a claim of
standing based on informational injury to CIEL.  The two citations that Plaintiff provide in
support of CIEL's asserted injuries both discuss standing based on organizational injury under

input and engagement in the decision-making process," thereby causing "CIEL to expend

additional effort to inform the public about coal financing and its potential effects on the

environment and public health."  Johl Decl. ¶ 10.

A similar claim of organizational injury premised on a procedural violation was recently

rejected by this court in *Scenic America, Inc. v. U.S. Dep't of Transp.*, 983 F. Supp. 2d 170

(D.D.C. 2013).  In that case, the plaintiff organization's first claim of injury was premised on the

agency's failure to follow notice-and-comment procedures, thereby "depriving [plaintiff] of an

opportunity to influence public policy."  *Id.* at 176.  In rejecting plaintiff's argument, the court

explained that a plaintiff cannot establish organizational standing based solely on "the

deprivation of the right to participate in notice-and-comment rulemaking."  *Id.* at 177; *see also*

*Int'l Bhd. of Teamsters v. TSA*, 429 F.3d 1130, 1135 (D.C. Cir. 2005) (rejecting a claim of

organizational injury premised on an agency's failure to provide public notice of the agency

---

*Havens* and not standing based on informational injury.  The failure to cite legal support for a
claim of informational injury is particularly significant here given that the viability of an
informational injury claim in a NEPA case is somewhat uncertain in this Circuit.  *Compare*
*Found. on Econ. Trends v. Lying*, 943 F.3d 79, 84 (D.C. Cir. 1991) ("[W]e have never sustained
an organization's standing in a NEPA case solely on the basis of 'informational injury,' that is,
damage to the organization's interest in disseminating the environmental data an impact
statement could be expected to contain."), *with Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d
496, 502 (D.C. Cir. 1994) ("[I]nformational injury is justiciable where the information sought is
'essential to the injured organization's activities . . . [and] lack of the information will render
those activities infeasible." (internal quotation marks omitted)).  In light of the sophisticated
nature of the parties in this case and the fact that they were ably represented by counsel, the
Court declines to manufacture and analyze an informational injury argument that Plaintiffs chose
not to present or develop.  *See Armenian Assembly of Am., Inc. v. Cafesjian*, 758 F.3d 265, 285
(D.C. Cir. 2014) (holding that "generic and cursory references" in trial court briefs "are a far cry
from properly pressing [the party's] . . . arguments at the trial-court level" in a manner sufficient
to avoid waiver).  Alternatively, to the extent that Plaintiffs wished to assert standing on the basis
of informational injury to CIEL, the Court finds that Plaintiffs have failed to allege specific facts
that would support such a claim.  Plaintiffs have not suggested that the information they were
denied is "essential" to CIEL's activities, that the lack of information will render its activities
infeasible, that the organization regularly uses the type of information in question, or that the
CIEL will be forced to obtain the missing information from other sources.  *Cf. Friends of*
*Animals*, 626 F. Supp. 2d at 111–12.

action in dispute, "thereby depriving [the organization] of the opportunity to comment thereon," because the "mere inability to comment effectively or fully, in and of itself, does not establish an actual injury" (internal quotation marks omitted)).  In other words, plaintiffs cannot transform an agency's violation of the general public's right to comment into injury in fact simply by stating that they, like the rest of the public, were denied the opportunity to comment.  *See Fla. Audubon*, 94 F.3d at 664 ("The mere violation of a procedural requirement . . . does not permit any and all persons to sue to enforce the requirement."); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo* —is insufficient to create Article III standing.").

The only apparent distinction between the claim of injury advanced by CIEL and those previously rejected in this circuit is the assertion that because CIEL was denied the opportunity to comment publicly on the loan guarantee, the organization had to "expend additional effort to inform the public" about the environmental impact of coal financing.  Johl Decl. ¶ 10.  However, Ms. Johl makes no mention of when such efforts occurred, whether or not it resulted in a drain on the organization's resources, or how its efforts to educate the public about the impacts of coal financing in an unspecified manner on an unspecified date can be distinguished from the group's ordinary programmatic work, which includes "efforts to inform and engage the public in policy-making processes that may have environmental and public health impacts."  *See Johhl* Decl. ¶ 5; *see also id.* ¶ 7 (explaining that CIEL developed and published information to inform the public about the environmental costs of coal-related projects in 2011 and 2012).  Indeed, the Johl declaration does not even suggest that whatever efforts CIEL used to educate the public about the impacts of coal financing can be distinguished in any way – be it costliness or effectiveness – from the public education efforts that CIEL would ordinarily have expended had the Bank

solicited public comment on the loan guarantee.  As far as the Court is able to ascertain, the organization's public education efforts may have been affected by Xcoal's decision to apply for the loan guarantee, but Plaintiffs have failed to show that the Bank's decision played any role in "perceptibly impairing" CIEL's public education efforts.

In sum, CIEL has failed to establish organizational injury in fact that was caused by the Bank's decision to authorize the $90 million loan guarantee.  Without such a showing, CIEL does not have standing to pursue the instant action.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs lack standing.  Accordingly, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' cross-motion for summary judgment.  Additionally, the Court denies as moot Plaintiffs' motion for the admission of extra-record evidence, and grants in part and denies in part the parties' respective motions to strike as discussed in Part III.B, *supra*.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 21, 2015                                              RUDOLPH CONTRERAS
                                                                                United States District Judge